# EXHIBIT A

**District 1**

## Case Summary

**Case No. 2025L014133**

| | | | |
|---|---|---|---|
| Jane Doe 4 -vs- UHS of Hartgrove, Inc.,UHS of Delaware, Inc.,Universal Health Services, Inc.,The Cooper Companies, Inc.,HGA Management Services, Inc.,Hospital Group of America, Inc.,Hospital Group of Illinois, Inc.,PSG Acquisition, Inc.,PSG Management, Inc. | § § § § § | Location: Judicial Officer: Filed on: Cook County Attorney Number: | **District 1** **Calendar, B** **11/12/2025** **101363** |

---

### Case Information

Case Type: Other Personal Injury / Wrongful Death - Jury

Case Status: **11/12/2025 Pending**

---

### Assignment Information

**Current Case Assignment**
Case Number  2025L014133
Court  District 1
Date Assigned  11/12/2025
Judicial Officer  Calendar, B

---

### Party Information

*Lead Attorneys*

**Plaintiff**  **Doe 4, Jane**  **Hensley, Bryce Thomas**
*Retained*

**Defendant**  **HGA Management Services, Inc.**

**Hospital Group of America, Inc.**

**Hospital Group of Illinois, Inc.**

**PSG Acquisition, Inc.**

**PSG Management, Inc.**

**The Cooper Companies, Inc.**

**UHS of Delaware, Inc.**

**UHS of Hartgrove, Inc.**
520 N. Ridgeway
Chicago, IL 60624

**Universal Health Services, Inc.**
367 South Gulph Road
King of Prussia, PA 19406

---

### Events and Orders of the Court

01/07/2026  **First Time Case Management**  (10:30 AM)  (Judicial Officer: Heneghan, Patrick J)
Resource: Location L2202 Court Room 2202
Resource: Location D1 Richard J Daley Center

## Case Summary

### Case No. 2025L014133

11/12/2025  New Case Filing

11/12/2025  
Exhibits Filed
*Order Granting Petition to Proceed Under Fictitious Name Jane Doe 4*
Party:   Plaintiff Doe 4, Jane
Party 2:   Attorney Hensley, Bryce Thomas
*Order Granting Petition to Proceed Under Fictitious Name Jane Doe 4*

11/12/2025  
Other Personal Injury Complaint Filed (Jury Demand)
*Complaint at Law*
Party:   Plaintiff Doe 4, Jane
Party 2:   Attorney Hensley, Bryce Thomas
*Complaint at Law*

11/12/2025  
Affidavit Filed
*Damages Affidavit*
Party:   Plaintiff Doe 4, Jane
Party 2:   Attorney Hensley, Bryce Thomas
*Damages Affidavit*

11/12/2025  
298 Petition Filed-Plaintiff/Petitioner
*Petition to Proceed Under Fictious Name*
Party:   Plaintiff Doe 4, Jane
Party 2:   Attorney Hensley, Bryce Thomas
*Petition to Proceed Under Fictious Name*

Law Division Motion Section: Initial Case Management Dates for CALENDARS (A,B,C,D,E,F,H,R,X,Z) will be heard in person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt,org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: 1/7/2026 10:30 AM

FILED
11/12/2025 3:53 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L014133
Calendar, B
35333131

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT LAW DIVISION

| | | |
|---|---|---|
| JANE DOE 4, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UHS OF HARTGROVE, INC., doing | ) | |
| business as Hartgrove Behavioral Health | ) | 2025L014133 |
| System and Hartgrove Hospital, | ) | |
| an Illinois corporation; | ) | |
| UNIVERSAL HEALTH SERVICES, | ) | |
| INC.; UHS OF DELAWARE, INC.; THE | ) | |
| COOPER COMPANIES, INC; PSG | ) | |
| ACQUISITION, INC.; PSG | ) | |
| MANAGEMENT, INC.; HOSPITAL | ) | |
| GROUP OF AMERICA, INC.; HOSPITAL | ) | |
| GROUP OF ILLINOIS, INC.; and HGA | ) | |
| MANAGEMENT SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S MOTION TO PROCEED UNDER FICTITIOUS NAME

NOW COMES the Plaintiff, Jane Doe 4, by and through her attorneys, STINAR GOULD GRIECO & HENSLEY, PLLC, and as for her Petition to Proceed Under a Fictitious Name pursuant to 735 ILCS 5/2-401(e), states as follows:

1. This is an action for damages arising against Defendants UHS of Hartgrove, Inc.; Universal Health Services, Inc.; UHS of Delaware, Inc.; The Cooper Companies, Inc.; PSG Acquisition, Inc.; PSG Management, Inc.; Hospital Group of America, Inc.; Hospital Group of Illinois, Inc.; and HGA Management Services, Inc. Jane Doe 4 suffered sexual exploitation, grooming, and sexual abuse at the hands of Hartgrove employees when she was approximately 16 years old and a patient entrusted to their care in a residential treatment facility. The attached

1

Complaint will be filed immediately upon this Court's ruling on the present motion, protecting her identity as a survivor of child sexual abuse.

2. Under Illinois statute, "[u]pon application for good cause shown the parties may appear under fictitious names." 735 ILCS 5/2-401(e).

3. "The determination of whether a plaintiff has shown good cause under section 2-401(e) lies in the discretion of the trial court." *Doe v. Northwestern Mem'l Hosp.*, 2014 IL App (1st) 140212, ¶ 36.

4. Fictitious names are a necessary manner to protect the identity and privacy of parties in lawsuits where the party is a "child[], rape victim[], and other particularly vulnerable parties or witnesses." *A.P. v. M.E.E.*, 354 Ill. App. 3d 989, 1003 (1st Dist. 2004).

5. Sexual abuse and/or assault allegations are "highly sensitive, personal matters that involve the disclosure of information of the utmost intimacy." *Doe v. Readey*, 2023 IL App (1st) 230867, ¶ 51 (Hyman, J., concurring) (internal quotation marks omitted).

6. Here, Plaintiff was sexually exploited, groomed, and abused as a minor child by Hartgrove employees who were in a position of power and authority over her when she was a patient there. The matter is highly personal, private, and sensitive to Plaintiff and the publication of the same with her name affixed would be severely traumatic and distressing.

7. Plaintiff has not released her name to the public and Plaintiff's interest in protecting her identity outweighs any public interest.

8. Moreover, Defendants suffer no prejudice from the granting of this Petition as they will be provided with such information confidentially. *See*, *e.g.*, *Doe v. Tinsley*, 2021 IL app (1st) 210228-U, ¶ 26.

2

FILED DATE: 11/12/2025 3:53 PM   2025L014133

9.      In light of statutory requirements permitting the filing of the Complaint under a fictitious name only for good cause shown, Plaintiff has not yet filed a Complaint at Law under her real name as a party.

10.     Plaintiff makes this Motion requesting leave to file a Complaint under a fictitious name. ***See*, attached proposed Complaint at Law.**

11.     This request comports with Illinois law permitting the filing under a fictitious name where there is a sexual abuse and/or assault victim involved, who was also particularly vulnerable at the time of the incident, and who has sustained severe and extreme emotional distress as a result of the allegations giving rise to this lawsuit.

WHEREFORE, Plaintiff, Jane Doe 4, by and through her attorneys, STINAR GOULD GRIECO & HENSLEY, PLLC, as this Honorable Court grant her Leave to file a Complaint under a Fictitious Name pursuant to 735 ILCS 5/2—401(e), and grant such further relief as the Court deems just and proper.

Date: November 11, 2025                              Respectfully Submitted,

                                                    **STINAR GOULD GRIECO &
                                                    HENSLEY, PLLC**
                                                    /s/ Steven L. Vanderporten
                                                    One of Plaintiff's Attorneys

Bryce T. Hensley
Martin D. Gould
Michael R. Grieco
Steven L. Vanderporten
**Stinar Gould Grieco & Hensley, PLLC**
101 N. Wacker Drive | Floor M | Suite 100
Chicago, Illinois 60606
Firm ID: 101363
P: (312) 728-7444
Bryce@SGGHLaw.com
Mike@SGGHLaw.com
Martin@SGGHLaw.com
Steven@SGGHLaw.com

3

FILED
11/12/2025 3:53 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L014133
Calendar, B
35333131

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT LAW DIVISION**

| | |
|---|---|
| JANE DOE 4, | ) |
| Plaintiff, | ) |
| v. | ) Case No.: **2025L014133** |
| UHS OF HARTGROVE, INC., doing business as Hartgrove Behavioral Health System and Hartgrove Hospital, an Illinois corporation; UNIVERSAL HEALTH SERVICES, INC.; UHS OF DELAWARE, INC.; THE COOPER COMPANIES, INC.; HOSPITAL GROUP OF AMERICA, INC., HOSPITAL GROUP OF ILLINOIS, INC.; HGA MANAGEMENT SERVICES, INC.; PSG ACQUISITION, INC.; AND PSG MANAGEMENT, INC., | ) Plaintiff Demands Trial by Jury |
| Defendants. | ) |

## SUPREME COURT RULE 222 AFFIDAVIT

I, Martin D. Gould, one of Plaintiff's attorneys, duly sworn under oath, state as follows:

Based upon information and belief as of the date of the signing of this Complaint, the total money damages sought exceeds the jurisdictional limits of $50,000.00.

Under penalties as provided by law pursuant to 735 ILCS 5/1-109 (1993), I certify that the statements set forth herein are true and correct.

Date:   November 12, 2025

Respectfully submitted,
**STINAR GOULD GRIECO & HENSLEY, PLLC**

*/s/ Martin D. Gould*
One of Plaintiff's Attorneys

Martin D. Gould
Bryce T. Hensley
Michael R. Grieco
Steven L. Vanderporten
Stinar Gould Grieco & Hensley, PLLC
101 N. Wacker Drive | Floor M | Suite 100

Chicago, Illinois 60606
Firm ID: 101363
P: (312) 728-7444
Martin@SGGHLaw.com
Bryce@SGGHLaw.com
Mike@SGGHLaw.com
Steven@SGGHLaw.com

FILED DATE: 11/12/2025 3:53 PM   2025L014133

Law Division Motion Section. Initial Case Management Dates for CALENDARS (A,B,C,D,E,F,H,R,X,Z) will be heard in person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt,org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: 1/7/2026 10:30 AM

FILED
11/12/2025 3:53 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L014133
Calendar, B
35333131

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT LAW DIVISION**

| | |
|---|---|
| JANE DOE 4, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UHS OF HARTGROVE, INC., doing | ) |
| business as Hartgrove Behavioral Health | ) |
| System and Hartgrove Hospital, | ) |
| an Illinois corporation; | ) |
| UNIVERSAL HEALTH SERVICES, INC.; | ) |
| UHS OF DELAWARE, INC.; THE | ) |
| COOPER COMPANIES, INC.; HOSPITAL | ) |
| GROUP OF AMERICA, INC., HOSPITAL | ) |
| GROUP OF ILLINOIS, INC.; | ) |
| HGA MANAGEMENT SERVICES, INC.; | ) |
| PSG ACQUISITION, INC.; AND PSG | ) |
| MANAGEMENT, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

Case No.:  **2025L014133**

Plaintiff Demands Trial by Jury

## COMPLAINT

Plaintiff, JANE DOE 4, by and through her undersigned attorneys, Stinar Gould Grieco & Hensley,  for her Complaint at Law against Defendants UHS of HARTGROVE, INC. ("UHS-Hartgrove"), d/b/a "Hartgrove Behavioral Health System" and "Hartgrove Hospital" ("Hartgrove" or "Hartgrove Hospital"); UNIVERSAL HEALTH SERVICES, INC. ("UHS, Inc."); UHS OF DELAWARE, INC. ("UHS-D"); THE COOPER COMPANIES, INC. ("Cooper Companies"); HOSPITAL GROUP OF AMERICA, INC.; HOSPITAL GROUP OF ILLINOIS, INC.; HGA MANAGEMENT SERVICES, INC.; PSG ACQUISITION, INC.; and PSG MANAGEMENT, INC. (collectively, "Defendants"), pleading hypothetically and in the alternative, states as follows:

1

## I. INTRODUCTION

1. This egregious case is brought on behalf of Jane Doe 4, who was sexually abused as a young teen and patient at Hartgrove Hospital. Jane Doe 4 was undergoing treatment at Hartgrove Hospital by an employee who was entrusted to care for patients and residents, including Jane Doe 4, but instead was tragically sexually abused and assaulted.

2. Plaintiff Jane Doe 4 brings this case against one of the largest providers of hospital and youth residential treatment services in the country, UHS, Inc., who together with its wholly-owned subsidiaries, UHS-D and UHS-Hartgrove created, controlled, and profited from, and ignored, covered up, and otherwise tolerated, a culture of child sexual abuse and exploitation at its facilities, including Hartgrove Hospital, a youth residential treatment facility in Chicago, Cook County, Illinois.

3. Prior to its acquisition by UHS-D and UHS-Hartgrove in 1999, Hartgrove Hospital and other youth residential treatment facilities were owned and operated by Cooper Companies, Inc., Hospital Group of America, Inc., Hospital Group of Illinois, Inc., HGA Management Services, Inc. PSG Acquisition Inc., and PSG Management, Inc., (collectively, the "Cooper Defendants"), which similarly tolerated and concealed the sexual exploitation of minor residents during its period of ownership and control, thereby causing and perpetuating a pattern of systematic abuse that continued under UHS's ownership.

4. Defendants regularly advertised themselves to the Illinois public, to Illinois governmental agencies and non-profit organizations, and to parents and guardians of minor patients or prospective patients in the Chicagoland area and across the State of Illinois, as owning and operating youth residential treatment facilities that were safe for children, staffed with trustworthy medical professionals, and which delivered high-quality behavioral healthcare with

compassion and care. Despite the advertising for decades, countless vulnerable children, including Plaintiff Jane Doe 4, have been subjected to horrific abuse at UHS and the Cooper Defendants' facilities across the country and in this State, including at Hartgrove Hospital.

5. Plaintiff Jane Doe 4 was a minor child at the time she was sexually abused as a patient of Hartgrove Hospital. As further explained below, to date, dozens of former patients of Hartgrove Hospital have come forward alleging they were subjected to sexual abuse as minors while undergoing treatment and/or residing at Hartgrove Hospital throughout the 1990s until present.

6. Defendant UHS, Inc., is a publicly traded company which owns and operates inpatient and outpatient behavioral health care facilities nationwide and consistently reports billions of dollars in annual revenue.

7. Defendant Cooper Companies is a publicly traded company that reports billions of dollars in annual revenue, positioning itself as one of the world's largest specialized medical device and ocular products (e.g., contact lenses) companies.

8. These Defendants and their subsidiaries' financial success, and the expansion locally and nationwide of youth residential treatment facilities, have been and continue to be attributable to a pattern and practice of prioritizing operating and profit margins—with particular emphasis on keeping patients at their facilities as long as possible—over basic patient safety and care.

## II. PARTIES

9. Plaintiff Jane Doe 4 is an adult woman, born in 1985, who was approximately 15 or 16 years old, when she was sexually abused as a minor patient at Hartgrove Hospital in approximately 2002.

3

10.     Plaintiff Jane Doe 4 was a citizen and resident of the State of Illinois at the time of the abuse. She currently resides in Texas.

11.     Defendant UHS-Hartgrove principal place of business at the time of the abuse was 520 North Ridgeway, Chicago, Cook County, Illinois. UHS-Hartgrove's current principal place of business is 5730 W. Roosevelt Road, Chicago, Cook County, Illinois.

12.     Defendant UHS-Hartgrove is a residential behavioral health care facility offering services to children (6-12 years old), adolescents (12-18 years old), and adults with behavioral health and emotional problems.

13.     At all relevant times, Hartgrove Hospital advertised itself as a facility "dedicated to providing quality behavioral health services to children, adolescents and adults through [its] full continuum of care."

14.     At all relevant times, Hartgrove Hospital had a Children's Program which provided services to children ages 3 through 12. This program treats children with behavior/emotional disorders, depression, attention deficit disorder, children exhibiting symptoms of physical and sexual abuse, and suffering from self-destructive behavior or suicidal ideation.

15.     At all relevant times, Hartgrove Hospital had Adolescent Programs which were designed to address the specific clinical needs of youth, ranging ages 12 to 18. These programs treated adolescents who exhibited symptoms of physical and sexual abuse, behavior disorders, depression, and substance abuse problems, as well as self-destructive or suicidal ideation.

16.     Defendant UHS, Inc. is now, and all relevant times herein has been, a public, for-profit Delaware corporation with a principal office in King of Prussia, Pennsylvania. UHS, Inc. owns, operates, manages, and controls behavioral health facilities and acute care hospitals throughout the United States and conducts substantial business in Illinois.

4

FILED DATE: 11/12/2025 3:53 PM   2025L014133

17. Defendant UHS, Inc. is the parent company of wholly owned subsidiaries, UHS-D and UHS-Hartgrove. UHS-D is a wholly owned direct subsidiary of UHS, Inc. UHS-Hartgrove is a wholly owned subsidiary of UHS-D.

18. Defendant UHS-D is a Delaware corporation which shares a principal office with its parent company, UHS, Inc., in King of Prussia, Pennsylvania.

19. Defendant UHS-D is the management company for UHS, Inc. and provides service on behalf of UHS, Inc. to all UHS, Inc.'s subsidiary facilities, including Hartgrove Hospital.

20. Defendant UHS-D is authorized to transact business in the State of Illinois and conducts substantial business in Illinois.

21. Defendant Cooper Companies is now, and at all relevant times herein, has been a public, for-profit, Delaware corporation. Cooper Companies' principal office was in Pleasanton, California until 2019, and since then has been in San Ramon, California.

22. Defendant Cooper Companies owned and operated Hartgrove Hospital through wholly owned subsidiaries from approximately 1992, when it acquired Hartgrove in an all stock purchase from a Nu-Med, Inc. subsidiary called Hospital Group of America, Inc. ("Original HGA"), until 1999, when it sold Hartgrove to UHS-D, UHS-Hartgrove, and other UHS entities, under an Asset Purchase Agreement dated March 12, 1999.

23. Cooper Companies acquired Hartgrove Hospital through its wholly owned subsidiary PSG Acquisition Inc. In June 1992, Original HGA was merged with and into PSG Acquisition, Inc., with that subsidiary surviving such merger and changing its name to Defendant Hospital Group of America, Inc. ("HGA").

24. In turn, Cooper Companies created a wholly owned subsidiary of HGA, Hospital Group of Illinois, Inc. ("HGI") to hold direct ownership of Hartgrove Hospital, and another

5

subsidiary, PSG Management, Inc. ("PSG Management"), to provide contracted management services to medical facilities previously owned by Nu-Med, including to Hartgrove Hospital.

25. In approximately 1997, Cooper Companies formed another wholly owned subsidiary of HGA called Defendant HGA Management Services, Inc. to begin providing contracted management services to acute hospitals and other medical facilities, including to Hartgrove Hospital.

26. At all relevant times, the Cooper Defendants were authorized to transact business in the State of Illinois and conducted substantial business in Illinois.

27. When Cooper Entities acquired Hartgrove Hospital, they became directly involved in Hartgrove's business operations, requiring the facility to institute and abide by, among other things, policies, procedures, training, and business strategies and practices implemented by the Cooper Defendants, including as it related to reporting and responding to allegations of physical and sexual abuse.

28. When Hartgrove Hospital was owned and operated by the Cooper Defendants, Hartgrove held itself out as being "a leading provider of psychiatric services in the State of Illinois", and "among the largest in the Chicago metropolitan area, providing service to abused, traumatized and disadvantaged children and adolescents and to complex neuropsychiatric clients." The Cooper Defendants specifically highlighted how "Hartgrove's staff includes specially trained personnel able to competently treat the very acute patient."

29. Following the acquisition of Hartgrove Hospital in 1999, UHS, Inc. became directly involved in Hartgrove's business operations by, among other things, instituting a mandatory orientation program for all Hartgrove employees and requiring Hartgrove to implement and adhere to its corporate policies, procedures, training programs, business strategies, and operational

practices.

30. Hartgrove Hospital is one of seven (7) behavioral facilities which UHS, Inc. currently owns in Illinois, with the majority located in Cook County. Hartgrove Hospital remains open today and has active plans to expand its facility and occupancy.

31. Defendant UHS, Inc. and its subsidiary and related corporate companies including but not limited to Defendant UHS-D, UHS Children Services, Inc., UHS Outpatient IL, LLC, Thousand Branches Business Support Services, LLC, UHS Outpatient, LLC, refer to themselves collectively as "UHS." Accordingly, when referring to "UHS" herein, it refers to UHS, Inc. and its subsidiary and related corporate companies, including but not limited to UHS-D.

### III. VENUE AND JURISDICTION

32. Venue is proper in the Circuit Court of Cook County, Illinois, Law Division, pursuant to 735 ILCS 5/2-101(1) and (2) because the causes of action stated herein arose out of acts and omissions that occurred at Hartgrove Hospital located in Cook County, Illinois, and Hartgrove's principal place of business was and still is located in Cook County, Illinois.

33. The amount in controversy exceeds $50,000.00.

34. Jurisdiction is proper pursuant to 735 ILCS 5/2-209 because Defendants, at all relevant times: (i) transacted business in Illinois, (ii) committed tortious actions within Illinois, (iii) owned, used, or possessed real estate within Illinois, and (iv) made or performed contracts and promises substantially connected with this State.

35. Defendants' connections with the State of Illinois are consistent with the requirements of the Due Process Clause of the Fourteenth Amendment because each Defendant has purposefully availed itself of the privilege of conducting activities in Illinois, the causes of action arise out of acts and omissions that occurred in Illinois, and each Defendants' activities are

7

so substantially connected to Illinois that the exercise of jurisdiction over each Defendant is fair and reasonable.

**A.      Personal Jurisdiction Exists over the Cooper Defendants**

36.      The Cooper Defendants' contacts with Illinois were not incidental as they specifically targeted a psychiatric hospital – Hartgrove Hospital – within Illinois.

37.      At the time of the Cooper Defendants' acquisition in 1992, Hartgrove Hospital had 199 licensed beds in Illinois.

38.      According to the Cooper Defendants' annual report to stockholders, Hartgrove Hospital was the largest of its psychiatric hospitals by bed count.

39.      By 1995, the Cooper Defendants were actively expanding outpatient and partial hospitalization programs at Illinois facilities affiliated with Hartgrove Hospital.

40.      For example, in 1996, the Cooper Defendants disclosed their intent to open the "Midwest Center for Youth and Families" ("Midwest Center") to "support regional services of Hartgrove Hospital" in Illinois. The Midwest Center was designed as "a subacute care facility for intermediate stays that provides stepped-down, cost-effective care for adolescent residential patients."

41.      In April 1997, the Cooper Defendants opened the Midwest Center in Kouts, Indiana, with 50 beds "to support Hartgrove Hospital." Specifically, the Cooper Defendants annual report points out that "the Midwest Center is close to the Hartgrove service area and is part of its continuum of care."

42.      Hartgrove Hospital and the Midwest Center specifically targeted Illinois children and adolescents with behavioral health/psychiatric issues.

43.      Both facilities were reimbursed for services provided to Illinois children and

adolescents by the Illinois Department of Children's and Family Services (DCFS).

44. At all relevant times, the Cooper Defendants transacted business in Illinois directly and through its subsidiary entities and agents, and executives and members of leadership at Hartgrove Hospital.

45. At all relevant times, the Cooper Defendants asserted authority and direction over its subsidiaries doing business in Illinois, such that these subsidiaries were the alter-egos and agents to conduct administrative and management operations of the Cooper Defendants' facilities in Illinois, including Hartgrove Hospital.

46. The State of Illinois has both general and specific jurisdiction over the Cooper Defendants. At all relevant times, the Cooper Defendants owned, operated, managed, and controlled Hartgrove Hospital, which was and is located in Cook County, Illinois.

47. At all relevant times, the Cooper Defendants were doing business in the State of Illinois through the ownership, operation, management, marketing, promotion, and control of services provided by their numerous behavioral healthcare facilities throughout the State of Illinois, including Hartgrove Hospital, and were profiting, substantially, from such activities.

48. At all relevant times, the sexual abuse giving rise to this action relates to and arises out of contacts which the Cooper Defendants had with the State of Illinois.

**B.  Personal Jurisdiction Exists over UHS-Hartgrove, UHS-D, and UHS, Inc.**

49. The State of Illinois has both general and specific personal jurisdiction over Defendants UHS-Hartgrove, UHS-D, and UHS, Inc.

**i.  UHS-Hartgrove**

50. At all relevant times, UHS-Hartgrove has been incorporated under the laws of Illinois.

9

FILED DATE: 11/12/2025 3:53 PM    2025L014133

51. At all relevant times, UHS-Hartgrove's principal place of business has been in Chicago, Cook County, Illinois.

52. UHS-Hartgrove's registered agent is the Illinois Corporation Service Company, located at 801 Adlai Stevenson Drive, Springfield, Illinois.

53. At all relevant times, the sexual abuse alleged herein occurred at Hartgrove Hospital in Cook County, Illinois.

### ii. UHS-D and UHS, Inc.

54. At all relevant times, Defendants UHS, Inc. and UHS-D were doing business in the State of Illinois through the ownership, operation, management, marketing, promotion, and control of services provided by their numerous behavioral healthcare facilities throughout the State of Illinois, including Hartgrove Hospital, and profiting substantially from such activities.

55. At all relevant times until present, the sexual abuse giving rise to this action relates to and arises out of contacts which Defendants UHS, Inc. and UHS-D had with the State of Illinois.

56. Defendant UHS-D is registered to do business in the State of Illinois as a foreign corporation. Defendant UHS-D's registered agent in Illinois is also the Illinois Corporation Service Company, located at 801 Adlai Stevenson Drive, Springfield, Illinois.

57. Defendant UHS, Inc. is registered to do business in the State of Illinois as a foreign corporation, and on information and belief, has been so registered for nearly 40 years, since 1988. Defendant UHS, Inc.'s registered agent in Illinois is also the Illinois Corporation Service Company, located at 801 Adlai Stevenson Drive, Springfield, Illinois.

58. At all relevant times, executives, officers, and members of leadership at Hartgrove Hospital were agents, servants, and employees of UHS, Inc., UHS-D, and UHS-Hartgrove, or a combination thereof. For example, Hartgrove Hospital's President, Matt Peterson, also serves as

10

UHS's Executive Vice President and President of UHS's Behavioral Health Division.

59. Additionally, Hartgrove Hospital's corporate officers, including President Matt Peterson and Secretary Matthew D. Klein, maintain their offices at UHS, Inc.'s Corporate Center at 367 S. Gulph Road in King of Prussia, Pennsylvania. (hereafter, "UHS Headquarters"). At all relevant times, the agents, employees, and servants that were *not* executives or members of leadership at Hartgrove Hospital (i.e. security guards, nurses, behavioral technicians, teachers, therapists, admission staff, etc.) were also agents, servants, and employees of Defendants UHS-D, UHS, Inc., and UHS-Hartgrove, or a combination thereof.

60. At all relevant times, Defendant UHS, Inc., through its management agent, UHS-D, has taken an active role in managing and supervising operations at Hartgrove Hospital and other Illinois facilities.

61. At all relevant times, UHS-D's managerial and supervisory functions have extended to daily operations at Hartgrove Hospital, including staffing; training; human resources; advertising; public relations; accounting; budgeting; banking; routine maintenance; compliance; policies and procedures; payroll, and especially relevant here; handling reports, allegations, and claims of physical or sexual abuse.

62. UHS, Inc., because of the fact it operates through UHS-D employees, sends employees into Illinois for the purpose of conducting business.

63. At all relevant times, UHS-D has been responsible for recruiting, interviewing, and hiring key personnel at Illinois youth residential treatment facilities owned by UHS, Inc. and UHS-D, including such key positions at Hartgrove Hospital as Chief Executive Officer (CEO), Chief Operating Officer (COO), and Chief Financial Officer (CFO).

64. At all relevant times, Defendant UHS-D was also responsible for recruiting,

11

interviewing, and hiring group directors, regional vice presidents, and divisional vice presidents based in Illinois, whose job duties include overseeing and supervising multiple Illinois facilities owned by UHS, including Hartgrove Hospital, Streamwood Behavioral Health System, Riveredge Hospital, Garfield Park Behavioral Hospital, and Pavilion Behavioral Health System.

65. These Illinois-based group directors, regional vice presidents, and divisional vice presidents could simultaneously be employed in key personnel roles (e.g., CEO, COO, and CFO) at Illinois facilities, such as Hartgrove Hospital.

66. At all relevant times, Hartgrove Hospital's key personnel like CEOs, CFOs, and COOs, were required to have regular meetings, check-ins, and phone calls with UHS-D executives to discuss operations on the facility.

67. At all relevant times, UHS-D also regularly performed formal evaluations of the CEOs at Hartgrove Hospital and other Illinois facilities, and UHS-D also conducted quarterly visits to the Illinois facilities, including Chicago-based Hartgrove Hospital.

68. Similarly, at all relevant times, Illinois-based executives would be required to attend divisional and budget meetings at UHS Headquarters in King of Prussia, Pennsylvania.

69. In addition to recruiting, interviewing, and hiring Illinois-based employees, UHS-D mandated employees at Hartgrove Hospital and other Illinois facilities undergo specific training. For example, employees at Hartgrove and other Illinois facilities were required to perform annual training on the "UHS Code of Conduct and Ethics." If an employee at Hartgrove Hospital violated the UHS Code of Conduct and Ethics, he or she could be terminated, even though the policy itself was not issued by Hartgrove Hospital.

70. In addition to requiring formal training, at all relevant times, Defendants UHS, Inc. and UHS-D issued formal policies and procedures which Hartgrove Hospital and other Illinois

12

facilities were required to follow. For example, employees at Hartgrove Hospital and other Illinois facilities were required to adhere to a "UHS Corporate Compliance Program."

71. At all relevant times, "governing boards" were formed at Hartgrove Hospital and other Illinois facilities whose responsibilities included ensuring the Illinois facility and employees were following all policies and procedures issued from UHS-D.

72. If key personnel at Hartgrove Hospital and other Illinois facilities did not comply with directives from UHS-D, they could be reprimanded.

73. Conversely, no one at Hartgrove Hospital had the authority to discipline or remove key personnel at the facility, such CEOs, CFOs, and COOs. Instead, that decision had to be made from UHS Headquarters in King of Prussia, Pennsylvania.

74. At all relevant times, UHS-D maintained a compliance hotline through which employees at Hartgrove Hospital and other Illinois facilities could anonymously make reports which would be evaluated and responded to by UHS-D.

75. If there was an allegation or report of physical or sexual abuse which was required to be reported, the custom, practice, and expectation would be for the Illinois facility's risk manager to report the incident to a UHS-D representative, including a group director, regional vice president, divisional vice president, as well as report the incident to UHS-D risk management, UHS-D nursing, and UHS-D's vice president.

76. At all relevant times, key personnel at Hartgrove Hospital and other Illinois facilities who were employed by UHS-D would: (i) investigate the allegations of abuse and sexual abuse; (ii) determine whether the allegations were credible, and; (iii) generate reports summarizing incident reports for transmittal to UHS-D's corporate offices at UHS Headquarters.

77. At all relevant times, UHS-D also assisted Hartgrove Hospital and other Illinois

13

facilities with contract negotiation in Illinois. Specifically, UHS-D negotiated contracts/vendor agreements on behalf of Hartgrove Hospital and other Illinois facilities, and accordingly, all Illinois facilities worked with the same vendors.

78.     At all relevant times, Hartgrove Hospital and other Illinois facilities were required to transmit census reports to UHS Headquarters showing the number of patients in the facility. The census reports revealed which Illinois facilities could use more patients, which were at capacity, and which needed additional marketing and advertising support.

79.     In addition to directing operations, Defendants UHS, Inc. and UHS-D advertised and marketed extensively in Illinois from UHS Headquarters in King of Prussia, Pennsylvania.

80.     At all relevant times, the UHS Marketing and Communications Department was based at UHS Headquarters in King of Prussia, Pennsylvania, had nearly 100 dedicated employees, and was led by Roselle Charlier, UHS's Vice President, Chief Marketing & Communications Officer.

81.     At all relevant times, the UHS Marketing and Communications Department was the primary source of marketing services and public relations for Hartgrove Hospital and other Illinois facilities.

82.     The UHS Marketing and Communications Department's objectives for marketing, advertising, and public relations for Hartgrove Hospital and other Illinois facilities included acquiring patients, attracting potential employees, and generating overall awareness of the facility.

83.     The UHS Marketing and Communications Department created specific content for Hartgrove Hospital and other Illinois facilities, including print media, email advertisements, commercials, billboard advertising, website and social media content, and radio ads, for purposes of advertising, marketing, and public relations campaigns directed at Illinois residents.

14

84. For example, the UHS Marketing and Communications Department assisted Illinois facilities with "pay-per-click" online advertising based on demographics such as ZIP Code. As a result of this advertising expenditure, when someone located in Illinois searched for a mental health facility, search engines would promote an advertisement for an Illinois facility within that person's geographical area.

85. At all relevant times, marketing, advertising, and public relations material generated by the UHS Marketing and Communications Department for placement in Illinois, including for Hartgrove Hospital, did not distinguish between UHS-D and UHS, Inc. and otherwise relied on the notoriety of the UHS name and logo.

86. Potential patients and employees were invited learn more about Hartgrove Hospital and other Illinois facilities by visiting UHS's website, www.uhs.com, clicking the "Location" tab on the homepage, using an interactive map to identify facilities by specific locale and geography, and clicking a hyperlink which takes you to a specific facility's, such as Hartgrove Hospital's, website.

87. Due in part to the efforts of the UHS Marketing and Communications Department, senior UHS and Hartgrove Hospital executives have affirmed that the Illinois market is one of the most successful and profitable divisions within the entire company. Upon information and belief, in 2024, Defendants will have generated approximately $38 million in net reimbursements (revenue) for its patients in Illinois from Illinois Medicaid Supplemental Payment Program alone (notwithstanding the tens of millions of dollars generated annually from private health insurance and other sources from its Illinois patients

88. UHS, Inc., because of the fact it operates through UHS-D employees in the UHS Marketing and Communications Department, has purposefully availed itself of the Illinois market

15

for potential patients and employees.

89.     At all relevant times, UHS-D played an active role in ensuring Hartgrove Hospital and other Illinois facilities had resources to operate, and UHS-D had plenary authority to manage and supervise Hartgrove Hospital under these Defendants' Management Agreement.

90.     At all relevant times, UHS-D had unlimited access to Hartgrove Hospital's financial information and had to approve budgets for Hartgrove Hospital and other Illinois facilities.

91.     At all relevant times, UHS-D had full access to Hartgrove Hospital's bank accounts.

92.     At all relevant times, Hartgrove Hospital had a depository account which was shared with UHS-D.

93.     At all relevant times, UHS-D controlled Hartgrove Hospital's bank accounts to ensure routine disbursements, including payroll, were properly funded.  In fact, UHS-D coordinated payroll for all Illinois facilities owned by UHS, Inc., including Hartgrove Hospital.

94.     At all relevant times, key personnel at Hartgrove Hospital and other Illinois facilities relied on UHS-D for finance, accounting, tax, insurance matters, and legal support. For example, tax returns for Hartgrove Hospital and other Illinois facilities were prepared by the UHS-D tax department, which was based out of UHS Headquarters.

95.     At all relevant times, UHS, Inc. transacted business in Illinois directly and through their agents, including UHS-D and UHS-Hartgrove, and these Defendants' Illinois executives and members of leadership.

96.     At all relevant times, Defendant UHS, Inc. asserted authority and direction over UHS-D, such that it was UHS, Inc.'s alter-ego and agent to conduct administrative and management operations of Hartgrove Hospital and UHS's other facilities in Illinois.

97.     At all relevant times, UHS, Inc. would send its filings with the U.S. Security and

16

Exchange Commission (SEC), including Annual 10-K filings, to Hartgrove Hospital and other Illinois facilities for review by key personnel and executives based in Illinois.

98. At all relevant times, key personnel and executives from Hartgrove Hospital and other Illinois facilities would attend UHS Inc. board meetings held at UHS Headquarters in King of Prussia, Pennsylvania.

99. At all relevant times, UHS-D employees in Illinois, including those based at Hartgrove Hospital, had the potential to earn, and did earn, stock in UHS, Inc. as part of their compensation.

100. UHS-D employees, including those based at Hartgrove Hospital, were also eligible to participate and did participate in a UHS, Inc.-sponsored Benefit Plan.

101. At all relevant times, the email domain names for UHS-D employees have been "@UHSInc.com", or "@uhs.com" creating the impression that they work for UHS, Inc. when they technically work for UHS-D.

102. At all relevant times, Defendant UHS, Inc. asserted authority and direction over UHS-Hartgrove, such that UHS-Hartgrove was UHS, Inc.'s alter ego and agent to operate Hartgrove Hospital.

103. At all relevant times, UHS, Inc. controlled the directors, corporate officers, and other members of the leadership of both UHS-D and Hartgrove Hospital, required them to obtain written approval for certain actions, and executed agreements obliging them to maintain standards created by UHS, Inc.

104. UHS, Inc. and UHS-D are subject to this Court's jurisdiction based on its direct contacts with the State of Illinois and the contacts of its domestic subsidiaries, agents, and alter-egos, UHS-D and USD-Hartgrove.

17

## IV. GENERAL ALLEGATIONS

105.  At all relevant times, Defendants knew that vulnerable minor patients admitted to behavioral health facilities, including but not limited to those admitted to and/or treated at Hartgrove Hospital, were susceptible to being taken advantage of and preyed upon by the adult staff members of those institutions who exercised control, power and authority over them – and were likewise susceptible to harm by other patients if not appropriately supervised and monitored. At all relevant times, Defendants were fully aware of this serious risk of harm, including but not limited to the serious risks of harm posed to Plaintiff Jane Doe 4.

106.  At all relevant times, Defendants owned, operated, maintained, staffed, and supervised Hartgrove Hospital, including but not limited to its mental health counselors, orderlies, aides, security guards, teachers, and other staff.

107.  At all relevant times, Defendants, through their employees and agents, had control and supervisory authority over Hartgrove Hospital's mental health counseling, Children's, and Adolsecent Programs, and residential programs, and over the staff and other agents administering the programs.

108.  At all relevant times, Defendants had the power to hire, appoint, supervise, monitor, restrict and fire each person, including staff, working at Hartgrove Hospital, including staff that treated, worked with and/or had access to the residents and minor patients at the facility.

109.  At all times relevant, Defendants' employees and agents staffed and operated the mental health counseling, education, and residential programs at Hartgrove Hospital. In doing  so, Defendants' agents and employees were required and authorized as part of their agency duties to interact with, mentor, supervise, and provide mental health counseling, education, and reform to youths participating in the residential programs.

18

110. At all relevant times, all staff members of Defendants were responsible for, among other things, the supervision and monitoring of the residents at Hartgrove Hospital, including Plaintiff Jane Doe 4.

111. At all relevant times, Defendants had a duty to supervise the staff members at Hartgrove Hospital during their respective employment with Defendants, including but not limited to the staff member who abused and exploited Plaintiff Jane Doe 4.

112. At all relevant times, as a matter of practice, custom, and internal policy, the Defendants and their employees and/or agents were notified about alleged and suspected instances of sexual, physical, and psychological abuse occurring at their subsidiary facilities, including but not limited to those occurring at Hartgrove Hospital.

113. At all relevant times, as a matter of practice, custom, and internal policy, the Defendants were notified of allegations of child abuse and neglect made to law enforcement and/or civil authorities, such as Illinois Department of Children and Family Services ("DCFS"), which were alleged to have occurred at a subsidiary facility, including but not limited to those occurring at Hartgrove Hospital.

114. Throughout the 1990s until present, Defendants were notified of allegations of abuse and neglect at their subsidiary facilities, including Hartgrove Hospital, on a regular basis,— often promptly after an incident and again during regular meetings amongst leadership.

**A. Jane Doe 4 Was Repeatedly Sexually Abused and Exploited As a Minor Patient at Hartgrove Hospital by Known Predatory Staff.**

115. Plaintiff Jane Doe 4 is an adult female, born in 1985, who was approximately 16-years old when she was sexually abused by Hartgrove Hospital staff in approximately 2002.

116. Plaintiff Jane Doe 4 was repeatedly sexually exploited and abused by a male Hartgrove Hospital employee, believed to be named Ernest Sullivan (referred to herein by name

19

or as "Plaintiff's abuser").

117. Upon information and belief, Ernest Sullivan was initially hired to work at Hartgrove Hospital by Cooper Defendants.

118. Upon information and belief, Ernest Sullivan worked at Hartgrove Hospital from the early 1990s until at least 2004, continuing to work at Hartgrove Hospital after the facility was acquired by UHS Defendants in 1999.

119. Upon information and belief, at all relevant times, Ernest Sullivan worked as a mental health counselor at Hartgrove Hospital, where he was given access to patient records and responsible for, among other things, counseling, mentoring, and treating minor patients, protecting minor patients and keeping order in the adolescent unit.

120. Prior to, during, and after Plaintiff's abuse, and at all relevant times, predatory staff at Hartgrove Hospital, including but not limited to Ernest Sullivan and Edmond Rivers, used their positions of trust and authority as mental health counselors to get access to and become familiar with minor patients' medical records, and to learn their vulnerabilities and past traumas, which in turn was used by these predatory staff to then prey upon, coerce, and abuse the minor patients.

121. Prior to Plaintiff's abuse, and at all relevant times, Hartgrove Hospital staff were aware of Plaintiff's abuser's propensity to prey on minors – and that he was unfit to hold any position of trust and authority over vulnerable minor patients such as Plaintiff.

122. Prior to Plaintiff's abuse, and at all relevant times, it was amongst the staff that Ernest Sullivan lacked the basic education, training and skills required to serve as a mental health counselor for vulnerable children.

123. Prior to Plaintiff's abuse, and at all relevant times, Hartgrove Hospital staff received reports and/or were otherwise made aware of allegations that Plaintiff's abuser had groomed,

20

sexually abused and exploited minor patients at the facility.

124.    For example, in or around 2000 - 2001, Hartgrove Hospital became expressly aware that minor female patients who were residing in the "2 South" unit, an adolescent unit on the second floor of the facility, reported that male mental health counselors, including counselor Ernest Sullivan and Richard Green, had been sexually abusing the girls.

125.    In or around 2001, in addition to Ernest Sullivan and Richard Green, there were at least approximately 3-4 other adult counselors at Hartgrove Hospital that were accused of sexually abusing minors under their care at the facility.

126.    In 2001, another minor patient reported to Hartgrove's Nurse Manager (for the day shift) in the 2 South Unit (hereinafter, "Nurse Manager T.M.") that: "Your staff ain't nothing but thugs with jobs."

127.    When the upset minor patient made those statements to Nurse Manager T.M., Nurse Manager T.M. knew at the time exactly which staff or "Clique" within Hartgrove the minor was referring to as acting and being like "thugs." Of note, two of the known members of this clique of thugs working in the 2 South Unit were Ernest Sullivan and Richard Green, both of whom had prior allegations that they sexually abused minor girls in that same unit.

128.    At this same time period in 2001, and at all relevant times, Defendants' leadership and staff, including Nurse Manager T.M., agreed with the minor patient's perception and characterization of Ernest Sullivan, Richard Green, and several of the other staff at Hartgrove Hospital as acting like "thugs" at the hospital, whereby they actively sought to intimidate not just the residents but also other staff that were not "in" their group.

129.    A Nurse Manager described the other staff in the 2 South Unit as follows:

   a. "The streets were running the hospital." A feeling that staff members were almost like thugs and gangsters themselves. Based on her background and

21

experience, Nurse Manager T.M. believed some of the staff were gang members.

b. "Yeah. It felt dangerous. It didn't feel safe . . . You know, it felt dangerous. It felt like part of the streets was in the hospital."

c. When Nurse Manager T.M. arrived on her unit, the mental health counselors and other staff "were not welcoming. They were intimidating looking . . . There was no greeting. They were just standing around, looking like they didn't trust me and maybe because of their size looking quite intimidating and certainly like I was invading upon their space.

d. Nurse Manager T.M. affirmed that it was obvious to the Hartgrove leadership that "they would never allow [the same Hartgrove staff] that they were hiring to supervise and treat kids [at Hartgrove] to ever watch their own kids."

e. Nurse Manager T.M., who supervised the day shift of one of the units from 2001-2004, stated she knew she could not trust the adult staff at Hartgrove Hospital that were supposed to be watching and taking care of the children.

130. Prior to Plaintiff's abuse, and at all relevant times, Ernest Sullivan and Edmond Rivers were identified by other staff as being some of the most well-known problematic staff at the facility, and suspected gang members.

131. Prior to, during, and after Plaintiff's abuse, and at all relevant times, Defendants senior leadership and staff expressly knew that a "code of silence" was pervasive amongst Defendants' executives and staff, and included among other things, leadership and staff actively covering up or otherwise turning a blind eye to patient abuse; executives and staff intentionally misleading and deceiving Illinois DCFS investigators visiting the facility; doctoring medical records and charts to cover up abuse or negligence, such as providing minors the wrong injections or medications; fraudulent record keeping and billing practices; covering up for staff using illegal substances while on the job or staff running personal errands while on the job instead of treating and supervising the minor residents under their care; and retaliating or threatening to retaliate against residents or staff that reported abuse or misconduct.

132. Prior to Plaintiff's abuse, and at all relevant times, Defendants' leadership were expressly aware that Ernest Sullivan helped cover up for and conceal the misconduct of other staff

22

at the facility, including but not limited to covering up for staff that left their units during work hours to run personal errands – which level units with 25-30 residents grossly under-staffed and under-supervised. Despite the serious allegations and obvious red flags, Plaintiff's abuser was allowed to continue to work at Hartgrove Hospital and have access to minor patients.

133.    During Plaintiff's stay at the facility, Plaintiff's abuser sexually abused and exploited Plaintiff on numerous occasions while she was a minor. The sexual abuse and exploitation included, but was not limited to, directing and coercing other minor patients into having sexual encounters with Plaintiff while she was a minor, sexually groping Plaintiff during these encounters, and masturbating in Plaintiff's presence.

134.    After the abuse, Plaintiff's abuser bragged to other Hartgrove Hospital staff about arranging, observing, and participating in the sexual encounter.

135.    After the abuse, Hartgrove Hospital staff made comments to Plaintiff about the abuse, including but not limited to, revealing intimate details of the abuse and laughing at Plaintiff, further inflicting shame, embarrassment, confusion and trauma on Plaintiff.

136.    Despite Hartgrove Hospital making comments to Plaintiff indicating they were aware of her abuse, there were no investigations into Plaintiff's abuse and exploitation by Hartgrove Hospital.

137.    At all relevant times, including prior to and during the time period of Plaintiff's abuse, staff at Hartgrove Hospital were aware that there were numerous other staff abusing and exploiting minor patients.

138.    Prior to, during, and after Plaintiff's abuse, and at all relevant times, predatory staff at Hartgrove Hospital, including but not limited to counselors Ernest Sullivan and Edmund Rivers, were brazen in their grooming, abuse, and exploitation of minor patients, including Plaintiff, often

23

times grooming and abusing patients in front of witnesses and making comments in public, evidencing a culture where abusers felt they could act with impunity.

139. During Plaintiff's stay at Hartgrove Hospital, Plaintiff Jane Doe 4 was provided or instructed to take sedatives and/or other medications to impair her physical and mental functioning.

140. As a direct and proximate cause and result of Defendants' careless, negligent, reckless, and/or willful and wanton acts and omissions, Plaintiff Jane Doe 4 was sexually abused while residing at Hartgrove Hospital.

141. As a direct and proximate cause of Defendants' wrongful acts and omissions, and the resulting child sexual, physical and psychological abuse, Plaintiff has suffered and continues to suffer serious injuries and damages, including but not limited to great pain of mind and body; shock; severe and permanent psychological and emotional distress; physical manifestations of aforesaid emotional and psychological distress; feelings of humiliation, disgrace, embarrassment, and loss of self-esteem; and loss of normal life. Further, Jane Doe 4 has sustained economic damages, including but not limited to past and future expenses for psychological treatment, therapy, and counseling, and loss of income and/or loss of earning capacity.

142. As a direct and proximate result of the sexual abuse Plaintiff Jane Doe 4 was subjected to at Hartgrove Hospital and Defendants' intentional, reckless, and negligent acts and/or omissions, Plaintiff Jane Doe 4 suffered and will continue to suffer severe and permanent personal injuries, including but not limited to severe psychological distress, emotional anguish, humiliation, embarrassment, loss of self-esteem, lost education, lost earnings, and other injuries and damages.

143. After Plaintiff's abuse, Earnest Sullivan and his clique of predatory staff remained employed by Defendants, where they continued to use their positions of trust and authority to to continue to groom, coerce, and sexually abuse vulnerable minor patients.

24

**B.      Defendants' Custom and Practice of Hiring and Retaining Dangerous and/or Unfit Executives and Staff; Providing Little to No Supervision, Training or Direction.**

144.    Prior to, during, and after Plaintiff's abuse, and at all relevant times, Defendants had a custom and practice of hiring and retaining clearly unqualified and unfit senior leadership, executives, and staff to operate, supervise, treat and care for minor vulnerable patients undergoing treatment and/or residing at Hartgrove Hospital, including but not limited to hiring and retaining staff who have had No relevant formal training or education regarding the work they are responsible for performing at the facility, with the majority of staff lacking basic education and training on how properly interact with, treat and care for mental health patients; hiring and retaining staff that were gang members, who regularly sought to intimidate not just the residents, but other staff; hiring and retaining staff whose only qualification was that they were related to or friends with Hartgrove executives or existing staff; and hiring and retaining executives and staff who were fired from other youth residential treatment centers for misconduct, abuse, and/or incompetence.

145.    During the time period Plaintiff resided at Hartgrove Hospital, in or around 2002, and at all relevant times, the senior leadership at Hartgrove Hospital included Suzanne Berry, the hospital's Chief Executive Officer (CEO); Ellen North, the hospital's Director of Human Resources; and Pamela Swamey, the hospital's Director of Nursing.

146.    Prior to being hired to serve as the CEO of Hartgrove Hospital in or around 1998, Suzanne Berry served as the CEO, COO, and/or another senior executive position at a similar youth residential treatment center in the Chicagoland area, Streamwood Hospital. In or around 1998, Suzanne Berry was terminated by Streamwood Hospital's owners and management team, UHS, Inc. and UHS-D, for among other reasons, her longstanding poor performance and

25

leadership in overseeing the operations, treatment and staff at Streamwood Hospital.

147.    When UHS, Inc. and UHS-D staff fired Suzanne Berry from her senior executive position at Streamwood Hospital, it was "an immediate fire," the directive from UHS was that Berry had to "leave the premise immediately." Berry was allowed to take a few belongings and then escorted out of the building.

148.    Upon information and belief, one of the reasons Suzanne Berry was terminated from her senior executive position at Streamwood Hospital was because she failed to adequately address dangerous and reckless staff at the facility, including Dr. Costigan who was known to have regular rageful episodes on the adolescent unit, often punching holes in the wall. Suzanne Berry ignored the clearly dangerous situation, permitting it to continue to pose a risk of danger to the children and other staff at the facility throughout her tenure at Streamwood Hospital.

149.    Upon information and belief, Cooper Defendants hired Suzanne Berry to serve as CEO of Hartgrove Hospital in or around 1998. When UHS, Inc. acquired Cooper Companies in 1999, Suzanne Berry retained her position of CEO of Hartgrove Hospital, becoming a direct employee of UHS-D and UHS-Inc.

150.    Following UHS, Inc.'s acquisition of Hartgrove Hospital in or around 1999, directors from UHS-D and UHS, Inc. served as Suzanne Berry's direct supervisors, and were responsible for supervising and evaluating her work performance. UHS-D and UHS, Inc. leadership also had the authority to discipline, promote, demote, and/or terminate Berry from her leadership position at Hartgrove Hospital.

151.    Prior to working for Hartgrove Hospital, Hartgrove's Director of Human Resources Ellen North worked closely with Suzanne Berry at Streamwood Hospital, where she served as controller. Following Suzanne Berry's termination, upon information and belief, Ellen North was

26

pressured by UHS-D and UHS, Inc. to resign.

152.	Prior to working for Hartgrove Hospital, Pam Swamey worked closely with Suzanne Berry at Streamwood Hospital, where she served as a director of nursing. Following Suzanne Berry's termination, upon information and belief, Pam Swamey was pressured by UHS-D and UHS, Inc. to resign.

153.	Upon information and belief, Cooper Defendants hired Ellen North and Pam Swamey in around 1998-1999. When UHS, Inc. acquired Cooper Companies in 1999, Ellen North and Pam Swamey retained their leadership positions with Hartgrove Hospital.

154.	At all relevant times, it was apparent to managerial staff at Streamwood Hospital who worked with Suzanne Berry and Ellen North that Berry and North did not have the necessary expertise to run and operate a youth residential treatment center like Streamwood Hospital.

155.	Prior to Plaintiff's abuse, Hartgrove Hospital hired Dan Ingram to work as a mental health counselor and addiction counselor for vulnerable children at Hartgrove Hospital. Dan Ingram was referred to by Hartgrove's residents and staff as "Big Dan." He was described by Hartgrove leadership and staff, including Nurse Manager T.M. that supervised one of the units Big Dan worked in, as follows: "Big, big, guy, they call him big Dan. Really big guy and he used his size to intimidate patients . . . . I felt like he was inappropriate . . . I felt like he used his size to intimidate and threaten patients."

156.	In or around 2001 when Nurse Manager T.M started working at Hartgrove Hospital, she was surprised to see Dan Ingram working at the facility given that she had hired him for abuse and misconduct at Streamwood Hospital, a similar facility in the Chicagoland area. Nurse Manager T.M. informed Ellen North and Pam Swamey about Dan Ingram and the fact she felt compelled to fire him from Streamwood Hospital. Nurse Manager T.M.'s concerns went ignored, and

27

Defendants allowed Dan Ingram to continue his employment at Hartgrove Hospital.

157. From 2001 through 2004, and at all relevant times, numerous staff at Hartgrove Hospital including Nurse Manager T.M. made numerous reports to CEO Suzanne Berry and Director of Human Resources Ellen North regarding problems at the hospital and other serious concerns they had, including but not limited to longstanding serious understaffing problems.

158. As a matter of practice and custom, CEO Suzanne Berry, Director of Human Resources Ellen North, and other hospital executives ignored the reports and concerns relayed to them by staff and patients, discouraged staff from making complaints, and otherwise failed to take any meaningful action to investigate and/or address problems and concerns raised by staff.

159. At all relevant times, it was apparent to Defendants' executives and staff that Suzanne Berry and Ellen North were not qualified or fit to run and manage Hartgrove Hospital safely.

160. From at least the late 1990s until at least 2005, including the entire time period Plaintiff underwent treatment at and resided at Hartgrove Hospital, Defendants provided "absolutely zero training" for Hartgrove's staff regarding what to do if a staff member received a report of sexual and/or physical abuse of a patient, or suspected it.

161. From at least the late 1990s until at least 2005, including the entire time period Plaintiff underwent treatment at and resided at Hartgrove Hospital, Defendants failed to have any specific policies, procedures, and/or protocols that advised staff what to do when they receive a report regarding child sexual, physical or physical abuse, or suspect child abuse.

### C. Hartgrove Hospital's Long History of Child Abuse and Misconduct Precedes Plaintiff's Abuse and Continues to This Day.

#### i. Patient Complaints

162. From at least the early 1990s, through the present, and at all relevant times herein,

28

there have been numerous reports of physical, sexual and emotional abuse of minor patients at Hartgrove Hospital, including many instances of abuse perpetrated by staff.

163. These reports occurred while Hartgrove Hospital was owned by and operated by Cooper Defendants and continued through and after the sale of Hartgrove Hospital to UHS.

164. Some of the many instances of sexual abuse of patients at Hartgrove Hospital include, among many others:

    a. A minor resident was sexually abused at Hartgrove Hospital in around 1993 or 1994. Abuse included but was not limited to being assaulted by Hartgrove staff and having her genitals fondled.

    b. A minor resident was sexually abused at Hartgrove Hospital over the course of four stays there from around 1994 to 1996. Abuse included but was not limited to being fondling and forced to perform oral copulation multiple times by male Hartgrove staff members.

    c. A minor resident was sexually abused at Hartgrove Hospital in around 1995. The abuse included but was not limited to being subjected to multiple instances of male Hartgrove staff members fondling her genitalia whenever they got the chance, including in the disciplinary room and in the office.

    d. A minor resident was sexually abused at Hartgrove Hospital in around 1996. The abuse included but was not limited to fondling of genitals by male Hartgrove staff members, including in the "timeout room."

    e. In 1997, an approximately 13-year-old female Hartgrove Hospital patient attempted to report to management that a staff member was sexually abusing her during their night shift. Staff told her she was making this up and did nothing.

    f. Multiple other former patients at Hartgrove Hospital recall a particularly abusive Hartgrove employee, Edmond Rivers, who sexually abused many of them. They describe him as aggressive and arrogant, going as far as to tell one child patient who he abused in approximately 1999, "tell them Edmond Rivers did it," mocking that nothing would be done to stop the abuse. He lingered extendedly in the shower areas or patient bedrooms at night. Edmond Rivers (also referred to herein as "Staff Perpetrator 1") overtly groomed female minors by among other things giving them special privileges to eat a better lunch in a different room.

    g. In 1998, a minor male patient was raped by a mental health technician in the Hartgrove Hospital gymnasium. He attempted to report this abuse to a nurse at Hartgrove. When he did, he was told he was lying, injected with a sedative, and punished with isolation. Nothing was ever done about the abuse.

FILED DATE: 11/12/2025 3:53 PM   2025L014133

h.  In 1999, another minor male patient was sexually abused by multiple male staff members after they sedated him. The minor male patient disclosed this abuse to a doctor at Hartgrove Hospital, but nothing was ever done about it.

i.  In approximately 2001-2002, John Doe 1 (Case No. 2024L013843) was sexually abused by three male staff members at Hartgrove Hospital. During at least one occasion while John Doe 1 was being sexually abused, another Hartgrove staff member walked into the bedroom and directly saw what was going on. The staff member laughed and then closed the door, taking no actions to prevent the abuse at the time or thereafter, and taking no further known action to ensure John Doe 1 and the other victims were safe.

j.  In 2001, a minor female patient was sexually abused by a male staff member. She reported the abuse to other Hartgrove Hospital staff members, but nothing was done to stop it.

k.  Another minor female patient was sexually abused between 2001 and 2006 by a male Hartgrove Hospital counselor and a male Hartgrove security guard. The minor female patient requested a patient advocate but was either ignored or given sedatives.

l.  Another minor female patient was raped by a male Hartgrove Hospital staff member in 2005 and 2006 on numerous occasions. She informed her counselor at Hartgrove, who did nothing.

m.  Between 2007 and 2008, another minor male patient was sexually abused by a male Hartgrove Hospital staff member. He reported the abuse to Hartgrove employees, but nothing was done to stop it.

n.  Between 2016 and 2018, a minor female patient was sexually abused by a female Hartgrove Hospital staff member. She reported the abuse to a Hartgrove guard but was told that she was lying. She asked the guard to look at the surveillance video, but he refused.

o.  In 2018, a minor female patient was sexually abused by a male Hartgrove Hospital staff member. She reported the abuse to other Hartgrove staff members. Nothing was done to stop the abuse.

165.  As recently as 2022, the Chicago Human Rights Authority found that a 17-year-old patient "was subject to inhumane treatment" in violation of the Mental Health and Developmental Disabilities Code (405 ILCS 5/2-102, 2-200, 3-600) when he was illegally detained at Hartgrove Hospital and discharged after being placed at a facility hundreds of miles away from his support

system without his consent.[1]

### ii. Public Reviews of Hartgrove Hospital

166. Many patients or their family members publicly posted about abuse, neglect, and other serious problems they experienced or witnessed at Hartgrove Hospital on the Internet including via Google and YELP reviews.

167. At all relevant times, these public postings provided further notice to Defendants of the serious systemic problems and dangers that plagued and continue to plague Hartgrove Hospital. Some examples of the public Internet postings discussing the problems and dangers at Hartgrove include the below posts, among many others:

> DO NOT BRING YOUR CHILDREN TO THIS HOSPITAL!!! This is a horrible horrible place . My child was brought in & participated in their PHP program. After 2 days I no longer brought him in due to a male staff "punishing" him by making him get on the floor & opening his legs in a split until it hurt him . I was not told of the incident. My son had to tell me & when I called they were rude & did not want to hear it . When asked to speak to a supervisor they took my name & number but never called . Stay away from this hospital!!

    a. <u>Internet Review Example 1</u>: a parent of a male patient at Hartgrove Hospital reported that her son was "punished" by staff by forcing him to "get on the floor" and "open his legs in a split until it hurt him." When the patient's mother attempted to report this incident to a supervisor at Hartgrove, the staff "took [her] name and number but never called."

> My brother was recently at this hospital and he told me how there was a male staff member on 2N that was disrespectful towards him and other male patients specifically. I was more shocked when he told me that this guy seemed to be checking out the female patients/staff and would spend more time watching certain female patients. Someone like this should not be working in a mental health hospital. It just sounds like they let anyone work here. Whoever that guy was needs to be investigated because I wonder how many people he has made uncomfortable if my brother felt that way

 6

    b. <u>Internet Review Example 2</u>: report that a male patient witnessed a Hartgrove Hospital male staff member "checking out the female patients" and "spend[ing] more time watching certain female patients. Someone like this should not be

---

[1] https://gac.illinois.gov/content/dam/soi/en/web/gac/hra/hrareports/21-9002-final.pdf.

working in a mental health hospital."

DO NOT SEND YOUR CHILDREN HERE. They will be further traumatized here. My child was beaten by other patients, made fun of by the staff there, was blamed for her fathers death, and continuously was mistreated here. I work at a school and have made it clear that none of our students should be recommended to attend there. This place doesn't care about its patients the people at top only care about money and pushing as many people through their doors as they can. I literally know people who worked there and said it was the worst place ever. If your CEO reads this, there's a special place in hell for people like you.

 19

     c.   <u>Internet Review Example 3:</u> a parent reported that her child was beaten by other patients and continually made fun of and mistreated by staff. The mother reported her impressions that Hartgrove Hospital's profits were more important than patients and that Hartgrove appears only to care about "pushing as many people through their doors as they can."

They're understaffed and the staff is extremely rude. My loved one was staying their and witnessed the staff talking down to patients and not giving necessities like soap. The bathroom didn't have a door or a curtain and the mirror was shattered so anyone could pick a piece off and hurt their self. It's ridiculous. Also, for suicide they let him out after 8 days with no follow up plan or counseling. It was 8 days of him watching TV and sleeping. How is that helping him?

 11

     d.   <u>Internet Review Example 4:</u> a family member of a patient reported their impression that Hartgrove Hospital is "understaffed" and that the medical care provided to patients was "watching TV and sleeping."

This was the worse facility that anyone could ever end up at. I had a recent stay and it was by the grace of God I made it out. They are extremely unorganized, understaffed and undertrained. I will not recommend this place for my worse enemy. The 1 star is for the 1% of the staff that actually cares about the patients. Possible Fraud occurring at this location.

     e.   <u>Internet Review Example 5:</u> a patient described Hartgrove Hospital as being "extremely unorganized, understaffed and undertrained…The 1 star is for the 1% of the staff that actually cares about the patients. Possible Fraud occurring at this location."

FILED DATE: 11/12/2025 3:53 PM    2025L014133

the staff they were very disrespectful took their job as a joke. made fun of the patients. told us they didn't care about us they just wanted the money. I cant even sleep being back at home. Im traumatized and keep having nightmares. havent been to sleep one full night

 8

f.  <u>Interview Review Example 6</u>: a patient reported that he was so traumatized from his experience at Hartgrove Hospital that he has not been able to sleep without nightmares since. His impression was that the staff "took their job as a joke" and "told us they didn't care about us they just wanted the money."

PLEASE DO NOT SEND YOUR CHILD HERE.
I stayed here for 6 days, and let me tell you it is one of the worst experiences here. I stayed in unit 2 south, the kids weren't the problem the staff is. You have to literally scream at the staff to take a shower and it's literally traumatizing of how they treat you. The staff telles you they're gonna get something for you but it's a lie.They told me to wait for 2 hours before getting any paperwork, but instead it took 12 hours. The customer service is terrible. The staff aren't even comforting at all. It's like a literal prison and the children were the prisoners waiting to be free. I was recommended here from Lori's Hospital and that was a huge mistake.

 32

g.  <u>Internet Review Example 7</u>: a patient reported that "the kids weren't the problem the staff is," comparing Hartgrove Hospital to "prison and the children were the prisoners waiting to be free." Thirty-two other Google Reviewers "thumbed up" the review.

One star would not recommend... the therapy classes were a joke juice ya up on drugs and send ya on your way. Lucky if you spend 5 minutes with a therapist or physiatrist. I get it's mostly state funded patients but we're still people also and deserve a fighting chance to get better ourselves. As a adult therapy isn't coloring pictures and sitting in a day room with unruly people to just send your ptsd threw the roof.

 22

h.  <u>Internet Review Example 8</u>: a patient reported that the medical treatment at Hartgrove Hospital was inadequate, stating "lucky if you spend 5 minutes with a therapist," explaining that their time was spent "coloring pictures and sitting in a day room with unruly people."

> It deserves No Stars. Avoid this place by ALL Means!
> The staff is abusive to the patients.
> The state really needs to investigate the abuse that's occurring inside the facility. I witnessed a staff slam a child to the floor. An 8 or 10 year old child will be damaged by the abuse the rest of his life.

 15

    i.    <u>Internet Review Example 9</u>: a patient reported that "the staff is abusive to the patients. The state really needs to investigate the abuse that's occurring inside the facility." The patient reported personally witnesses the staff abuse children as young as 8 or 10 years old.

### iii.    The 2010-2011 UIC Investigation & Findings

168.    In addition to the complaints by residents and their parents and/or guardians, conditions at Hartgrove Hospital were so bad the facility (and UHS as a whole) had become the subject of numerous federal, state and local investigations including back in around 2010 when state officials asked healthcare experts to intervene and investigate the facility.

169.    In June 2010, the University of Illinois at Chicago ("UIC")'s Mental Health Policy Program was asked to conduct a quality-of-care review of Hartgrove Hospital on behalf of the Illinois Department of Children and Family Services ("DCFS"). The UIC team's findings were alarming.

170.    Following an extensive investigation into Hartgrove Hospital, the UIC team ultimately published a report summarizing its investigation and findings ("the UIC Hartgrove Report").

171.    In its Report, the UIC team concluded among other things:

    a.    Hartgrove Hospital subjected minor patients to "a consistent pattern of unacceptable risks of harm, substandard quality of care, poor clinical treatment and discharge planning, and questionable clinical management practices by hospital and corporate officials at all levels of the organization."

    b.    The failures and problems identified by the UIC team were not limited to Hartgrove Hospital; rather, the report concluded that "troubling reports suggest [] a pattern of quality of care issues, harm to patients or major healthcare fraud charges involving UHS-operated facilities in a dozen other states beyond Illinois."

c.  Hartgrove Hospital "often exposed patients to jeopardy and substandard care in the hospital," including failing to protect patients from harm or risks of harm; failing to ensure a safe treatment environment; failing to ensure adequate staffing for patient care; failing to adequately train and supervise staff; failing to develop individualized treatment plans; failing to develop adequate discharge/aftercare plans; and failing to conduct effective QAPI monitoring.[2]

172.  Based on their investigation, interviews, and review, the UIC team concluded that Hartgrove Hospital was a "dysfunctional healthcare institution."

173.  The UIC Hartgrove Report was based on a six-month investigation into patient conditions at Hartgrove Hospital conducted by experts from UIC's department of psychiatry.

174.  Other concerning findings from the UIC team included:

a.  Between November 2010 and mid-June 2011, there were reports of over 100 cases of children and adolescent patients who were subjected to physical attacks, threatening behavior, and sexual assaults at Hartgrove Hospital.

b.  Thirty "unusual incident reports" occurred during just a six-week period of May 1 through June 15.

c.  On one occasion, a UIC reviewer witnessed a staff to patient ratio of one to twenty-two. This staff member disclosed to the UIC team: "there are just too many people up in here."

d.  The UIC team described an environment of chaos, physical attacks and sexual assaults of young patients at Hartgrove Hospital; and one confidential staff source very early in the review process stated that "violence is an everyday occurrence at this hospital."

e.  "Based on the available evidence, it is reasonable to conclude that staffing levels at UHS Hartgrove are woefully inadequate even under normal circumstances, and that patient safety and quality of care have directly suffered as a result of corporate level decisions to minimize labor costs of facility operations."[3]

175.  UIC experts found that "hospital staff and company officials at times tried to mislead them by attempting to cover up problems or keep reviewers from finding out about them."

176.  The UIC Hartgrove Report stated: "Perhaps most disturbing, Hartgrove staff were

---

[2] UIC Hartgrove Report (2010-2011), pp. 18-19.

[3] UIC Hartgrove Report (2010-2011), p. 25

35

repeatedly told by UHS (parent company) officials that anyone suspected of providing information to the UIC reviewers would be fired."

177.    Another example of corporate interference in this investigation and the practice, customer and culture of coverup at UHS and Hartgrove Hospital included an incident where two old patients reported their concern for the safety of a younger patient to a UIC-reviewer, urging the younger child patient be "someplace safer."  That same day, the UIC team met with the Hartgrove CEO and discussed the Report. When the UIC-reviewer examined that minor patient's chart the very next day, a special note had been added to it: "Pt denies ever feeling intimated by peers or ever having feelings of being unsafe. He denies ever verbalizing those kinds of feelings to staff or peers." In short, in response to the UIC reviewers informing Hartgrove of a safety concern with a patient, "UHS Hartgrove officials though it appropriate to ask a mentally ill and cognitively impaired child to essentially vouch for his own personal safety in the hospital."

178.    While the UIC investigation was still ongoing, Hartgrove Hospital employees were creating a false paper trail to defend themselves.

179.    In the UIC Hartgrove Report, which was ultimately released to the public, the UIC expert team candidly expressed their distrust of UHS officials: "The UIC team discovered very early in the review process that it could not rely on UHS officials to be entirely forthcomings about problems at the hospital…despite repeated assurance of transparency."

180.    The UIC Hartgrove Report further identified instances of Hartgrove Hospital staff disclosing to UIC-reviewers that extra staff had been artificially added to the hospital during the review to mislead UIC.

181.    Several patients also told UIC-reviewers that they were questioned about what they had shared with the UIC-reviewers by UHS officials.

36

182. The UIC team's findings were based on their extensive review of approximately 12,000 pages of documents including medical/psychiatric histories of wards, treatment and discharge plans, minutes of the medical executive staff committee and risk management committee meetings, policy and procedure guidelines, and unusual incident reports.

183. Additionally, the UIC team conducted telephone interviews with federal and state agency officials in several states and spoke with patients, family members, news media reporters and other people familiar with the finding of federal and state surveys into UHS facilities across the nation.

184. UIC experts discussed the ultimate findings of their investigation with the CEO, medical director, and director of nursing at Hartgrove Hospital on August 25, 2011.

185. After reviewing UIC's preliminary findings, DCFS officials put an "intake hold" on the facility, meaning new state wards would not be authorized for placement there.

186. Hartgrove Hospital's CEO, Steven Airhart, wrote a letter to DCFS defending the institution and claiming that the "overwhelming majority" of its employees "met the time requirements and competency assessment procedures for the facility."

187. In response to media coverage regarding the UIC investigation and subsequent Report, UHS spoke on behalf of Hartgrove Hospital in an official statement, stating in part: "Despite the findings in the UIC report, Hartgrove is proud of its track record and has many more success stories to its credit than the negative ones highlighted in the report."

### iv. Local Police Reports

188. Decades of local police reports provide further evidence of Defendants' longstanding knowledge of the sexual abuse problem at Hartgrove Hospital, a problem that plagued many of the Cooper Defendants' and UHS's facilities including those in Illinois.

189. For decades, and at all relevant times, Defendants were made expressly aware of reports of sexual, physical and psychological abuse perpetrated by staff members on patients, and patients on other patients.

190. While Chicago Police Department (CPD) records from prior to 2007 have yet to be obtained, records from 2007 until present shed light on the systemic nature of the problem. An example of some of these reports up until present include, among many others:

a. On July 30, 2007, police received a report that a minor female patient was sexually abused by another male patient at Hartgrove Hospital.

b. On July 16, 2008, a minor male patient reported that he had been raped by a fellow patient his roommate, in April.

c. On July 29, 2008, police received a Child Abuse Hot Line report that a minor male patient was raped by his nurse at Hartgrove Hospital.

d. On November 10, 2008, police received a report of aggrieved criminal sexual assault involving a 12-year old male patient at Hartgrove Hospital.

e. On November 19, 2010, a minor female patient reported that she was drugged and raped by a male staff member at Hartgrove Hospital.

f. On December 21, 2010, a minor male patient reported that a male hospital attendant at Hartgrove Hospital sexually abused him in his living quarters while he was asleep.

g. On May 6, 2011, a minor male patient reported that he was raped by his roommate at Hartgrove Hospital.

h. On September 23, 2011, a minor male patient reported that he was sexually abused by his therapist at Hartgrove Hospital.

i. On May 6, 2011, a minor male patient was sexually abused by an older male patient at Hartgrove Hospital.

j. On June 18, 2014, a nine-year old male patient was sexually abused by an older male patient at Hartgrove Hospital.

k. On February 2, 2015, a male patient reported that he was raped by another male patient. Video footage demonstrated the offender was able to enter the victim's room, close the door behind him, and stay there for over ten minutes. A Hartgrove Hospital doctor inspected the male victim and determined no rape kit was necessary.

l. On September 10, 2015, a male patient reported that he was raped in his living quarters by another patient who entered his room at night.

38

m.  On April 21, 2017, a female patient was sexually assaulted by a male patient on video in the middle of a group therapy session.

n.  On March 30, 2018, an eight-year-old female patient reported through the Child Abuse Hotline that a male staff member sexually assaulted her when he entered her room at night.

o.  On October 18, 2017, a female patient disclosed she was sexually abused by a nighttime employee of Hartgrove Hospital. She reported that at around 3AM, the employee came into her room as part of the hospital's procedure of checking on patients every fifteen minutes. He began stroking her leg and ignored her requests to leave the room. He eventually removed her pants and kissed her genitals through her clothes. At that point, the victim's roommate heard the rustling between them and cried out for the offender to leave the room. When Chicago Police received this report from the Hartgrove Risk Manager, they stated that the employee had been suspended but refused to identify who the offending employee was without "authoriz[ation] by human resource."

p.  On April 30, a Child Abuse Hotline report was submitted on behalf of a six-year-old female patient who was sexually abused by a night shift employee between January 1, 2018 and April 14, 2018. The child reported that the Hartgrove Hospital employee came into her room at night and removed her clothing, prompting her to start screaming. A witness also reported that she was abused by the same staff member when she was a patient at the hospital.

q.  On March 18, 2018, a parent of a female patient at Hartgrove Hospital reported that "one of the workers put his penis in her mouth," stating "don't worry I will fuck you later." The patient was sedated at the time of the abuse. The patient was able to identify the employee by name.

r.  On March 19, 2018, a female patient reported that a male employee, likely a cleaning or maintenance technician, at Hartgrove Hospital sexually abused her while she was showering.

s.  On January 16, 2019, a minor female patient reported that a staff member sexually assaulted her at Hartgrove Hospital.

t.  On February 11, 2020, a nine-year-old male patient's mother reported that on January 13, 2019 he was sexually abused at Hartgrove Hospital by staff members who told him he "needs to be a good boy" and comply.

191.  Some reports made to the Chicago Police Department regarding sexual abuse experienced by patients at Hartgrove Hospital between 2019-2020 include, among others

a.  On March 4, 2019, a female patient at Hartgrove Hospital reported a sexual assault she experienced when another male patient followed her into her room in February.

39

b. On October 2, 2019, a male patient at Hartgrove Hospital reported a sexual assault he experienced when his roommate raped him in their living quarters.

c. On March 6, 2020, a male patient reported they were raped by another male patient while at Hartgrove Hospital. The victim's parent told police that an assessment coordinator at Hartgrove stopped returning her calls when she confronted them about the sexual abuse.

d. On April 29, 2020, a minor female patient reported she had been sexually abused by a male staff member with the title of manager/program specialist at Hartgrove Hospital between December 2019 and March 2020. This staff member abused her in her room, the laundry room, and the shower. Hartgrove staff told police that there are no video cameras in the patient's room or the laundry room. The staff member immediately resigned when confronted.

e. On August 5, 2020, a minor female patient reported that she was sexually abused in June by a Hartgrove Hospital employee who she identified by name.

f. On December 29, 2020, police received a report through the Child Abuse Hotline that a female patient had been sexually abused by a male staff member when she was a minor at Hartgrove Hospital when he entered her room at night.

g. On March 3, 2021, police received a report from DCFS that a Hartgrove Hospital patient disclosed he was sexually abused by a staff member two years prior when he was just thirteen years old.

h. On May 12, 2021, police received a report from DCFS that a minor patient was sexually abused by a staff member at Hartgrove Hospital in a supply room.

i. On March 3, 2021, police received a report from DCFS that a Hartgrove Hospital patient disclosed he was sexually abused by a staff member two years prior when he was just thirteen years old.

j. On May 12, 2021, police received a report from DCFS that a minor patient was sexually abused by a staff member at Hartgrove Hospital in a supply room.

192. Some complaints reported to the Chicago Police Department regarding sexual abuse experienced by patients at Hartgrove Hospital for the years 2021-2022 include, among others:

a. On December 17, 2021, a Child Abuse Hotline report disclosed that a patient at Hartgrove Hospital reported to her counselor that a male staff member there raped her on two occasions between April 2021 and September 29, 2021.

b. On April 28, 2021, police received a report that a former minor patient was sexually assaulted by another patient in the immediate preceding weeks. She brought this to the attention of several staff members but nothing was done to stop the abuse from occurring.

c. On April 19, 2021, police received a report that a minor male patient at Hartgrove Hospital was forced to engage in sexual relations with another male patient who threatened to kill him and assaulted him in his sleep.

d. On April 24, 2021, police received a report that a male patient was raped by another male patient at Hartgrove Hospital.

e. On September 24, 2021, police received a report through the Child Abuse Hotline that a minor female patient was sexually abused in a hospital room by a male staff member at Hartgrove Hospital.

f. On November 18, 2021, police received a report through the Child Abuse Hotline that a minor male patient at Hartgrove Hospital woke up to a staff member sexually abusing him.

g. On December 8, 2023, police received a report through the Child Abuse Hotline that a minor female patient at Hartgrove Hospital was sexually abused by another patient while asleep in her bed.

h. On February 15, 2022, police received a report through the Child Abuse Hotline that a minor patient at Hartgrove Hospital was sexually assaulted by a staff member. The staff member admitted to scrolling through sexually explicit images in the presence of the minor victim.

i. On February 19, 2022, police were dispatched to Loretto Hospital in response to a female patient receiving a rape kit that demonstrated injuries consistent with sexual assault. The victim reported that after she was sedated heavily by employees at Hartgrove Hospital, she woke up with her pants and underwear lowered to her ankles and found semen on her pants. On another occasion, she woke up in her bed to a male staff member laying on top of her placing both hands on her mouth.

j. On February 18, 2022, police received a report that a Hartgrove Hospital staff member followed a patient into her room, touched her breast, pushed her onto the bed, and threatened her that "this is just a preview of what is to come."

k. On March 23, 2022, police received a report that a patient at Hartgrove Hospital was raped by a staff member after they were injected with sedatives.

l. On April 23, 2022, police received a report that a minor patient at Hartgrove Hospital was raped by another patient who entered her room while she was sleeping.

m. On October 31, 2022, police received a report that a minor male patient at Hartgrove Hospital was raped by another patient. The victim told his father that the risk manager at Hartgrove tried to convince him not to disclose that he was raped for several hours when he disclosed the experience to a nurse.

193. In just the last two years, sexual assault complaints have continued to be reported to the Chicago Police Department regarding patient experiences at Hartgrove Hospital (2023-

41

2024).

194. Some of those reports to the CPD include, among others:

a. On November 10, 2023, an anonymous teacher reported to the Child Abuse Hotline that a student had chosen to write a writing assignment about a girl who was raped while she was a patient at Hartgrove Hospital. Later, she changed the story to be written in the first person. The reporter asked the minor student about the assignment and the minor disclosed that she had been a patient at Hartgrove for five days a year prior and, on her third night there, she woke up with her pants unzipped and was bleeding from her private parts. The minor stated that she tried to report it but was not believed. The abuse occurred approximately November 3, 2022.

b. On November 15, 2022, a police report was filed on behalf of a female who was raped in the open intake space of Hartgrove Hospital. The offender was able to force his penis into her mouth and get on top of her and penetrate her against her will, on video camera, before anyone intervened on her behalf. It is unclear if the woman had even completed the entry intake process of becoming a patient at the time she was raped on the premises.

c. On January 3, 2024, a prior patient at Hartgrove Hospital reported to the police that he was sexually assaulted by another patient while sleeping there. He tried to report the assault to a Hartgrove staff member, who told him the incident was consensual. The abuse occurred on February 3, 2023.

d. On May 7, 2023, a police report was filed on behalf of a patient who was raped by two offenders at the same time in the showers at Hartgrove Hospital. She reported to Hartgrove staff.

e. On July 24, 2023, a patient reported that she was sexually abused by a Hartgrove Hospital employee five days prior, identifying the staff member by name. He pushed her into an empty patient room and raped her. She tried to tell staff members about the incident for three consecutive days, but "no one believed her."

f. On April 10, 2024, a former patient reported to police that she was raped by a staff member after she was sedated on approximately March 22, 2024. In the police investigation, Hartgrove Hospital representatives acknowledged that the victim's clothing and bedding was taken from her and changed immediately. They also acknowledged that Hartgrove is not staffed with a Sexual Assault Nurse Examiner.

g. On June 17, 2024, a report was submitted the Chicago Police Department through the Child Abuse Hotline detailing that a former patient was sexually abused by a Hartgrove Hospital employee on May 26, 2024 in the "quiet room." In their forthcoming investigation, Police learned that the employee was discharged for undisclosed reasons on August 21, 2024.

42

h. On June 23, 2024, a victim reported to police that she was raped by a Hartgrove Hospital employee while a patient there a few weeks prior.

i. On July 15, 2024, Chicago Police Department officers arrived at Hartgrove Hospital and conducted a body camera recorded event. A male patient told his mother that he was being sexually abused by the hospital staff. Upon release, the mother reported witnessing physical evidence of sexual assault on her son. The son told police that he recalls being assaulted by male staff members after they sedated him with tranquilizers.

195. Upon information and belief, neither police reports, the 2010 UIC Hartgrove Investigation & Report, nor direct patient complaints have ever resulted in a meaningful review and/or change in the policies and procedures that have created the environment of child abuse and coverups that pervade Hartgrove Hospital and other UHS facilities.

196. A variety of systems ensured that Cooper Companies and UHS, Inc., as the parent companies of Hartgrove Hospital and other of its subsidiary facilities, knew or should have known of abuse occurring at its facilities.

197. At all relevant times, mandatory reporting laws required facilities and staff to notify local DCFS and law enforcement, which generated appropriate documentation.

198. At all relevant times, internal policies created, controlled, or influenced by Defendants also required facilities to generate internal "unusual incident reports," that UHS had a duty to be aware of, monitor, and take appropriate actions to ensure their policies and procedures were resulting in the prevention of foreseeable patient harm.

199. At all relevant times, Defendants also had a duty to perform their due diligence in hiring and supervising their employees, including monitoring their behavior and treatment towards patients and reviewing any complaints about them.

200. At all relevant times, Defendants' longstanding knowledge of the problem of patient abuse at its facilities and of the abusive incidents occurring at Hartgrove Hospital is evidenced by its active oversight and involvement in operating and managing its subsidiaries.

201. Despite persistent institutional problems and failures, Hartgrove Hospital has immediate plans to expand its facility, to further maximize profits by adding even more patient beds.

202. The CEO of Hartgrove Hospital, Steven Airhart, stated in a LinkedIn Post in July 2024 that Hartgrove's forthcoming "significant expansion" will increase Hartgrove's patient capacity from 160 to 212 at a cost of $30 million for completion in 2026.

203. On his LinkedIn bio, CEO Airhart calls Hartgrove Hospital "one of the most respected and successful hospitals in Illinois and within Universal Health Services."

**D.  Defendants Have a History of Prioritizing Profits over Patient Safety and Care, which Has Resulted in the Abuse of Countless Children at Defendant Owned Facilities.**

204. At all relevant times, Defendants knowingly, fraudulently, and with the intent to deceive the public, including the Plaintiff and her parents, grandparents and guardians, held Hartgrove Hospital out as a properly and appropriately licensed hospital providing inpatient psychiatric services, residential behavioral health services for children and adolescents with behavioral issues.

205. At all relevant times, Defendants put pressure on doctors and admissions staff at Hartgrove Hospital to fill beds and to admit children even though these Defendants knew the staffing levels at Hartgrove were inadequate, that it would be detrimental to the patients, that the patients created safety risks to other children admitted at Hartgrove due to inadequate staffing and protection, that the patients would be in danger due to inadequate staffing and protection, and that Hartgrove could not provide the appropriate care and protection to the patients.

206. At all relevant times, Defendants pressured and encouraged doctors and staff to keep patients admitted to Hartgrove Hospital for as long as the patients could pay, even when inpatient

44

care or residential treatment was no longer medically necessary or beneficial to the patients.

207. At all relevant times, Defendants encouraged unnecessary admissions and excessive length of stay (LOS) with the specific purpose of increasing revenue.

208. At all relevant times, Defendants pressured others to improve length of stay averages (i.e., keep patients at the facility longer) because Defendants made the most profit after the first five days of a patient's admission.

209. At all relevant times, Defendants targeted patients for RTC admissions as the easiest way to get a patient approved for a longer stay to increase revenue and profits.

210. At all relevant times, Defendants made "bed-to- bed transfers" for patients from the RTC to the general hospital units at Hartgrove Hospital to maintain a profitable "head-to-bed" ratio at the facility while capitalizing on the higher cost of treatment associated with patients with primary diagnoses of mental illness, psychiatric conditions, developmental disabilities, and/or other behavioral health conditions.

211. At all relevant times, Defendants made "bed-to- bed" transfers from the RTC to the general hospital or local UHS facilities in Illinois for patients with known mental illness, psychiatric conditions, developmental disabilities, and/or other behavioral health conditions with the knowledge and understanding that doing so would create a danger for patients in the transferee Units and for the patients being transferred. Nonetheless, these Defendants made these "bed-to-bed" transfers to increase revenue and profits.

212. At all relevant times, Defendants made "bed-to- bed" transfers from the RTC to the general hospital or local UHS facilities in Illinois for patients with known mental illness, psychiatric conditions, developmental disabilities, and/or other behavioral health conditions with the knowledge and understanding that the staff was inadequate in numbers, experience, and

45

training to protect and care for the patients. Nonetheless, these Defendants made these "bed-to-bed" transfers to increase revenue and profits.

213.    At all relevant times, Defendants constantly pressured staff to change the primary diagnoses of patients, chart aggressive or sexually aggressive precautions in the patients' records, and otherwise make fraudulent and materially false statements in medical records to justify longer stays and higher costs associated with their stays at Hartgrove Hospital in an effort to increase revenue and profits.

214.    At all relevant times, nurses and other staff members at Hartgrove Hospital who were agents, employees, and servants of Defendants frequently and routinely used physical restraints and seclusion for patients, including the Plaintiff Jane Doe 4, as a matter of punishment, or for ease and convenience because staffing numbers and ratios were inadequate.

215.    In the event of a possible incident or event involving physical abuse or sexual abuse of patients, Defendants instructed staff to inform the parents, grandparents or guardians of the patients involved that the appropriate investigations and measures were being taken internally, and that the allegations or accusations had been reported to the appropriate authorities, even though staff was under clear instruction not to report the accusations to authorities and the staff had not reported the allegations or accusations to external authorities.

### i.    Federal Investigations into Cooper Companies

216.    In November 1992, Cooper Companies and its former co-chairman, Gary Alan Singer, were indicted on numerous charges of mail and wire fraud, money laundering and racketeering in running a junk bond scheme that netted $3 million.

217.    The SEC filed a related case in November 1992 against Cooper Companies, Gary Singer, Steven Singer, and other members of the Singer family alleging similar fraud claims and a

46

conspiracy to allocate company bond trading profits to family accounts and to manipulate junk bond prices.

218. In January 1994, Cooper Companies was found guilty of six counts of mail fraud and one count of wire fraud at trial and paid a criminal fine of $1.8 million. Cooper Companies also announced that it had agreed to surrender $1.62 million and pay a civil penalty of $1.15 million. Most of Cooper Company's civil penalty was offset by the criminal penalty.

219. During the course of these investigations, Hartgrove Hospital's revenue stream caused Cooper Companies profits to soar.

220. From 1993 through 1995 HGA (Hartgrove Hospital's parent company) consistently generated nearly half of the Cooper Companies' total revenue.

221. In 1996, HGA's revenue increased by 3%.

222. Following the Cooper Defendants' expansion of their Illinois presence by opening the Midwest Center Facility, HGA's revenue increased significantly by 23% in 1997. In fact, Hartgrove Hospital's revenue itself increased by $1.4 million.

223. In approximately 1999, the Cooper Defendants sold all four psychiatric hospitals under its HGA subsidiary to UHS-D, UHS-Hartgrove, and other UHS entities for a total of $32 million.

### ii. Federal Investigations into UHS and Its Facilities

224. The systemic abuse and dysfunction at Hartgrove Hospital is a microcosm of a wider problem within UHS. UHS has faced legal scrutiny from both state governments and the federal government for decades.

225. In 2005, a former UHS employee filed a whistleblower complaint against McAllen Hospitals d/b/a South Texas Health System, a UHS behavioral health facility. The complaint

alleged that the facility had entered financial relationships with doctors to refer patients to UHS behavioral health facilities. As a result of the complaint, government authorities opened an investigation into the facility for violations of the False Claims Act, the federal Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b, and the Stark Law, 42 U.S.C. § 1395m. UHS later settled the matter for $27.5 million.

226. 2008, the United States Department of Justice first investigated another one of UHS's youth residential treatment facilities in Cook County, Illinois: Riveredge Hospital for among other things alleged fraudulent billing practices involving Medicare and Medicaid. The federal government alleged that UHS's psychiatric hospitals were unethically and illegally admitting as many patients as possible to their facilities and keeping them there as long as possible, even if the patients did not need treatment or were not receiving adequate treatment at the facility.

227. In turn, this practice maximized the payments the facilities received from Medicare and Medicaid, which comprised at least one third of the institutions' revenue.

228. According to UHS filings with the SEC in April 2011, it derives "a significant portion of [its] revenue from third-party payors, including the Medicare and Medicaid programs." With respect to Illinois, UHS reported its expectation to receive "significant amounts of [Medicaid revenues] from" Illinois. UHS reported that "collection of receivables from third-party payors" is "our primary source of cash and is critical to our operating performance."

229. As set forth further below, UHS's business model encourages and incentivizes over-billing and under-staffing.

230. Several UHS employees have disclosed to the media that in managing their job performance, supervisors pressured them on the sheer quantity of billing records submitted to Medicaid agencies, irrespective of and even at the expense of the quality of care actually provided

to patients. UHS's term for this practice internally was "doctor shaming."

231.    UHS, Inc. has settled False Claims Act allegations with several state attorney generals for allegations of fraudulent reporting to receive state Medicaid funding.  For example, in March 2012, UHS and two of its subsidiaries paid $6.85 million to the United States and Virginia. UHS closed the Viriginia facility shortly before the settlement.

232.    In August of 2012, UHS settled similar allegations with the state of California for $4.25 million. The allegations included that employees at the facility were inappropriately credentialed or not credentialed and that children were "warehouse[d]."

233.    In February 2013, the U.S. DOJ issued subpoenas to 10 UHS-owned behavioral health facilities requesting documents going back to January 2008. The DOJ also issued subpoenas directly to Defendant UHS, Inc. for documents pertaining to several of its Illinois's facilities: Rock River Academy, Hartgrove Hospital, and Streamwood Behavioral Health.  The DOJ continued to issue subpoenas to UHS facilities through 2015. UHS reported this investigation in its 2015 filing with the Securities and Exchange Commission ("SEC").

234.    The DOJ investigation continued and expanded over the years, as the DOJ eventually targeted not only the individual facilities within the Universal Health Services' corporate umbrella, but Universal Health Services itself.

235.    In UHS's March 31, 2015, filing with the SEC, the UHS Senior Vice President and CFO Steve Filton addressed the DOJ investigation, noting that the company was "uncertain as to potential liability and/or financial exposure."

236.    During its investigations, the U.S. Department of Justice discovered numerous instances of sexual abuse that had occurred at UHS facilities throughout the country beginning as early as 2001:

49

a.  Two former counselors of Westwood Lodge plead guilty to statutory rape of a 15-year-old patient in the summer of 2001. Both were sentenced criminally and registered as sex offenders.

b.  In October 2008, two minor patients of another UHS facility told staff members that they had been sexually abused by another patient after staff administered sedative medications to them. No incident report was generated nor were any steps taken to separate the children from the sexual abuser who was then their roommate. When interviewed, the mandatory reporter defended her failure to report, stating that she did not believe the girls were telling the truth.

c.  In April 2010, a minor patient at another UHS facility accused an older patient of forcing him to have oral sex and attempting to rape him. Investigators reviewed video footage that confirmed the child's allegations. The facility agreed to improve its monitoring procedures and training for staff. Reports from this facility showed another child alleged they were forced to give oral sex to a staff member.

d.  In December 2010, 25 internal incident reports of sexual allegations were uncovered from another UHS facility during a 3-month period. Of the over 500 reportable incidents that occurred at that facility in just three months, only three reports were submitted to the health reporting system for that entire year. Among those reports included, was a report regarding a minor patient who was raped by another patient. The local state health department also reported violations of cross-boarding regulations that included younger children sleeping in adolescent units which housed two "known pedophiles."

e.  In April 2011, a minor patient at another UHS facility reported that he had been sexually abused by a resident. The local Department of Behavioral Health and Developmental Services conducted an investigation into the facility, ultimately suspending its admissions and downgrading its license.

f.  In July 2011, two adolescent female patients were threatened and forced to engage in improper sexual activities with a male staff member at another UHS facility. The investigation revealed that "none of the nurses or staff questions why a male staff was on the adolescent unit."

g.  In April 2012, a minor patient of a UHS facility alleged he was sexually and physically assaulted by another patient who had a documented record of sexually assaulting other patients. The case settled in September 2014.

h.  In May 2012, state agency officials discovered that another UHS facility had failed to report suspected child abuse in part because its employment practices and policies and procedures did not provide front-line staff with effective communication tools. The facility's CEO reported he had directly received calls complaining of understaffing.

i.  In December 2012, one of UHS' facilities in Florida was closed by regulators due to significant health, safety, and security concerns. The facility's supervisor was arrested in August 2012 and ultimately convicted of felony child abuse. She was

50

allowed to return to her position after her arrest. In February 2013, a former mental health technician was arrested on charges of sexually abusing six minor girls while employed there. He was found guilty of the charges in March 2014.

j. In July 2013, a Miami Herald article reported that the Florida Department of Justice received reports that 10% of youth patients at a UHS facility there reported being sexually victimized by staff in 2012.

k. In December 2013, a mother filed a lawsuit alleging that a UHS facility failed to protect her minor son from being sexually abused by a male nurse while he was a patient there. The employee plead guilty to criminal charges in 2013 and was sentenced to 10 years.

l. In February 2014, authorities determined that a UHS facility's executive management body failed to properly oversee the hospital to prevent abuse and neglect. Their findings included reports that patients with the intellectual capacity of a child were not properly supervised and were put at risk of being sexually abused by other residents.

m. In January 2016, UHS-owned National Deaf Academy closed in the wake of allegations of patient abuse. Media reported that local police were dispatched to the academy 162 times over two years, including seven calls for sexual crimes against children.

n. In February 2017, the CEO of a UHS-owned facility in Oklahoma City told law enforcement that the facility does not report allegations of sexual assault of patients to police and only conduct internal investigations, which directly violated Oklahoma law. His statements were in response to an investigation concerning patient-on-patient sexual assault that occurred there.

o. In July 2017, authorities closed another UHS-owned facility in Florida because of "serious deficiencies that potentially could threaten the health and safety of the youth placed at the program." Authorities closed a UHS-owned facility in Massachusetts the following month during an investigation into the sexual assault of a patient there, citing "issues concerning patient safety and quality of care."

p. Next month, in September 2017, yet another UHS-owned facility in Massachusetts was forced to suspend admissions after finding "serious issues involving patient safety." It was forced to close down in February 2018.

q. In January 2018, allegations were raised against a Texas UHS-owned facility that two 13 and 15-year-old female patients were raped by two older male patients when the minor girls were housed adjacent to them.

r. In February 2020, two separate employees of a UHS-owned facility in Virginia were criminally investigated on allegations of patient sexual abuse.

  i. One, a psychotherapist, was indicted on two counts of object sexual penetration by force of a former patient in 2018 and 2019. He committed suicide on the day his plea would have been entered.

51

ii. The other, the former medical director, was charged with four felony sex crimes: two counts of object sexual penetration by force and two counts of aggravated sexual battery of an incapacitated patient. He was allowed to maintain his position as medical director for months after the allegations surfaced, and subsequent investigations revealed that he had been accused of sexually abusing female patients as early as April 2017. Twenty additional former patients have since come forward identifying themselves as sexual abuse survivors from this perpetrator.

iii. That facility is still operating today.

s. Also in February 2020, at another UHS-owned facility in Utah, a staff member was charged with first-degree felony sodomy of a child and second-degree felony of enticing a minor, a 12-year-old patient there.

237. There have also been countless reports regarding physical and emotional abuse of children at UHS facilities.

238. Some notable reports of abuse include, among others:

a. In May 2013 alone in just the state of Florida: (1) two former employees of a UHS facility disclosed an instance where a child with an injured leg was refused a wheelchair and made to crawl in her own urine to the bathroom; (2) an employee of another facility was found guilty of slamming a minor child into a wall and sitting on her for 20 minutes; and (3) a mental health technician at another institution was charged with aggravated felony abuse for twisting the arm of a minor child to the point of causing a spiral fracture.

b. In November 2016, an autistic patient of a UHS facility died when he was subjected to a manual hold by an employee. The coroner ruled the cause of death to be a homicide.

c. Again, in January 2018, a mental health technician at a UHS facility in Virginia was charged with involuntary manslaughter after the state medical examiner concluded the teenage patient he had restrained died from homicide.

239. At least 13 UHS-owned youth residential treatment facilities in the United States have been closed down by UHS after allegations of patient abuse and neglect surfaced.

240. In Illinois, UHS's Rock River Academy was forced to close in approximately 2015.

241. In or about July 2019, UHS, Inc. reached an agreement in principle with the U.S. Department of Justice ("DOJ")'s Civil Division, and various states' attorneys general offices, to resolve the civil aspects of the federal government's investigation of UHS, Inc.'s behavioral health

52

facilities for $127 million. On July 6, 2020, UHS, Inc. entered into definitive settlement agreements with the government pursuant to the terms and amounts consistent with the aforementioned agreement in principle (hereinafter "DOJ Settlement Agreement").

242. The DOJ Settlement Agreement was the culmination of a decade-long investigation into UHS, Inc., UHS of Delaware, Inc. and UHS Facilities, including Hartgrove Hospital. The federal government contended that the UHS corporate system:

> [S]ubmitted or caused to be submitted false claims for inpatient behavioral health services provided to Medicare, Tricare, FEHB, and VA beneficiaries at [UHS Facilities, including Hartgrove Hospital], resulting from UHS's (i) admission of [patients] who were not eligible for inpatient or residential treatment, (ii) failure to properly discharge [patients] when they no longer needed inpatient or residential treatment, (iii) improper or excessive lengths of stay, (iv) failure to provide adequate staffing, training, and/or supervision of staff, (v) billing for services not rendered, (vi) improper use of physical and chemical restraints and seclusion; and (vii) failure to provide inpatient acute or residential care in accordance with federal and state regulations, including, but not limited to, failure to develop and/or update individual assessments and treatment plans, failure to provide adequate discharge planning, and failure to provide required individual and group therapy.

DOJ Settlement Agreement, pp. 6-7.

243. Pursuant to UHS, Inc.'s settlement agreements with governmental entities, on July 9, 2020, UHS, Inc. made net aggregate payments of approximately $117.3 million, before accrued interest and related fees, costs and individual claims due to or on behalf of third parties, including $88.1 million pursuant to the terms of the agreement with the DOJ and Office of Inspector General for the United States Department of Health and Human Services ("OIG").

244. Additionally, as part of the OIG Settlement Agreement, UHS, Inc. and UHS-D entered into a five-year Corporate Integrity Agreement (the "Corporate Integrity Agreement"). The Corporate Integrity Agreement applied to UHS, Inc.'s and UHS-D's Behavioral Health Division, and UHS, Inc.'s and UHS-D's "oversight and management of that division."

245. In July 2022, the United States Senate Committee on Finance and the Senate

53

Committee on Health, Education, Labor, and Pensions launched a two-year investigation into allegations of abuse and neglect occurring at residential treatment facilities ("RTFs") including those operated by UHS.[4] Those Committees have since issued the report "Warehouses of Neglect: How Taxpayers Are Funding Systemic Abuse in Youth Residential Treatment Facilities" which included the following findings relevant to UHS facilities, among others:

    a.  "Children suffer routine harm inside RTFs. These harms include sexual, physical, and emotional abuse, unsafe and unsanitary conditions, and inadequate provision of behavioral health treatment"

    b.  "The risk of harm to children in RTFs is endemic to the operating model. The harms children in RTFs experienced are the direct, casual result of an operating model that incentivizes providers to optimize revenues and operating and profit margin. RTF providers offer minimal therapeutic treatment in deficient physical settings with lean staff composed of non-professionals, which maximizes per diem margins."

    c.  "Horrific instances of sexual abuse persist unremedied inside RTFs."

    d.  Some UHS facilities offer both "sex offender treatment" an "sexual trauma" treatment in the same location.

    e.  "Rampant reports of children being verbally abused at RTFs." Allegations of verbal abuse at facilities are widespread and appear to go unaddressed.

    f.  "Children are routinely emotionally abused in RTFs. In many facilities, children, who are already in a precarious state – due to underlying behavioral health needs, potential system-involvement, and removal from their communities – are subjected to emotional abuse by staff and peers." Moreover, "public reporting contains numerous accounts of staff manipulating the children in their care."

    g.  "In addition to the risk of abuse and neglect children are exposed to in RTFs, the everyday conditions of the facilities often also impart latent indignity and suffering. RTFs, as therapeutic facilities, should provide home-like environments (safe, welcoming, clean, healthy, and healing) to children. It is clear from children's testimony, public reporting, first-hand accounts to Committee staff, and thousands of pages of documents reviewed by the Committee, that some RTFs [which includes multiple UHS facilities that were part of the Senate's investigation into a sample size of RTF facilities] trap children in a dehumanizing physical environment and atmosphere."

---

[4] https://www.finance.senate.gov/imo/media/doc/rtf_report_warehouses_of_neglect.pdf.

h. Many children did not receive appropriate care, and which the RTF was receiving payment for (whether paid through Medicaid reimbursements, child welfare systems private health insurance, or other sources). "In many cases, facilities are not providing children the care they describe in the children's treatment plans." "This means that these children are referred to inpatient psychiatric settings for serious diagnosis – which require specific, evidence-based, highly planned, and measurable treatment – but their conditions are going untreated or undertreated and can also be exacerbated by the sexual, physical, verbal, and emotional abuse to which they may be exposed."

i. "Copious evidence from both Committee review and public reporting support the heartbreaking reality of pervasive sexual abuse by staff in" UHS facilities. For example, on September 21, 2021, Oklahoma Human Services substantiated an allegation of a staffer sexually abusing a child at a UHS facility. Rather than terminating the abusive staff member, the UHS facility reassigned the staff member to another unit, where the sexual abuse continued. When asked as recently as May 23, 2024 whether an employee's failure to report child abuse would result in disciplinary action, UHS leadership said that "it might."

j. UHS facilities violated industry standards, federal/state regulations, and in some cases their own policies when administering chemical restraints to children. The Committee found instances where staff were using chemical restraints on children without the necessary medical order for a chemical restraint in their record, and the medication was not listed on the child's medication list.

k. On May 23, 2024, the Committee asked UHS leadership "whether there are any circumstances when a child might be both chemically restrained and secluded. UHS personnel stated they believed there were circumstances in which it could be necessary and said that there are no rules preventing doubling or tripling up on a restraint or seclusion. In fact, such practice is prohibited by federal law." The Committee reviewed instances where staff used chemical restraints in unjustifiable circumstances, including on children who were calm or without attempting other less restrictive interventions prior.

l. Children report taking many medications, which leaves them feeling not like themselves. In many cases, children at UHS facilities were subjected to multiple medications concurrently, known as polypharmacy. Surveys at facilities revealed that many children did not know all the psychotropic medications they were taking, nor could they state the reason for taking them.

m. "RTFs are intended and reimbursed to offer intensive services, but the Committee's Investigation observed RTFs that were understaffed or had poorly trained employees."

n. Background checks, including state abuse registry checks and licensure checks, are not completed properly. In some cases, criminal history or background checks reveal that staff have histories that may disqualify them from working with children.

55

o. "Staff across facilities [including UHS facilities] abdicate their responsibilities as caregivers by failing to discharge the basic duties expected of them. The Committee reviewed multiple accounts of dereliction of duty by RTF staff."

p. "Staff routinely fail to supervise and account for the children in their care."

q. "RTF industry leaders have an incentive to prioritize operating and profit margins over care, creating the conditions in which the children who are remanded to institutions leave worse off than when they arrived."

r. In 2023, 43 percent of UHS's total net revenue was derived from its Behavioral Health segment, comprising $6.2 billion. In an October 2023 earnings call, the UHS CFO said, "broadly increasing occupancy [of our behavioral business] is the most significant opportunity we see."

s. "Medicaid is the primary payer for health care services for children in the child welfare system."

246. In 2024, another one of UHS, Inc.'s health care facilities in Illinois, Pavilion Behavioral Health System, was found liable for negligence and ordered by a jury to pay a patient $535 million in damages based on a rape she experienced as a minor patient there. In a filing with the Securities and Exchange Commission, UHS called the verdict "unexpected" and "unprecedented."

247. At all relevant times, Defendants knew that providing enough staff to meet patients' needs was an essential administrative requirement for all hospitals and residential treatment centers.

248. At all relevant times, Defendants knew that staffing levels must take into account patients' risk of violence and suicide as well as their medical needs.

249. At all relevant times, Defendants knew that adequate and sufficient staffing levels vary between residential treatment centers, general hospitals, and inpatient psychiatric hospitals. This is because the population served by a facility or hospital impacts the staffing levels that are adequate and sufficient to protect the patients from other residents/patients, third parties, staff, and themselves.

250. At all relevant times, Defendants knew that inpatient psychiatric hospital staffing

56

requirements are higher than residential treatment centers and general hospitals because of the risks presented by the population served.

251.    From 2006 until 2016, facilities owned and operated by UHS were cited or investigated for inadequate staffing violations on approximately ninety (90) occasions.

252.    In 2017, UHS' shareholders filed four sets of shareholder derivative lawsuits in the Eastern District of Pennsylvania alleging that the UHS Board of Directors "pushed forward aggressive business plans that incentivized or encouraged UHS behavioral health facilities across the country to engage in fraudulent billing practices and other misconduct in order to meet financial goals." *See In re Universal Health Servs., Inc., Derivative Litig.*, Civil Action No. 17-2187.

253.    In October 2020, former patients of one of UHS's youth residential treatment facilities, Cumberland Hospital for Children and Adolescents, filed a lawsuit alleging that Universal Health Services' former medical director, Dr. Daniel Davidow, and a former psychotherapist, Dr. Herschel Harden, sexually and physically abused them. Victims ranged from age 9-26 residing in 11 different states. Dr. Harden committed suicide on the day of his criminal plea hearing.

254.    In July 2020, UHS agreed to pay the state of Massachusetts $15 million to settle two separate sets of allegations the company improperly billed the state's Medicaid program for services that did not actually occur at its subsidiary facilities there from 2009-2017. The state attorney general stated: "This company routinely allowed unqualified and unsupervised mental health professionals to provide care to patients and improperly billed MassHealth for it. This behavior put patients at risk and wasted critically needed health care dollars."

255.    UHS also agreed to a national settlement of $122 million to resolve False Claims Act allegations that from 2007-2018, UHS submitted claims for payment to government healthcare

programs across the United States for services not actually rendered as billed at its various subsidiary facilities, or for "billing for medically unnecessary inpatient behavioral health services, failing to provide adequate and appropriate services, and paying illegal inducements to federal healthcare beneficiaries.

### E. Defendants Act as One Entity with Hartgrove Hospital

#### i. The Cooper Companies and Hartgrove Hospital Act as One Entity.

256. The Cooper Companies appointed their direct executives to executive positions at several of its subsidiaries, including at Hartgrove Hospital, reflecting an overlap in leadership between the subsidiaries and the parent corporation.

257. The Cooper Companies ensure the compliance of its subsidiaries through the implementation, dissemination, and enforcement of Cooper Companies training, policies, and procedures.

258. The Cooper Companies require all divisions, subsidiaries, affiliated companies, and employees to follow their company-wide training.

259. In effect, the Cooper Companies used their subsidiaries as their agents to carry out their business strategies and practices, with the misguided belief that by creating layers of shell companies and subsidiaries to act on their behalf that Cooper Companies (as the parent company) would be somehow shielded from the foreseeable adverse effects of many of its policies and practices, including but not limited to many referenced herein.

260. At all relevant times, Hartgrove Hospital followed the policies and procedures created, controlled, and/or enforced by the Cooper Companies and its corporate officers.

261. At all relevant times, Cooper Companies' policies and procedures applied equally to employees of the Cooper Defendants and their subsidiaries, including employees who worked at

Hartgrove Hospital.

262. Upon information and belief, Cooper Companies directed, received, and/or submitted medical reports for the submission of federal and state funding on behalf of its individual subsidiary facilities like Hartgrove Hospital.

263. At all relevant times, Cooper Companies played a direct role in creating and disseminating the policies and procedures for training their subsidiary facilities' staff to prepare such reports and submitting those documents to the state and federal agencies.

264. At all relevant times, Cooper Companies took primary lead in handling any serious legal matters involving their subsidiary facilities, including but not limited to local, state and federal investigations, prosecutions, and lawsuits, as well as personal injury lawsuits filed by former patients and/or staff.

265. At all relevant times, Cooper Companies and its corporate employees took the lead on handling public relations matters when it came to allegations of abuse, misconduct or institutional failures involving its subsidiary facilities including those in Illinois.

266. At all relevant times, Cooper Companies created or exercised control over the policies and procedures that caused or allowed for the continued sexual abuse of patients at its facilities. Those policies and procedures include but are not limited to those that control the hiring, supervision, and termination of employees who have access to vulnerable minor patients like Plaintiff Jane Doe 4 as well as decisions of how vulnerable minor patients are provided medical care that is both necessary and free of physical and/or sexual abuse.

267. At all relevant times, Cooper Companies assumed a duty to monitor, review, and analyze reports, governmental investigations, and lawsuits, and to among other things, identify staff, and/or policies and practices that posed a risk of harm to patients, and/or other red flags,

59

perform further investigation where needed, and to take prompt corrective action(s) to ensure that facilities were safe for patients.

268. At all relevant times, Cooper Companies and their corporate employees including senior leadership provided support on a variety of other operational and management matters for its subsidiary facilities, including but not limited to regulatory compliance, contracts, labor relations, employee benefits, advertising, day-to-day operations, safety and security, risk management, technology, and training.

269. At all relevant times, Hartgrove Hospital employees considered themselves as employees of the Cooper Companies and held themselves out to the public as such.

270. At all relevant times, Cooper Companies controlled the hiring of employees at individual subsidiary facilities, including Hartgrove Hospital.

271. At all relevant times, executives and members of leadership at Hartgrove Hospital were agents, servants, and employees of the Cooper Companies, HGA, HGI, or a combination thereof.

272. At all relevant times, the agents, employees, and servants that were not executives or members of leadership at Hartgrove Hospital (i.e. security guards, nurses, behavioral technicians, teachers, therapists, admission staff, etc.) were also agents, servants, and employees of the Cooper Entities and Hartgrove, or a combination thereof.

273. At all relevant times, Cooper Companies asserted authority and direction over Hartgrove Hospital such that HGA and HGI were the Cooper Companies' alter ego and agent to operate Hartgrove.

274. At all relevant times, Cooper Companies controlled the directors, corporate officers, and other members of leadership of Hartgrove Hospital, required them to obtain written

60

approval for certain actions, and executed agreements obliging them to maintain standards created by Cooper Companies.

### ii.     UHS, Inc., UHS-D, and UHS-Hartgrove Act as One Entity

275.    At all relevant times, Defendant UHS, Inc. is one of the largest providers of hospital and youth residential treatment facilities in the country.

276.    At all relevant times, since the early 1980s until present, Defendant UHS, Inc.'s business model was and is to acquire healthcare facilities, including behavioral health facilities and hospitals, and infuse them with UHS's operating systems, business practices, and policies and procedures.

277.    Chairman, CEO & Founder of UHS, Inc., Alan Miller, highlighted the company's longstanding acquisition strategy during an investor call on May 17, 2010, regarding a forthcoming acquisition of Psychiatric Solutions.  During that call, Miller acknowledged that Psychiatric Solutions and UHS were then "the nation's largest operators of freestanding psychiatric inpatient facilities," presenting a "truly unique opportunity to combine forces to transform our behavioral business." In November 2010, UHS acquired Psychiatric Solutions and their 105 inpatient and outpatient facilities in 32 states for a purchase price of $3.04 billion.

278.    Discussing the "opportunity" of mentally ill youth, UHS's CEO stated "to give you a sense of scope the inpatient behavioral segment represents an approximately $20 billion segment with an estimated 73 million people in the US having diagnosable mental illnesses. In fact, four of the ten leading causes of disability in the United States are mental illnesses."

279.    Defendant UHS, Inc. measures and calculates its profits and maintains statistics within two separate divisions of the corporation: the (1) Acute Care Division; and (2) Behavioral Health Division.  At all relevant times, Hartgrove Hospital was and is part of UHS, Inc. and UHS-

61

D's Behavioral Health Division.

280. At all relevant times, UHS's subsidiary facilities operated as an extension of UHS, Inc., and such facilities have been and continue to be treated as indistinguishable from UHS, Inc. in its corporate records and statements. For example, in UHS, Inc.'s Form 10-K annual reports filed with the SEC, it defines the terms "we," "us," "our," "UHS," and the "Company" to refer to both UHS "and its subsidiaries." It defines UHS' "principal business" to be "***owning and operating, through our subsidiaries . . . behavioral health care facilities***.

281. At all relevant times up until present, on behalf of ultimate parent company UHS, Inc., UHS-D created and managed a central UHS, Inc. website: www.uhs.com. Like its physical corporate headquarters, UHS, Inc.'s website displays information and refers to UHS, Inc., but not UHS-D.

282. Like its filings with the SEC, on its website, at all relevant times up until present, UHS, Inc. have held out its subsidiary facilities, including but not limited to Hartgrove Hospital, as being owned and operated by UHS, Inc. For example, on its website, UHS, Inc. used and uses language such as "our hospitals," "our facilities," "our Locations," "our Quality," "people we serve," "UHS serves your community," "Our corporate and health care facility team members," and other references to "we," "our," and "us," to mean and refer to both UHS and its subsidiaries, including but not limited to Hartgrove Hospital, collectively.

FILED DATE: 11/12/2025 3:53 PM   2025L014133



283. At all relevant times up until present, on UHS's website (www.uhs.com) it listed the facilities UHS, Inc. owned and operated on a page on a page titled "our LOCATIONS." Under the "our LOCATIONS" page, among many other facilities, the website expressly listed Hartgrove Hospital as one the facilities it owns and operates in Illinois.

284. At all relevant times, in communications to shareholders, UHS Executives consistently referred to the patients at subsidiary healthcare facilities as "our patients" and the employees of those facilities as "those who work on behalf of UHS," "us," and "we."

285. At all relevant times, UHS, Inc. held its facilities out to the public, parents, guardians, and child services agencies, including Hartgrove Hospital, as safe places with trustworthy staff that delivered "high-quality care" to patients.

286. As just one example, on its website, UHS, Inc. described its facilities and services as providing: "The care you trust, not far from home."

FILED DATE: 11/12/2025 3:53 PM   2025L014133



287.  On its public website, UHS, Inc. states in part:

Universal Health Services, Inc. (UHS) is one of the largest and most respected providers of hospital and healthcare services in the nation with approximately 96,700 employees dedicated to improving people's lives and transforming the delivery of healthcare. Through its subsidiaries, the company operates 27 Acute Care hospitals, 333 Behavioral Health inpatient facilities, 27 freestanding emergency departments and 21 outpatient facilities and ambulatory care centers in 39 states in the U.S., Washington, D.C., Puerto Rico and the United Kingdom. UHS also offers health insurance plans through Prominence Health, and manages a network of physicians through Independence Physician Management.[5]

288.  Defendant UHS, Inc. is the parent company of Defendant UHS-D as well as its subsidiary companies located in Illinois, including but not limited to Defendant UHS-Hartgrove.

289.  At all relevant times, Defendant UHS, Inc. owned 100% of UHS-D stock.

290.  UHS, Inc. was and is a holding company that operates through its subsidiaries, including but not limited to Defendants UHS-D and UHS-Hartgrove.

---

[5] https://uhs.com/ (emphasis added).

64

291. At all relevant times, Defendant UHS-Hartgrove's principal place of business was listed with the Illinois Secretary of State as being located at 367 South Gulph Road, King of Prussia, Pennsylvania 19406– the exact same location as UHS Headquarters.

292. At all relevant times, "UHS" was and is the trade name that represents the entire group of UHS companies and subsidiaries, including but not limited to Defendant UHS-Hartgrove.

293. At all relevant times, "UHS" is a registered trademark of Defendant UHS-D, one of UHS, Inc.'s subsidiaries.

294. At all relevant times, Defendant UHS-Hartgrove has shared offices and officers with Defendants UHS, Inc. and UHS-D.

295. At all relevant times, UHS Headquarters was home to UHS, Inc. and UHS-D, and was prominently branded with UHS insignia, without ever signifying that an entity called UHS-D operated there. Specifically, UHS-D employees work in a building labeled "Universal Health Services, Inc."

296. At all relevant times, UHS-D paid executives who were employed by UHS, Inc. For example, while UHS, Inc. claims that it has no operations or employees, it does employ a Chief Executive Officer, Marc Miller, who works out of UHS Headquarters.

297. At all relevant times, UHS, Inc. and UHS-D have utilized the same payroll system.

298. At all relevant times, UHS, Inc. and UHS-D have access to the same UHS, Inc. sponsored benefit plan.

299. At all relevant times, UHS, Inc. and UHS-D share the same in-house legal and accounting department and have the same General Counsel.

300. At all relevant times, UHS-D filed taxes on behalf of UHS, Inc.

301. At all relevant times, UHS-D prepared the UHS, Inc.'s filings with the SEC.

65

302.    At all relevant times, executives of Defendants UHS-Hartgrove and UHS-D were invited to attend and did attend UHS, Inc. board meetings.

303.    At all relevant times, UHS, Inc. ensures the compliance of its subsidiaries, including Defendants UHS-Hartgrove and UHS-D, through among other means the implementation, dissemination, and enforcement of UHS training, policies, and procedures, which it has referred to internally as its company-wide compliance program.

304.    According to UHS, Inc.'s Annual Reports, which are publicly available at https://ir.uhsinc.com/financial-information/annual-reports, the compliance program's elements "include a Code of Conduct, risk area specific policies and procedures, employee education and training, an internal system for reporting concerns, auditing and monitoring programs, and a means for enforcing the program's policies."

305.    One Annual Report further states that:

> Since its initial adoption, the compliance program continues to be expanded and developed to meet the industry's expectations and our needs. Specific written policies, procedures, training and educational materials and programs, as well as auditing and monitoring activities have been prepared and implemented to address the functional and operational aspects of our business. Specific areas identified through regulatory interpretation and enforcement activities have also been addressed in our program. Claims preparation and submission, including coding, billing, and cost reports, comprise the bulk of these areas. Financial arrangements with physicians and other referral sources, including compliance with anti-kickback and Stark laws and emergency department treatment and transfer requirements are also the focus of policy and training, standardized documentation requirements, and review and audit.[6]

306.    UHS, Inc.'s Board of Directors and senior executives devise business strategies for the parent company as well as its subsidiary facilities and determine how those strategies will be implemented within and across its subsidiary facilities, including but not limited to where and how

---

[6] This quotation was taken from UHS, Inc.'s Annual Report for 2011, but is identical in language for every year of publicly available Annual Reports.

FILED DATE: 11/12/2025 3:53 PM   2025L014133

the company will invest capital, with the primary objective of increasing/maximizing profits for its shareholders.

307. In effect, UHS, Inc. has used and uses its subsidiaries as its agents to carry out its business strategies and practices, with the misguided belief that by creating layers of shell companies and subsidiaries to act on its behalf that UHS, Inc. (as the parent company) would be somehow shielded from the foreseeable adverse effects of many of its policies and practices, including but not limited to many referenced herein.

308. At all relevant times, Hartgrove Hospital has followed and still follows policies and procedures created, controlled, and/or enforced by UHS, Inc. and its corporate officers. These include but are not limited to requiring all employees of UHS facilities including Hartgrove Hospital to report and/or file "unusual incident reports" with UHS-D or UHS, Inc. for all instances where sexual abuse is suspected or witnessed

309. At all relevant times, as a matter of practice, custom, and internal policy, UHS, Inc. and its employees and/or agents were notified about "unusual incident reports" occurring at its subsidiary facilities, including but not limited to those occurring at Hartgrove Hospital.

310. At all relevant times, as a matter of practice, custom, and internal policy, UHS, Inc. was notified of allegations of child abuse and neglect made to law enforcement and/or civil authorities, such as DCFS, which were alleged to have occurred at a subsidiary facility.

311. Upon information and belief, UHS Inc. was notified of allegations of abuse and neglect at its subsidiary facilities on a regular basis—at the very least on an annual basis, if not promptly after an incident or quarterly.

312. At all relevant times, UHS, Inc. created and maintained a Quality and Compliance Committee with the purpose of assisting its Board of Directors in "fulfilling its oversight

responsibilities concerning review of the Company's policies and procedures relating to healthcare-related regulatory and compliance issues and the delivery of quality medical care to patients." [7] This Committee includes three members of the Board of Directors who meet quarterly.

313. The identified "duties and responsibilities" of this Committee include (but are not limited to) "the direct responsibility and authority" to:

    a. "[O]versee the information, policies, procedures and reporting systems the Company **and its subsidiaries** have in place to provide reasonable assurance that: (1) the operations of the Company and its subsidiaries comply with all federal and state laws and regulations applicable to healthcare providers; and (2) the Company and its subsidiaries deliver quality medical care to patients and promote patient safety"; and

    b. "Review, as appropriate, information relating to Company quality, clinical risk, patient safety and performance improvement." The Committee receives reports at least on a quarterly basis regarding broadly "any internal or external complaints" that "raise material and substantiated concerns that a facility or facilities is not complying with applicable laws or regulations related to reimbursement, patient safety, or the quality of patient care."

314. At all relevant times, UHS, Inc.'s policies and procedures, including its Code of Business Conduct and Corporate Standards, applied equally to employees of UHS "and its subsidiaries," which at all relevant times included employees working at Hartgrove Hospital.

315. Among many other UHS policies, at all relevant times, all employees were required to "promptly report all suspected violations" by other employees to UHS or their supervisor. UHS-D maintains a compliance avenue for reporting potential concerns of its code of ethical conduct that allows for anonymous reporting.

316. Upon information and belief, UHS directs, receives, and/or submits medical reports for the submission of federal and state funding on behalf of its individual subsidiary facilities like Hartgrove Hospital.

---

[7] www.ir.uhs.com/uhs-quality-and-compliance-committee-charter.

317.    At all relevant times, UHS, Inc. played a direct role in creating and disseminating the policies and procedures for training UHS, Inc. and its subsidiary facilities' staff to prepare such reports and facilitated submitting those documents to the state and federal agencies.

318.    At all relevant times, UHS took primary lead in handling any serious legal matters involving its subsidiary facilities, including but not limited to local, state and federal investigations, prosecutions, and lawsuits, as well as personal injury lawsuits filed by former patients and/or staff.

319.    For example, UHS, Inc. responded to the U.S. DOJ on behalf of its subsidiary facilities when faced with subpoenas for documents.

320.    Moreover, on numerous occasions, UHS, Inc. has paid to settle False Act Claims based on allegedly fraudulent billings submitted to state and federal governments for Medicaid for treatment at its subsidiary facilities.

321.    Throughout various state and federal investigations into its facilities over time, UHS has acted on behalf of its facilities. For example, when the Pennsylvania Department of Public Welfare demanded $4 million in recoupment of alleged false billing for unnecessary medical treatment at its subsidiaries in 2011, UHS, Inc. "filed administrative appeals for all of our facilities."

322.    At all relevant times, UHS took the lead on handling public relations matters when it came to allegations of abuse, misconduct or institutional failures involving its subsidiary facilities including those in Illinois.

323.    At all relevant times until present, UHS corporate representatives inserted themselves into the media to defend the reputation of the subsidiary when investigations have arisen. In those instances, UHS representatives spoke about its own policies and procedures and

69

identified its subsidiaries as an extension of itself, using language like "our patients."

324.     As one of many examples, UHS affirmatively inserted itself into the defense of Hartgrove Hospital in 2011 in response to the UIC's investigation and report detailing institutional dysfunction, substandard treatment and care, and patient abuse at the facility. Speaking on behalf of Hartgrove in an official statement, UHS's corporate representatives said: "Despite the findings in the UIC report, Hartgrove is proud of its track record and has many more success stories to its credit than the negative ones highlighted in the report."

325.     At all relevant times, UHS's business model is and has been to acquire youth residential treatment facilities and infuse them with the "UHS way" of doing things, including UHS's policies, procedures, and even employees. UHS did just that when it acquired Hartgrove Hospital in 1999.

326.     From the outset when it acquired Hartgrove Hospital, UHS considered Hartgrove to be merely an extension of itself and business. In its Annual Report Form 10-K filed with the SEC on March 29, 2000, UHS disclosed that it "selectively seeks opportunities to expand its base of operations by acquiring . . . additional hospital facilities," identifying its acquisition of Hartgrove in April 1999.[8] In its definitions, UHS defined "the Company" to mean both UHS, Inc. and its subsidiaries.

327.     When Hartgrove Hospital was acquired from the Cooper Defendants in 1999, the Hartgrove CEO became an employee of UHS-D.

328.     At all relevant times, UHS created or exercised control over the policies and procedures that caused or allowed for the continued sexual abuse of patients 4.  Those policies and

---

[8] https://ir.uhs.com/static-files/64b2c33b-fe8f-4c3f-a551-5b5aaa886972.

procedures include but are not limited to those that control the hiring, supervision, and termination of employees who have access to vulnerable minor patients like Jane Doe 4 as well as decisions of how vulnerable minor patients are provided medical care that is both necessary and free of physical and/or sexual abuse.

329. At all relevant times, the policies generated by UHS-D contained the UHS logo and branding, and did not conspicuously identify UHS-D.

330. At all relevant times, in messages to employees, the President and CEO of UHS, Inc. does not differentiate between UHS, Inc. and UHS-D.

331. UHS's internal policies and procedures created a system by which it was required to be notified of lawsuits alleging physical or sexual abuse, local, state and/or federal investigations, as well as "unusual incident" reports occurring at and involving its subsidiary facilities. At all relevant times, UHS explicitly assumed a duty to monitor, review, and analyze these reports, governmental investigations, and lawsuits, and to among other things, identify staff, and/or policies and practices that posed a risk of harm to patients, and/or other red flags, perform further investigation where needed, and to take prompt corrective action(s) to ensure that facilities were safe for patients.

332. At all relevant times, UHS and its corporate employees including senior leadership provided support on a variety of other operational and management matters for its subsidiary facilities, including but not limited to regulatory compliance, contracts, labor relations, employee benefits, advertising, day-to-day operations, safety and security, risk management, technology, and training. At all relevant times, Hartgrove Hospital employees considered themselves as employees of UHS and held themselves out to the public as such.

333. For example, the CEO of Hartgrove, Steven Airhart, identifies his employer on

71

LinkedIn as "Hartgrove Behavioral Health System / UHS:"



**Chief Executive Officer**
Hartgrove Behavioral Health System / UHS
May 2013 - Present · 11 yrs 7 mos
Chicago, IL

334. Hartgrove Hospital's CEO Steven Airhart, who also serves as the CEO of another UHS facility in Cook County, Garfield Park Behavioral Hospital, has an email address using a UHS domain, e.g., @uhs.com.

335. At all relevant times, the "UHS" brand name is what is recognizable by consumers, regardless of whether it is referring to the UHS, Inc. or a subsidiary

336. Defendant UHS-Hartgrove's corporate officer Matthew Klein is also the general counsel of Defendants UHS, Inc. and UHS-D.

337. Defendant UHS-Hartgrove's treasurer is also a corporate officer of UHS, Inc.

338. Defendant UHS-D's Chief Financial Officer is also an officer of Defendant UHS, Inc.

339. In fact all of Defendant UHS-Hartgrove's officers and directors are also employees of UHS-D

340. At all relevant times, Defendant UHS-D did not maintain a website which was separate from UHS, Inc.

341. At all relevant times, corporate officers and directors of UHS, Inc. were also employed by UHS-D.

342. The UHS, Inc. website states that UHS, Inc. has approximately 99,300 employees, which is misleading and false, considering that the employees being referred to are either employed by UHS-D or another subsidiary or affiliated UHS entity.

343. At all relevant times, UHS controlled the hiring of employees at individual

72

subsidiary facilities, including Hartgrove Hospital.

344. For example, Hartgrove Hospital CEO provided a UHS email domain for the UHS Group's Director of Human Resources, Imran Fayyaz, when seeking to fill the Director of Risk Management, Human Resource Manager, and Talent Acquisition Specialist positions at Hartgrove, calling Fayyaz "my" Group Director:



Steven Airh... • 3rd+    + Follow    ···
Group Director & CEO,...
6yr • 🌐

If anyone has a "strong" recommendation for a Director of Risk Management/Performance Improvement, Human Resource Manager, &/or Talent Acquisition Specialist, please ask them to forward their resume to my Group Director of Human Resources at Imran.Fayyaz@uhsinc.com. I am seeking strong, proven talent to be placed at one or both of my facilities (Hartgrove Behavioral Health System &/or Garfield Park Behavioral Hospital) in Chicago.

345. At all relevant times, executives and members of leadership at UHS-Hartgrove, including but not limited to its President and Secretary, were agents, servants, and employees of UHS-D, UHS, Inc., and Hartgrove or a combination thereof.

346. As a matter of practice and custom, these joint employees of UHS and UHS subsidiaries used the same UHS email domain addresses.

347. For example, Hartgrove's CEO, Steven Airhart, who also serves as the CEO of another UHS facility in Cook County, Garfield Park Behavioral Hospital, used a UHS domain as his email akin to UHS's corporate employees, i.e., @uhs.com.

348. At all relevant times, Defendant UHS, Inc. transacted business in Illinois directly and through its agents, UHS-Hartgrove, UHS-D, and executives and members of leadership at

73

Hartgrove Hospital.

349. For example, UHS-D handled all legal, accounting, tax, finance, construction, real estate, marketing, communications, public relations and other functions for the benefit of UHS, Inc. and the UHS subsidiary entities.

350. At all relevant times, UHS, Inc. asserted authority and direction over Defendant UHS-D, UHS, Inc.'s subsidiary doing business in Illinois, such that it was UHS, Inc.'s alter-ego and agent to conduct administrative and management operations of its UHS Facilities in Illinois, including Hartgrove Hospital.

351. At all relevant times, UHS, Inc. asserted authority and direction over UHS-Hartgrove, UHS, Inc.'s domestic subsidiary, such that UHS-Hartgrove was UHS, Inc.'s alter ego and agent to operate Hartgrove Hospital.

352. At all relevant times, UHS, Inc. controlled the directors, corporate officers, and other members of leadership of Defendants UHS-D and UHS-Hartgrove, required them to obtain written approval for certain actions, and executed agreements obliging them to maintain standards created by UHS, Inc.

## COUNT 1: COMMON LAW NEGLIGENCE
### Plaintiff v. Defendants UHS-Hartgrove, UHS, Inc., and UHS-D

353. Plaintiff incorporates all preceding paragraphs into this Count as if fully set forth herein.

354. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D accepted and treated minor patients at Hartgrove Hospital, including but not limited to those who suffered from emotional or behavioral disorders and problems, mental illnesses, depression, attention deficit disorder (ADD) / attention-deficit hyperactivity disorder (ADHD); those who had known

74

FILED DATE: 11/12/2025 3:53 PM   2025L014133

or suspected preexisting traumas such as physical and sexual abuse; and those suffering from self-destructive behavior/suicidal ideation.

355. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D owned and operated a residential treatment program at Hartgrove Hospital whereby minors such as Plaintiff resided at the facility for a period of time, without their parents or guardians, and for the purpose of undergoing inpatient 24-hour care.

356. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D agreed to and did undertake to provide for the supervision, care, and physical safety of children and adolescents at and upon the premises of Hartgrove Hospital, including without limitation, Plaintiff.

357. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D and their employees and agents, were cognizant of Plaintiff's medical history, condition, and vulnerabilities, and that she was a minor. At all relevant times, these Defendants had a duty to ensure its patients / residents at Hartgrove Hospital, including Plaintiff, were safe while residing and/or undergoing treatment at the facility.

358. At all relevant times, Plaintiff, who was a minor patient, relied on Defendants UHS-Hartgrove, UHS, Inc., and UHS-D for her safety and well-being.

359. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a heightened, non-delegable duty to protect Plaintiff from harm, including, but not limited to, sexual exploitation and abuse inflicted by its own employees.

360. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a special relationship with its patients / residents, including Plaintiff, over whom they exercised total control while they resided at facilities and / or underwent treatment at their facilities, including Hartgrove Hospital.

361. At all relevant times, the Plaintiff and Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, and their employees and agents, stood in such a special relationship to one another that the law imposed on these Defendants an obligation of reasonable conduct for the benefit of the Plaintiff, including but not limited to an affirmative duty to aid and/or protect against and prevent an unreasonable risk of physical harm from its own employees and agents, as well as from third parties.

362. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, and their officers, agents, and employees, owed various other duties to their minor patients such as Plaintiff, who at all relevant times was in their custody and control and on their premises.

363. At all relevant times, Defendants UHS-Hartgrove, UHS-D, and UHS, Inc. had a duty to provide their minor patients including Plaintiff with adequate, competent medical care, treatment, and education.

364. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a duty to adequately vet, control and supervise their employees and agents for the protection of Plaintiff and the other residents, including a duty to vet, control and supervise Plaintiff's abuser.

365. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc. and UHS-D knew, or in the exercise of reasonable care should have known, that predatory staff members and patients presented a risk of danger to Plaintiff and other residents.

366. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a duty to investigate improper conduct of staff and to keep their residents in a safe environment, when on notice that their safety was threatened.

367. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a policy to require any employee who suspects or has knowledge that a resident was or may have

76

been sexually exploited, harassed, or abused to immediately report such information to the appropriate supervisory officials and authorities.

368. At all relevant times, pursuant to the Illinois Abused and Neglected Child Reporting Act, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, and their employees and agents, had a legal duty to immediately notify and report to the Illinois Department of Family and Child Services (DCFS) all instances where they suspect or receive knowledge that a patient was or may have been sexually, physically, or psychologically abused, and/or groomed.

369. These duties are non-exhaustive and non-delegable.

370. Notwithstanding these duties and policies, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, by and through their actual, implied, and/or apparent agents, employees, and/or servants, including but not limited to Plaintiff's abuser, committed one or more of the following negligent acts and/or omissions:

    a. Failed to ensure Plaintiff's safety and well-being and otherwise keep Plaintiff safe.

    b. Failed to protect Plaintiff from sexual, physical, and emotional/mental exploitation and abuse while she was at Hartgrove Hospital;

    c. Failed to stop predatory staff and residents from harming Plaintiff, including sexually exploiting and abusing her;

    d. Failed to properly monitor and supervise its employees and agents, including Plaintiff's abuser;

    e. Failed to properly monitor and supervise the time its employees and agents, such as Plaintiff's abuser, spent with residents, such as Plaintiff;

    f. Failed to properly monitor and supervise potentially dangerous residents / patients, who Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, knew or should have known posed a risk of harm to other residents such as Plaintiff;

    g. Failed to promptly and accurately report known or suspected child abuse at its facilities to proper authorities (if reported at all), including but not limited to medical authorities or local law enforcement, and Illinois DCFS, as required by Illinois law;

    h. Failed to follow the facility's policies and procedures on reporting known or suspected abuse of patients / residents;

77

i. Failed to enforce the facility's policies and procedures on reporting known or suspected abuse of patients / residents;

j. Continued to retain Plaintiff's abuser and other predatory abusers despite their history of misconduct and abuse of residents;

k. Failed to properly train and educate its staff in regards to appropriate conduct with minor patients, and how to prevent and adequately respond to known or suspected incidents of child physical, sexual and emotional abuse, and/or grooming;

l. Failed to adequately train employees and staff how to identify the warning signs that a resident was being exploited, abused, and/or groomed;

m. Failed to warn patients / residents in their programs (and their parents, grandparents, and/or legal guardians) about the known history of abuse, violence, and dangers at UHS facilities including and particularly at Hartgrove Hospital;

n. Failed to develop and implement adequate policies, procedures, and training to prevent the sexual, physical, and emotional exploitation and abuse of minor patients at Hartgrove Hospital;

o. Failed to investigate or timely and adequately investigate known or suspected staff misconduct, and/or sexual, physical, and/or emotional/mental exploitation and abuse of minor patients;

p. Failed to properly investigate suspected, reported or witnessed child exploitation and abuse involving Plaintiff;

q. Failed to properly investigate the sexual abuse of Plaintiff, including but not limited to failure to document and process the evidence, and failure to conduct an unbiased investigation;

r. Failed to conduct a proper background check on employees and agents to ensure employees did not have a history of disqualifying offenses;

s. Failed to fire, discipline, and/or remove abusive staff members, or otherwise prevent them from accessing Plaintiff and other minor residents on or off the premises;

t. Perpetuated or otherwise tolerated a system and culture that covered up abuse, downplayed reporting and failed to thoroughly investigate physical sexual and emotional exploitation and abuse of residents / patients;

u. Failed to reprimand, discipline, and terminate staff that failed to report, or failed to promptly and accurately report, known or suspected exploitation and abuse of minors to the proper officials and authorities;

v. Covered up, minimized, and/or ignored allegations of patient exploitation and abuse;

w. Permitted staff members to supervise other staff where a conflict of interest existed and it was foreseeable that the supervisor would be unable to adequately and

78

independently supervise said staff members, including but not limited to the Plaintiff's abuser during the relevant time period;

x. Actively misled the public, parents, guardians, and child services agencies regarding the quality and trustworthiness of the staff at Hartgrove Hospital and at UHS facilities in general;

y. Actively misled the public, parents, guardians, and child services agencies regarding the true nature and extent of abuse occurring at its facilities, the institutional failures and problems that existed at its facilities including Hartgrove Hospital, and the true history, nature and extent of the dangers posed to residents/patients by predatory staff and residents for financial gain; and/or

z. Was otherwise negligent.

371. As a direct and proximate cause and result of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful acts and omissions, Plaintiff was sexually abused while residing at Hartgrove Hospital.

372. As a direct and proximate cause of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful acts and omissions, and the resulting child sexual, physical and psychological abuse, Plaintiff has suffered and continues to suffer serious injuries and damages, including but not limited to great pain of mind and body; shock; severe and permanent psychological and emotional distress; physical manifestations of aforesaid emotional and psychological distress; feelings of humiliation, disgrace, embarrassment, and loss of self-esteem; and loss of normal life; Further, she has sustained economic damages, including but not limited to past and future expenses for psychological treatment, therapy, and counseling, and loss of income and/or loss of earning capacity.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against Defendants UHS OF HARTGROVE, INC., UNIVERSAL HEALTH SERVICES, INC., and UHS OF DELAWARE, INC., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of bringing this action, and for such other further relief this Court deems appropriate and just.

## COUNT 2: NEGLIGENT HIRING AND RETENTION
### *Plaintiff v. Defendants UHS-Hartgrove, UHS, Inc., and UHS-D*

373.    Plaintiff incorporates all preceding paragraphs into this Count as if fully set forth herein.

374.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D accepted and treated minor patients at Hartgrove Hospital, including but not limited to those who suffered from emotional or behavioral disorders and problems, mental illnesses, depression, attention deficit disorder (ADD) / attention-deficit hyperactivity disorder (ADHD); those who had known or suspected preexisting traumas such as physical and sexual abuse; and those suffering from self-destructive behavior/suicidal ideation.

375.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D owned and operated a residential treatment program at Hartgrove whereby minors such as Plaintiff resided at the facility for a period of time, without their parents or guardians, and for the purpose of undergoing inpatient 24-hour care.

376.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D agreed to and did undertake to provide for the supervision, care, medical and physical safety of children and adolescents at and upon the premises of Hartgrove Hospital, including without limitation, Plaintiff.

377.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, and their employees and agents, were cognizant of Plaintiff's medical history, condition, and vulnerabilities, and that she was a minor.

378.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a duty to ensure its patients / residents at Hartgrove Hospital, including Plaintiff, were safe while residing and/or undergoing treatment at the facility.

379.    At all relevant times, Plaintiff, who was a minor patient, relied on Defendants UHS-Hartgrove, UHS, Inc., and UHS-D for her safety and well-being.

380.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D knew or should have known that Plaintiff's abuser had a particular unfitness for the position he held at Hartgrove Hospital, which gave him unsupervised access to and oversight of vulnerable minor patients such as Plaintiff, based on his history of misconduct and incompetence.

381.    At all relevant times, including prior to, during and after Plaintiff's abuse, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D knew or should have known that Plaintiff's abuser posed a risk of harm to vulnerable minor patients such as Plaintiff and was otherwise unfit for the positions of trust and authority he held at Hartgrove Hospital.

382.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a duty to adequately vet its staff members, employees, agents, and/or servants prior to hiring them to work with the minor patient/residents residing or undergoing treatment at Hartgrove Hospital for mental or behavioral care and treatment.

383.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a duty to act reasonably in hiring employees.

384.    Notwithstanding these duties and policies, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, failed to conduct a proper background check on Plaintiff's abuser prior to hiring him to ensure he did not have a history of disqualifying offenses, despite knowing that he would be working unsupervised with minor patient/residents at the Hartgrove Hospital facility.

385.    Notwithstanding its knowledge and these duties, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D failed to ensure that its hiring standards, policies, and procedures adequately screened for sexual abusers prior to hiring them and providing them with unsupervised

81

and unfettered access to minor patient/residents.

386.     Notwithstanding its knowledge and these duties, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D hired Plaintiff's abuser despite knowledge of the danger posed by him to minor Hartgrove Hospital patient/residents, including Plaintiff, and failed to take any measures to protect and ensure the safety of minor patient/residents, including Plaintiff.

387.     Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a duty to act reasonably in retaining employees.

388.     At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D were on notice that staff members had sexually exploited and assaulted patient/residents while those patients were being treated at the Hartgrove Hospital.

389.     At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a duty to investigate improper staff conduct and to keep patient/residents in a safe environment when on notice that their safety and wellbeing was threatened.

390.     At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D knew, or in the exercise of reasonable care should have known, that predatory staff members and patients presented a risk of danger to Plaintiff and other minor patient/residents at Hartgrove Hospital.

391.     At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D knew or in the exercise of reasonable care should have known, that Plaintiff's abuser had a particular unfitness for the position he held at Hartgrove Hospital, which gave Plaintiff's abuser unsupervised and unfettered access to and oversight of vulnerable minor patient/residents, including Plaintiff, based on his history of misconduct and incompetence.

392.     At all relevant times, including prior to, during, and after Plaintiff's abuse, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D knew or should have known that Plaintiff's

abuser posed a risk of harm to vulnerable minor patient/residents, including Plaintiff, and was otherwise unfit for the positions of trust and authority he held at Hartgrove Hospital.

393. Despite notice of the dangers posed by Plaintiff's abuser, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D retained his employment and failed to take remedial measures to protect and ensure the safety of patient/residents, including Plaintiff.

394. By hiring and retaining Plaintiff's abuser, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D created a risk of exposing hospital patients to potentially dangerous individuals and created the opportunity for Plaintiff's abuser to sexually, physically, and emotionally exploit and abuse Plaintiff.

395. As a result of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's negligent hiring and retention of her abuser, these Defendants entrusted Plaintiff's safety to an individual who these Defendants knew, or should have known with the exercise of reasonable care, was not fit or prepared to safely perform mental health services and/or to otherwise be responsible for supervising minor, vulnerable patients, such as Plaintiff, in rooms and locations alone (or as the only adult) on the premises.

396. As a direct and proximate cause and result of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful acts and omissions, which includes the negligent hiring and retention of Plaintiff's abuser, Plaintiff was sexually exploited and abused while residing at Hartgrove Hospital.

397. As a direct and proximate cause of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful acts and omissions, and the resulting child sexual, physical and psychological exploitation and abuse, Plaintiff has suffered and continues to suffer serious injuries and damages, including but not limited to great pain of mind and body; shock; severe and permanent

83

psychological and emotional distress; physical manifestations of aforesaid emotional and psychological distress; feelings of humiliation, disgrace, embarrassment, and loss of self-esteem; and loss of normal life; Further, she has sustained economic damages, including but not limited to past and future expenses for psychological treatment, therapy, and counseling, and loss of income and/or loss of earning capacity.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against Defendants UHS OF HARTGROVE, INC., UNIVERSAL HEALTH SERVICES, INC., and UHS OF DELAWARE, INC., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of bringing this action, and for such other further relief this Court deems appropriate and just.

## COUNT 3: NEGLIGENT SUPERVISION
### *Plaintiff v. Defendants UHS-Hartgrove, UHS, Inc., and UHS-D*

398.    Plaintiff incorporates all preceding paragraphs into this Count as if fully set forth herein.

399.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D accepted and treated minor patients at Hartgrove Hospital, including but not limited to those who suffered from emotional or behavioral disorders and problems, mental illnesses, depression, attention deficit disorder (ADD) / attention-deficit hyperactivity disorder (ADHD); those who had known or suspected preexisting traumas such as physical and sexual abuse; and those suffering from self-destructive behavior/suicidal ideation.

400.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D owned and operated a residential treatment program at Hartgrove Hospital whereby minors such as Plaintiff resided at the facility for a period of time, without their parents or guardians, and for the purpose of undergoing inpatient 24-hour care.

401.     At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D agreed to and did undertake to provide for the supervision, care, and physical safety of children and adolescents at and upon the premises of Hartgrove Hospital, including without limitation, Plaintiff.

402.     At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, and their employees and agents, were cognizant of Plaintiff's medical history, condition, and vulnerabilities, and that she was a minor.

403.     At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a duty to ensure all patients / residents at Hartgrove Hospital, including Plaintiff, were safe while residing and/or undergoing treatment at the facility.

404.     At all relevant times, Plaintiff, who was a minor patient, relied on Defendants UHS-Hartgrove, UHS, Inc., and UHS-D for her safety and well-being.

405.     At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a duty to adequately vet, control and supervise their employees and agents for the protection of Plaintiff and the other residents, including a duty to vet, control and supervise Plaintiff's abuser.

406.     At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D knew, or in the exercise of reasonable care should have known, that predatory staff members and certain residents/patients presented a risk of danger to Plaintiff and other residents/patients.

407.     At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a duty to investigate improper conduct of staff and to keep their residents in a safe environment, when on notice that their safety was threatened.

408.     At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a policy to require any employee who suspects or receives has knowledge that a resident was or may

85

have been sexually exploited, harassed, or abused to immediately report such knowledge information to the appropriate supervisory officials and authorities.

409. At all relevant times, pursuant to the Illinois Abused and Neglected Child Reporting Act, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, and their employees and agents, had a legal duty to immediately notify and report to the Illinois Department of Family and Child Services (DCFS) all instances where they suspect or receive knowledge that a patient was or may be have been sexually, physically, or psychologically harassed, exploited, abused, and/or groomed.

410. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a policy to require any employee who suspects or receives knowledge that a resident may be sexually harassed or abused, or was being groomed or exploited, to immediately report such knowledge or concerns to the appropriate officials.

411. At all relevant times, pursuant to the Illinois Abused and Neglected Child Reporting Act, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, and their employees and agents, had a legal duty to immediately notify and report to law enforcement and the Illinois Department of Family and Child Services (DCFS) all instances where they suspect or receive knowledge that a patient may be sexually or psychologically harassed, exploited, abused, and/or groomed.

412. At all times relevant herein, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D hired and employed Plaintiff's abuser.

413. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D knew or should have known that Plaintiff's abuser had a particular unfitness for the positions he held at Hartgrove Hospital, which gave him unsupervised access to and oversight of vulnerable minor patients such as Plaintiff, based on his history of misconduct and incompetence.

414. At all relevant times, including prior to, during and after Plaintiff's abuse, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D knew or should have known that Plaintiff's abuser posed a risk of harm to vulnerable minor patients such as Plaintiff and were otherwise unfit for the positions of trust and authority they held at Hartgrove Hospital.

415. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, by and through their agents, employees, and/or servants, failed to adequately supervise Plaintiff's abuser, as well as predatory patients, by committing one or more of the following acts and/or omissions:

   a. Failed to stop predatory staff and residents from harming Plaintiff, including sexually exploiting and abusing her;

   b. Failed to properly monitor and supervise its employees and agents, including Plaintiff's abuser;

   c. Failed to properly monitor and supervise the time its employees and agents, such as Plaintiff's abuser, spent with residents, such as Plaintiff;

   d. Failed to properly monitor and supervise potentially dangerous residents / patients, who Defendants UHS-Hartgrove, UHS, Inc., and UHS-D knew or should have known posed a risk of harm to other residents such as Plaintiff;

   e. Failed to promptly and accurately report known or suspected child abuse at its facilities to proper authorities (if reported at all), including but not limited to medical authorities or local law enforcement, and Illinois DCFS, as required by Illinois law;

   f. Failed to follow the facility's policies and procedures on reporting known or suspected abuse of patients / residents;

   g. Failed to enforce the facility's policies and procedures on reporting known or suspected abuse of patients / residents;

   h. Continued to retain Plaintiff's abuser despite their history of misconduct and abuse of residents;

   i. Failed to report Plaintiff's abuser to proper authorities, such as law enforcement and Illinois DCFS, for known or suspected abuse and/or grooming of minor patients including but not limited to Plaintiff;

   j. Failed to properly investigate Plaintiff's abuser;

   k. Failed to treat, investigate or question Plaintiff's abuser as suspects, including failure to conduct witness interviews;

   l. Failed to terminate Plaintiff's abuser;

87

m. Failed to reprimand, discipline, and terminate staff that failed to report, or failed to promptly and accurately report, known or suspected abuse of minors to the proper officials and authorities;

n. Covered up, minimized, and/or ignored allegations of patient abuse;

o. Permitted staff members to supervise other staff where a conflict of interest existed and it was foreseeable that the supervisor would be unable to adequately and independently supervise said staff members, including but not limited to Plaintiff's abuser during the relevant time period; and/or

p. Was otherwise negligent in regard to supervision of predatory staff and residents and in ensuring the safety of vulnerable minor residents such as Plaintiff.

416. As a direct and proximate cause and result of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful acts and omissions, which includes these Defendants' negligent supervision, Plaintiff was sexually exploited and abused while residing at Hartgrove Hospital.

417. As a direct and proximate cause of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful acts and omissions, and the resulting child sexual, physical and psychological exploitation and abuse, Plaintiff has suffered and continues to suffer serious injuries and damages, including but not limited to great pain of mind and body; shock; severe and permanent psychological and emotional distress; physical manifestations of aforesaid emotional and psychological distress; feelings of humiliation, disgrace, embarrassment, and loss of self-esteem; and loss of normal life; Further, she has sustained economic damages, including but not limited to past and future expenses for psychological treatment, therapy, and counseling, and loss of income and/or loss of earning capacity.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against Defendants UHS OF HARTGROVE, INC., UNIVERSAL HEALTH SERVICES, INC., and UHS OF DELAWARE, INC., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of bringing this action, and for such other further relief this Court deems appropriate and just.

## COUNT 4: VICARIOUS LIABILITY FOR CHILD SEXUAL ABUSE / BATTERY
## RESTATEMENT (SECOND) OF TORTS § 317
### *Plaintiff v. Defendants UHS-Hartgrove, UHS, Inc., and UHS-D*

418. Plaintiff incorporates all preceding allegations as though fully alleged herein.

419. At all times relevant, Plaintiff's abuser was an employee or agent of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D.

420. The Restatement (Second) of Torts, Section 317 states:

*A master is under the duty to exercise reasonable care so as to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them if:*

    i. *The servant*

        1. *Is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or*

        2. *Is using a chattel of the master; and*

    ii. *The master*

        1. *Knows or has reason to know that he has the ability to control his servant, and*

        2. *Knows or should know of the necessity and opportunity for exercising such control.*

421. At all relevant times, it was the duty of the Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, through the acts of their employees and/or agents, to exercise reasonable care for the protection and benefit of their minor patients at Hartgrove Hospital, including Plaintiff.

422. In the alternative, if the actions of Plaintiff's abuser during the time Plaintiff resided at Hartgrove Hospital were acts outside the scope of his employment by the Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, these acts were such acts for which these Defendants had legal responsibility, as more particularly described below.

423. Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, as masters, were under a duty to exercise reasonable care to control their servant, Plaintiff's abuser, to prevent him from

intentionally harming others, or from conducting themselves so as to create an unreasonable risk of bodily harm to others, such as Plaintiff.

424. At all relevant times, Plaintiff's abuser was upon the premises of Hartgrove Hospital and had access to Plaintiff through the privilege of their employment with Defendants UHS-Hartgrove, UHS, Inc., and UHS-D.

425. At all relevant times, Plaintiff's abuser was upon the premises owned and in possession of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D when he sexually abused Plaintiff.

426. At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D knew or had reason to know that they had the ability to control Plaintiff's abuser and knew or should have known of the necessity and opportunity for exercising such control.

427. The sexual abuse perpetrated upon Plaintiff occurred on Hartgrove Hospital's premises and property that Plaintiff's abuser occupied and/or used and/or had access to by virtue of their position of employment, trust and authority at the youth residential treatment facility.

428. Plaintiff's abuser was on Hartgrove Hospital's premises only by their employment with Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, and these Defendants knew that they had the ability to control him, and that Plaintiff's abuser was likely to be alone with minors at the facility, including at night.

429. Defendants UHS-Hartgrove, UHS-D, and UHS, Inc. knew or reasonably should have known that to allow predatory staff outside of the presence of other responsible, trustworthy adults was a formula for disaster; and such disaster did occur in the form of the abuse of Plaintiff.

430. Defendants UHS-Hartgrove, UHS-D, and UHS, Inc. breached the duty of care owed to Plaintiff, a minor patient, by committing one or more of the following wrongful acts and/or

90

FILED DATE: 11/12/2025 3:53 PM    2025L014133

omissions, through the actions or omissions of its agents and employees, including Plaintiff's abuser:

    a.  Plaintiff's abuser sexually abused and exploited Plaintiff, a vulnerable minor patient, on property owned, operated or controlled by Defendants UHS-Hartgrove, UHS, Inc., and UHS-D; and/or

    b.  Plaintiff's abuser used property owned, operated or controlled by the Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, to facilitate the sexual abuse and exploitation of Plaintiff, a vulnerable minor patient.

431.    Due to the inherent power disparity between a minor patient at a behavioral health facility and the employees who exercise total control over their health, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, knew they must take extra caution in vetting and supervising the adults who have access to these vulnerable children.

432.    Defendants UHS-Hartgrove, UHS, Inc., and UHS-D (masters) failed to exercise reasonable care over their employees (servants) enabling them to sexually exploit and abuse vulnerable children like Plaintiff Jane Doe 4 with impunity on their premises.

433.    As a direct and proximate cause and result of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful acts and omissions, as described in part herein, Plaintiff was sexually exploited and abused while residing at Hartgrove Hospital.

434.    As a direct and proximate cause of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful acts and omissions, and the resulting child sexual, physical and psychological exploitation and abuse, Plaintiff has suffered and continues to suffer serious injuries and damages, including but not limited to great pain of mind and body; shock; severe and permanent psychological and emotional distress; physical manifestations of aforesaid emotional and psychological distress; feelings of humiliation, disgrace, embarrassment, and loss of self-esteem; and loss of normal life; Further, she has sustained economic damages, including but not limited to

past and future expenses for psychological treatment, therapy, and counseling, and loss of income and/or loss of earning capacity.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against Defendants UHS OF HARTGROVE, INC., UNIVERSAL HEALTH SERVICES, INC., and UHS OF DELAWARE, INC., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of bringing this action, and for such other further relief this Court deems appropriate and just.

## COUNT 5: WILLFUL AND WANTON CONDUCT
### *Plaintiff v. Defendants UHS-Hartgrove, UHS, Inc., and UHS-D*

435.    Plaintiff incorporates the factual allegations above as though alleged herein.

436.    At all times relevant, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D owned and operated Hartgrove Hospital, a youth residential treatment facility, which was responsible for providing medical treatment, housing, and education for vulnerable minor patients, including Plaintiff.

437.    At all times relevant, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D had a duty to provide a safe, secure, and protective environment for their patients, including Plaintiff.

438.    At all times relevant, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, including their employees and agents, had a duty to refrain from acting with an utter indifference and/or conscious disregard for the safety of patients at Hartgrove Hospital, including Plaintiff.

439.    In breach of said duty, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, by and through their actual, implied, and/or apparent agents, employees, and/or servants, including but not limited to Plaintiff's abuser, acted with conscious or reckless disregard when they committed the following willful and wanton acts and/or omissions.

92

a. Failed to ensure Plaintiff's safety and well-being and otherwise keep Plaintiff safe;

b. Failed to protect Plaintiff from sexual, physical, and emotional/mental exploitation and abuse while she was at Hartgrove Hospital;

c. Failed to stop predatory staff and residents from harming Plaintiff, including sexually exploiting and abusing her;

d. Failed to properly monitor and supervise its employees and agents, including Plaintiff's abuser;

e. Failed to properly monitor and supervise the time its employees and agents, such as Plaintiff's abuser, spent with residents, such as Plaintiff;

f. Failed to properly monitor and supervise potentially dangerous residents / patients, who Defendants UHS-Hartgrove, UHS, Inc., and UHS-D knew or should have known posed a risk of harm to other residents such as Plaintiff;

g. Failed to promptly and accurately report known or suspected child abuse at its facilities to proper authorities (if reported at all), including but not limited to medical authorities or local law enforcement, and Illinois DCFS, as required by Illinois law;

h. Failed to follow the facility's policies and procedures on reporting known or suspected abuse of patients / residents;

i. Failed to enforce the facility's policies and procedures on reporting known or suspected abuse of patients / residents;

j. Continued to retain Plaintiff's abuser despite his history of misconduct and abuse of residents;

k. Failed to properly train and educate its staff in regard to appropriate conduct with minor patients, and how to prevent and adequately respond to known or suspected incidents of child physical, sexual and emotional abuse, exploitation and/or grooming;

l. Failed to adequately train employees and staff how to identify the warning signs that a resident was being abused, exploited, and/or groomed;

m. Failed to warn patients / residents in their programs (and their parents, grandparents, and/or legal guardians) about the known history of abuse, exploitation, violence, and dangers at UHS facilities including and particularly at Hartgrove Hospital;

n. Failed to develop and implement adequate policies, procedures, and training to prevent the sexual, physical, and emotional exploitation and abuse of minor patients at Hartgrove Hospital;

93

o. Failed to investigate or timely and adequately investigate known or suspected staff misconduct, and/or sexual, physical, and/or emotional/mental exploitation and abuse of minor patients;

p. Failed to properly investigate suspected, reported or witnessed child abuse involving Plaintiff after a staff member walked in on Plaintiff being sexually exploited and abused on the premises;

q. Failed to conduct a proper background check on employees and agents to ensure employees did not have a history of disqualifying offenses;

r. Failed to fire, discipline, and/or remove abusive staff members, or otherwise prevent them from accessing Plaintiff and other minor residents on or off the premises;

s. Perpetuated or otherwise tolerated a system and culture that covered up abuse, downplayed reporting and failed to thoroughly investigate physical sexual and emotional abuse of residents / patients;

t. Failed to reprimand, discipline, and terminate staff that failed to report, or failed to promptly and accurately report, known or suspected exploitation and abuse of minors to the proper officials and authorities;

u. Covered up, minimized, and/or ignored allegations of patient abuse;

v. Permitted staff members to supervise other staff where a conflict of interest existed and it was foreseeable that the supervisor would be unable to adequately and independently supervise said staff members, including but not limited to the Plaintiff's abuser during the relevant time period;

w. Actively misled the public, parents, guardians, and child services agencies regarding the quality and trustworthiness of the staff at Hartgrove Hospital and at UHS facilities in general;

x. Actively misled the public, parents, guardians, and child services agencies regarding the true nature and extent of abuse occurring at its facilities, the institutional failures and problems that existed at its facilities including Hartgrove Hospital, and the true history, nature and extent of the dangers posed to residents/patients by predatory staff and residents for financial gain; and/or

y. Otherwise acted with conscious or reckless disregard for the safety and well-being of Plaintiff.

440. As a direct and proximate cause and result of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's reckless and/or willful and wanton acts and omissions, Plaintiff was sexually exploited and abused while residing at Hartgrove Hospital.

94

441.    As a direct and proximate cause of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D wrongful acts and omissions, and the resulting child sexual, physical and psychological exploitation and abuse, Plaintiff has suffered and continues to suffer serious injuries and damages, including but not limited to great pain of mind and body; shock; severe and permanent psychological and emotional distress; physical manifestations of aforesaid emotional and psychological distress; feelings of humiliation, disgrace, embarrassment, and loss of self-esteem; and loss of normal life; Further, she has sustained economic damages, including but not limited to past and future expenses for psychological treatment, therapy, and counseling, and loss of income and/or loss of earning capacity.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against Defendants UHS OF HARTGROVE, INC., UNIVERSAL HEALTH SERVICES, INC., and UHS OF DELAWARE, INC., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of brining this action, and for such other further relief this Court deems appropriate and just.

## COUNT 6: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### *Plaintiff v. Defendants UHS-Hartgrove, UHS, Inc., and UHS-D*

442.    Plaintiff incorporates all preceding paragraphs as if alleged herein.

443.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D exercised power and control over their minor patients including Jane Doe 4. They exercised so much control over their patients, their agents and employees had authority to inject them with medication akin to a tranquilizer without their consent.

444.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, by and through their respective actual or apparent employees, servants, and/or agents, and by and through their official and unofficial policies, practices, and customs, engaged in outrageous conduct that

95

was so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society.

445. Thus, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, and their respective actual or apparent employees, servants, and agents, either intended that their conduct should inflict severe emotional distress or knew of and recklessly or negligently disregarded a high probability that their conduct would cause severe emotional distress.

446. Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, and Plaintiff's abuser, committed extreme and outrageous conduct against Jane Doe 4 when it subjected her to sexual exploitation and abuse as a living condition of her receiving "treatment" at their residential treatment center. Other Hartgrove Hospital agents and employees promoted a culture that celebrated and/or mocked the exploitation of children, making jokes about patients who were subject to child sex exploitation and abuse. This culture enabled sexual abuse of children on the premises and normalized disbelieving patients who tried to report they were experiencing sexual abuse. Hartgrove Hospital agents and employees who knew about or suspected the abuse Jane Doe 4 was suffering on the premises also intentionally chose not to comply with their mandatory reporter requirements under Illinois law.

447. Defendants UHS, Inc. and UHS-D committed extreme and outrageous conduct by creating, promoting, disseminating, and enforcing an unofficial business policy where their subsidiaries including UHS-Hartgrove would profit off of patient neglect, namely: pressuring understaffed facilities to prioritize their time submitting billing records to maximize profits at the expense of actually rendering safe patient care, and encouraging understaffing to cut costs. UHS executives also publicly supported its employee sexual abusers when investigated by state and

federal authorities along with the media, including for Hartgrove Hospital, directly telling the public not to believe the former patients who reported they were sexually abused there.

448.  Defendants UHS-Hartgrove, UHS, Inc., and UHS-D were aware of the high probability that Jane Doe 4 would be subjected to sexual exploitation and abuse and continue to be subjected to sexual exploitation abuse by the employee exploitation and abusing her when they took these outrageous actions. Internal and external complaints of sexual exploitation abuse abound from Hartgrove Hospital.

449.  It is common sense that sexual assault of any kind will cause severe emotional distress. Child sexual abuse is commonly understood to cause a lifetime of emotional trauma that manifests in physical symptoms of injury.

450.  As a direct and proximate result of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful and outrageous conduct, Jane Doe 4 was sexually exploited and abused and otherwise suffered trauma at Hartgrove Hospital as well as thereafter.

451.  As a direct and proximate cause of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful acts and omissions, and the resulting child sexual, physical and psychological exploitation and abuse, Plaintiff has suffered and continues to suffer serious injuries and damages, including but not limited to great pain of mind and body; shock; severe and permanent psychological and emotional distress; physical manifestations of aforesaid emotional and psychological distress; feelings of humiliation, disgrace, embarrassment, and loss of self-esteem; and loss of normal life; Further, she has sustained economic damages, including but not limited to past and future expenses for psychological treatment, therapy, and counseling, and loss of income and/or loss of earning capacity.

452.    In addition to its own acts, conduct set forth herein was committed by the employees, agents, servants, and/or officials of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's in the course and scope of their employment and while upon the premises in possession of these Defendants upon which the abusers were privileged to enter only as servants of these Defendants.

453.    By virtue of the special relationship between Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's and Plaintiff herein, these Defendants are vicariously liable for the conduct of their agents, servants, officials, and employees constituting extreme and outrageous conduct.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against Defendants UHS OF HARTGROVE, INC., UNIVERSAL HEALTH SERVICES, INC., and UHS OF DELAWARE, INC., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of bringing this action, and for such other further relief this Court deems appropriate and just.

## COUNT 7: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### *Plaintiff v. Defendants UHS-Hartgrove, UHS, Inc., and UHS-D*

454.    Plaintiff incorporates all preceding paragraphs as if alleged herein.

455.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D exercised power and control over their minor patients including Jane Doe 4. They exercised so much control over their patients, their agents and employees had authority to inject them with medication akin to a tranquilizer without her consent.

456.    At all relevant times, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, by and through their respective actual or apparent employees, servants, and/or agents, and by and through their official and unofficial policies, practices, and customs, engaged in outrageous conduct that was so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society.

98

457.    Thus, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D, and their respective actual or apparent employees, servants, and agents, either intended that their conduct should inflict severe emotional distress or knew of and recklessly or negligently disregarded a high probability that their conduct would cause severe emotional distress.

458.    Defendant UHS-Hartgrove, UHS-D, and UHS, Inc. committed extreme and outrageous conduct against Jane Doe 4 when it, among other things, subjected her to sexual exploitation and abuse as a living condition of her receiving "treatment" at their youth residential treatment facility. Other Hartgrove Hospital agents and employees promoted a culture that celebrated and/or mocked the exploitation of children, making jokes about patients who were subject to child sex abuse. This culture enabled sexual exploitation and abuse of children on the premises and normalized disbelieving patients who tried to report they were experiencing sexual abuse. Hartgrove Hospital agents and employees who knew about or otherwise suspected Jane Doe 4 and other residents were being abused on the premises also failed to comply with their mandatory reporter requirements under Illinois law.

459.    Defendants UHS, Inc. and UHS-D committed extreme and outrageous conduct by creating, promoting, disseminating, and enforcing an unofficial business policy where their subsidiaries including UHS-Hartgrove would profit off of patient neglect, namely: pressuring understaffed facilities to prioritize their time submitting billing records to maximize profits at the expense of actually rendering safe patient care, and encouraging understaffing to cut costs. UHS executives also publicly supported its employee sexual abusers when investigated by state and federal authorities along with the media, including for Hartgrove Hospital, directly telling the public not to believe the former patients who reported they were sexually abused there.

460. Defendants UHS-Hartgrove, UHS, Inc., and UHS-D were aware of the high probability or should have known of the reasonable likelihood that Jane Doe 4 would be subjected to sexual exploitation and abuse and continue to be subjected to sexual exploitation abuse by the employee abusing her when they took these outrageous actions. These Defendants received internal and external complaints of sexual exploitation and abuse occurring at Hartgrove Hospital.

461. It is common sense that sexual assault of any kind will cause severe emotional distress. Child sexual abuse is commonly understood to cause a lifetime of emotional trauma that manifests in physical symptoms of injury.

462. As a direct and proximate result of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful and outrageous conduct, Jane Doe 4 was sexually exploited and abused and otherwise suffered trauma at Hartgrove Hospital as well as thereafter.

463. As a direct and proximate cause of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful acts and omissions, and the resulting child sexual, physical and psychological exploitation and abuse, Plaintiff has suffered and continues to suffer serious injuries and damages, including but not limited to great pain of mind and body; shock; severe and permanent psychological and emotional distress; physical manifestations of aforesaid emotional and psychological distress; feelings of humiliation, disgrace, embarrassment, and loss of self-esteem; and loss of normal life; Further, she has sustained economic damages, including but not limited to past and future expenses for psychological treatment, therapy, and counseling, and loss of income and/or loss of earning capacity.

464. In addition to its own acts, conduct set forth herein was committed by the employees, agents, servants, and/or officials of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D in the course and scope of their employment and while upon the premises in possession of the

100

these Defendants upon which the abusers were privileged to enter only as servants of these Defendants.

465.    By virtue of the special relationship between Defendants UHS-Hartgrove, UHS, Inc., and UHS-D and Plaintiff herein, these Defendants are vicariously liable for the conduct of their agents, servants, officials, and employees constituting extreme and outrageous conduct.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against Defendants UHS OF HARTGROVE, INC., UNIVERSAL HEALTH SERVICES, INC., and UHS OF DELAWARE, INC., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of bringing this action, and for such other further relief this Court deems appropriate and just.

## COUNT 8: CIVIL CONSPIRACY
### *Plaintiff v. Defendants UHS-Hartgrove, UHS, Inc., and UHS-D*

466.    Plaintiff incorporates all preceding allegations as though fully alleged herein.

467.    Defendants UHS-Hartgrove, UHS, Inc., and UHS-D agreed to participate in an unlawful act that resulted in Plaintiff's injury: creating and knowingly furthering a business model that understaffs and under-supervises youth residential treatment facilities and submits medical bills for treatment not actually rendered in order to maximize profits.

468.    Defendants UHS-Hartgrove, UHS, Inc., and UHS-D each participated in the negligent policies and procedures and hiring and supervision decisions that employed predatory staff at Hartgrove Hospital and tolerated their presence even after patients reported sexual exploitation and abuse there.

469.    Defendants UHS-Hartgrove, UHS, Inc., and UHS-D each consciously chose to implement or abide by the unlawful scheme to maximize profits at the expense of patient safety and were enriched as a result.

470. In furtherance of the conspiracy, to the detriment of Plaintiff and untold others, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D committed the following additional wrongful/unlawful acts and/or omissions:

    a. Retained and failed to supervise predatory staff, including but not limited to Plaintiff's abuser, when it knew of the necessity and opportunity to do so;

    b. Fraudulently represented that Plaintiff's abuser was fit to treat and supervise vulnerable minor patients and safe to have unsupervised contact with vulnerable minor patients; and/or

    c. Fraudulently concealed and withheld its knowledge of the true nature and extent of prior complaints, allegations and incidents of sexual exploitation, abuse, or misconduct involving staff and other residents, for financial gain.

471. Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's conduct in furtherance of the conspiracy facilitated Plaintiff's abuser's access to vulnerable minors and the opportunity to sexually abuse them, including Plaintiff.

472. As a direct and proximate result of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful conduct, Jane Doe 4 was sexually exploited and abused and otherwise suffered trauma at Hartgrove Hospital as well as thereafter.

473. As a direct and proximate cause of Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's wrongful acts and omissions, and the resulting child sexual, physical and psychological abuse, Plaintiff has suffered and continues to suffer serious injuries and damages, including but not limited to great pain of mind and body; shock; severe and permanent psychological and emotional distress; physical manifestations of aforesaid emotional and psychological distress; feelings of humiliation, disgrace, embarrassment, and loss of self-esteem; and loss of normal life; Further, she has sustained economic damages, including but not limited to past and future expenses for psychological treatment, therapy, and counseling, and loss of income and/or loss of earning capacity.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against

Defendants UHS OF HARTGROVE, INC., UNIVERSAL HEALTH SERVICES, INC., and UHS OF DELAWARE, INC., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of bringing this action, and for such other further relief this Court deems appropriate and just.

## COUNT 9: NEGLIGENCE – ALTER EGO / SINGLE ENTITY LIABILITY
### *Plaintiff v. Defendants UHS, Inc. and UHS-D.*

474.    Plaintiff incorporates all preceding paragraphs into this Count as if fully set forth herein.

475.    At all relevant times, Defendants UHS, Inc., together with and through its wholly owned subsidiary and agent, UHS-D, had the right to and did govern the conduct of UHS-Hartgrove and Hartgrove Hospital, as UHS does for all of its subsidiary health care facilities. This included but was not limited to UHS establishing, implementing, monitoring, and enforcing the policies, procedures, and training that subsidiary facility employees and patients were to follow.

476.    At all relevant times, UHS-Hartgrove and Hartgrove Hospital, and their agents or employees, were following the direction or authorization of those UHS policies, procedures, training, and directions when they knew or had reason to know that Plaintiff was being sexually exploited, abused, and battered on the premises by Hartgrove Hospital agents or employees but did nothing to prevent or protect her from such sexual abuse or otherwise stop the sexual abuse.

477.    At all relevant times, Defendants UHS, Inc., and UHS-D, and their actual or apparent agents and employees, breached their duty to Jane Doe 4 when they negligently failed to implement or enforce policies that appropriately acknowledged the documented risk of patient sexual abuse and took measures to prevent it from occurring at subsidiary health care facilities like Hartgrove Hospital. This includes policies that:

103

a. require the reasonable monitoring of the whereabouts of staff like Jane Doe 4's abusers to ensure, particularly at nighttime, that staff have a valid medical purpose to enter patients' barracks and are not doing so with the intention of sexually abusing patients;

b. train staff to recognize and report sexual abuse when it is occurring and create an environment where patients both feel and are in fact safe to report they are experiencing sexual abuse;

c. educate patients as to what inappropriate behavior constitutes grooming and/or sexual abuse and inform patients of the practical means to report sexual abuse both internally and externally;

d. ensure staff members who are engaging in such inappropriate and abusive behaviors will be terminated from employment promptly;

e. organize patients, staff, and the brick-and-mortar components of a facility in such a way as to prevent or at least minimize known or foreseeable risks of sexual abuse;

f. require safety audits be conducted to ensure that patients are in fact not experiencing sexual abuse at a given facility, particularly where unusual incident reports or other complaints document the issue may be occurring there; and

g. require facilities and their staff members to take seriously patient complaints of sexual abuse and meaningfully investigate those complaints.

478. At all relevant times, Defendants UHS, Inc. and UHS-D negligently failed to review internal and external complaints coming from Hartgrove Hospital and respond accordingly, resulting in the sexual exploitation and abuse of Jane Doe 4. Notwithstanding the dozens of police reports, unusual incident reports, and media coverage, UHS defended its policies and procedures and openly disbelieved patients who bravely reported their experiences.

479. Piercing the corporate veil between UHS-Hartgrove and its parent companies, UHS, Inc. and UHS-D, is both appropriate and necessary to avoid substantial injustice. UHS, Inc., together with and through its wholly owned subsidiary and agent, UHS-D, controls its healthcare facility subsidiaries and uses them to enhance its own profits. When child sexual abuse reaches a level of severity at any given subsidiary that the public become aware of it through media coverage,

UHS, Inc. may simply shut the facility down, evading accountability for the harm it has created, tolerated, and profited from.

480. At all relevant times, the key decision makers for Hartgrove Hospital are the same decision makers at UHS, Inc. or UHS-D. All major decisions for UHS healthcare facilities are controlled by UHS, Inc. and UHS-D. Hartgrove Hospital's own CEO represents himself to the public as an employee of UHS, Inc.

481. At all relevant times, UHS, Inc. records revenue from individual healthcare facility subsidiaries like Hartgrove Hospital on UHS, Inc.'s accounting books, and UHS, Inc. controls the submission of individual healthcare facility subsidiaries' patient medical records for billing to be reimbursed by state and federal Medicaid programs. All major financial and managerial decisions of Hartgrove Hospital and UHS's other healthcare facility subsidiaries were made through a centralized system controlled and operated by UHS, Inc., together with and through its wholly owned subsidiary and agent, UHS-D.

482. At all relevant times, employees of Hartgrove Hospital and other UHS healthcare facility subsidiaries were employees of UHS, Inc. or UHS-D who received paychecks and benefits directly from UHS, Inc. or UHS-D. On UHS's website, for example, it identifies UHS, Inc. itself as employing over 96,700 individuals across the "UHS map" of hospitals, facilities, and health services.

483. In another example, if an individual were interested in applying for a job at a subsidiary healthcare facility of UHS, it would apply for such a job directly on the UHS website: https://jobs.uhs.com/careers/. The underlying subsidiary healthcare facility does not have its own separate website portal for job applications, as illustrated below:

105

FILED DATE: 11/12/2025 3:53 PM   2025L014133



484.    At all relevant times, UHS, Inc. has held itself and its subsidiary healthcare facilities out to the public as a single company both through its public statements to the media, its filings with the state and federal government, its system of hiring and employing individuals, and its public website.

485.    For example, under the tab '*our facilities*' on the UHS, Inc. website (html link '*our communities*'), the subsidiary healthcare facilities are listed: https://uhs.com/our-communities/. The UHS, Inc. website continues to use "we" and "our" to describe the subsidiaries and their patients, as illustrated below:

106

Improving the lives of the people we serve in our hospitals and communities

The care you trust, not far from home. Our facilities are dedicated to supporting our communities and giving back. Discover how UHS serves your community.

400+ FACILITIES    96,700 EMPLOYEES    3.6M PATIENTS PER YEAR

486.    Treating UHS-Hartgrove, UHS, Inc., and UHS-D as separate and distinct corporate entities would sanction a fraud or promote injustice. UHS, Inc. has engaged in a nationwide scheme of acquiring health care facilities and directly profiting from patient neglect and abuse. Allowing UHS, Inc. to be treated as a legally distinct entity sanctions their scheme where they profit from their subsidiary facilities' abuse and neglect but may never face liability for that abuse and neglect. Because UHS, Inc. can simply close any subsidiary healthcare facility where significant patient harm occurs—as it did with Red River Academy in Rockford Illinois—UHS, Inc. would have the power to both enable child sexual abuse and ensure no plaintiff can obtain a judgment to compensate them for that sexual abuse.

487.    At all relevant times, UHS, Inc. directed and authorized the policies and procedures (or lack thereof) that created an environment where sexual exploitation and abuse was knowingly tolerated at its healthcare facility subsidiaries, including Hartgrove Hospital.

488.    Sexual exploitation and abuse is objectively a foreseeable outcome of being a patient at a UHS subsidiary health care facility. Plaintiff incorporates allegations ¶¶ 245(a)-(s) demonstrating the federal government's findings to that effect.

489.    At all relevant times, UHS, Inc., together with and through its wholly owned subsidiary and agent, UHS-D, knew the precise conditions that would result in patient sexual abuse

107

occurring at its facilities as it received hundreds of reports to that effect from its facilities across the nation since at least 2005.

490. UHS, Inc., together with and through its wholly owned subsidiary and agent, UHS-D, mandated an overall business and budgetary strategy at its subsidiary healthcare facilities like Hartgrove to maximize profits at the cost of patient safety:

a. Subsidiary employees were instructed by Defendant UHS, Inc., together with and through its wholly owned subsidiary and agent, UHS-D, to intake as many patients as possible while keeping payroll as low as possible, resulting in consistent understaffing;

b. Subsidiary employees were further specifically directed to prioritize the preparation and submission of medical records for billing to maximize payments from state and federal programs like Medicare and Medicaid;

c. Employees were specifically authorized to submit medical records that reflected patient treatment that did not actually occur; and

d. UHS, Inc.'s policy of handling patient complaints of sexual abuse was to disbelieve and discredit patients. UHS's subsidiaries like Hartgrove Hospital were specifically authorized to do the same: to not take patients seriously when they complained of abuse, and to do nothing to ensure sexual abuse is not in fact occurring to patients who report abuse.

491. As a direct and proximate result of the sexual exploitation and abuse he experienced at the hands of a Hartgrove Hospital employee and Defendants UHS, Inc. and UHS-D's institutional negligence, Jane Doe 4 has suffered and will continue to suffer severe and serious personal injuries, including but not limited to severe psychological distress, emotional anguish, humiliation, embarrassment, loss of self-esteem, and other injuries and damages.

492. At all relevant times, Hartgrove Hospital shared elements of managerial staff with employees and agents of UHS, Inc. and UHS-D.

493. At all relevant times, UHS-Hartgrove, UHS, Inc., and UHS-D had joint control and management of their operations at Hartgrove Hospital.

494. At all relevant times, UHS-Hartgrove and UHS, Inc., together with and through its wholly owned subsidiary and agent, UHS-D, had joint control and management of their operations through common managers, and executives, including Hartgrove Hospital's President who also worked at UHS's corporate headquarters.

495. At all relevant times, UHS-Hartgrove, UHS, Inc., and UHS-D shared profits relating to its behavioral health facilities and services.

496. At all relevant times, UHS-Hartgrove, UHS, Inc., and UHS-D, failed to maintain an arm's length relationship between one another and their businesses.

497. At all relevant times, UHS-Hartgrove, UHS, Inc., and UHS-D have been and are mere alter egos of one another.

498. Because UHS-Hartgrove, UHS, Inc., and UHS-Dare mere alter-egos of one another, UHS-Hartgrove, UHS, Inc., and UHS-D are liable to Plaintiff for the debts and liabilities of one another, including any and all judgments rendered against any of these entities.

499. In the alternative, at all relevant times, UHS-Hartgrove and its agents and employees acted as actual or apparent agents of Defendants UHS, Inc. and UHS-D, and thus Defendants UHS, Inc. and UHS-D liable for Hartgrove's negligent, reckless, and/or willful or wanton acts and/or omissions under agency principles.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against Defendants UNIVERSAL HEALTH SERVICES, INC. and UHS OF DELAWARE, INC. for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of bringing this action, and for such other further relief this Court deems appropriate and just.

**COUNT 10: NEGLIGENCE – JOINT VENTURE**
*Plaintiff v. Defendants UHS-Hartgrove, UHS, Inc., and UHS-D*

500. Plaintiff incorporates all preceding paragraphs into this Count as if fully set forth herein.

501. At all times relevant herein, Defendants UHS-Hartgrove, UHS, Inc., and UHS-D operated as a joint venture to provide behavioral health services to adults and children in the State of Illinois and particularly in the Chicagoland area.

502. As part of the joint venture, Defendants UHS, Inc. and UHS-D maintained control over UHS-Hartgrove's business operations and staff, including its executives who maintained offices at UHS Corporate Headquarters in King of Prussia, Pennsylvania.

503. At all relevant times, Defendants UHS, Inc., together with and through its wholly owned subsidiary and agent, UHS-D, had the right to and did govern the conduct of UHS-Hartgrove, as UHS, Inc. does for all of its subsidiary health care facilities. This included but was not limited to UHS, Inc., independently and together with and through UHS-D, establishing, implementing, monitoring, and enforcing the policies, procedures, and training that subsidiary facility employees and patients were to follow.

504. At all relevant times, Hartgrove Hospital and its agents or employees were following the direction or authorization of the aforementioned UHS policies, procedures, training, and directions when they knew or had reason to know that Plaintiff was being sexually exploited, abused, and battered on the premises by UHS-Hartgrove agents or employees but did nothing to prevent or protect her from such sexual abuse or otherwise stop the sexual abuse.

505. At all relevant times, Defendants UHS, Inc. and UHS-D, and their actual or apparent agents and employees, breached their duty to Jane Doe 4 when they negligently failed to implement or enforce policies that appropriately acknowledged the documented risk of patient

110

sexual exploitation and abuse and took measures to prevent it from occurring at subsidiary health care facilities like Hartgrove Hospital. This includes policies that:

a. require the reasonable monitoring of the whereabouts of staff like Jane Doe 4's abusers to ensure, particularly at nighttime, that staff have a valid medical purpose to enter patients' barracks and are not doing so with the intention of sexually abusing patients;

b. train staff to recognize and report sexual abuse when it is occurring and create an environment where patients both feel and are in fact safe to report they are experiencing sexual abuse;

c. educate patients as to what inappropriate behavior constitutes grooming and/or sexual abuse and inform patients of the practical means to report sexual exploitation and abuse both internally and externally;

d. ensure staff members who are engaging in such inappropriate and abusive behaviors will be terminated from employment promptly;

e. organize patients, staff, and the brick-and-mortar components of a facility in such a way as to prevent or at least minimize known or foreseeable risks of sexual exploitation and abuse;

f. require safety audits be conducted to ensure that patients are in fact not experiencing sexual exploitation or abuse at a given facility, particularly where unusual incident reports or other complaints document the issue may be occurring there; and

g. require facilities and their staff members to take seriously patient complaints of sexual abuse and meaningfully investigate those complaints.

506. At all relevant times, Defendants UHS, Inc. and UHS-D negligently failed to review internal and external complaints coming from Hartgrove Hospital and respond accordingly, resulting in the sexual exploitation and abuse of Jane Doe 4. Notwithstanding the dozens of police reports, unusual incident reports, and media coverage, UHS defended its policies and procedures and openly disbelieved patients who bravely reported their experiences.

507. At all relevant times, the key decision makers for Hartgrove Hospital were and are the same decision makers at UHS, Inc. and UHS-D. All major decisions for UHS healthcare facilities are controlled by UHS, Inc., together with and through its wholly owned subsidiary and

111

agent, UHS-D. Hartgrove Hospital's own CEO represents himself to the public as an employee of UHS, Inc.

508.    At all relevant times, UHS, Inc. records revenue from individual healthcare facility subsidiaries like Hartgrove Hospital on UHS, Inc.'s accounting books, and UHS, Inc. controls the submission of individual healthcare facility subsidiaries' patient medical records for billing to be reimbursed by state and federal Medicaid programs. All major financial and managerial decisions of Hartgrove Hospital and UHS's other healthcare facility subsidiaries were made through a centralized system controlled and operated by UHS, Inc., together with and through its wholly owned subsidiary and agent, UHS-D.

509.    Upon information and belief, employees of Hartgrove Hospital and other UHS healthcare facility subsidiaries were employees of UHS, Inc. or UHS-D who received paychecks and benefits directly from UHS, Inc. or UHS-D. On UHS, Inc.'s website, for example, it identifies UHS itself as employing over 96,700 individuals across the "UHS map" of hospitals, facilities, and health services.

510.    In another example, if an individual were interested in applying for a job at a subsidiary healthcare facility of UHS, Inc. it would apply for such a job directly on the UHS website: https://jobs.uhs.com/careers/. The underlying subsidiary healthcare facility does not have its own separate website portal for job applications, as illustrated below:

112



511.    At all relevant times, UHS, Inc. has held itself and its subsidiary healthcare facilities out to the public as a single company both through its public statements to the media, its filings with the state and federal government, its system of hiring and employing individuals, and its public website.

512.    For example, under the tab '***our facilities***' on the UHS, Inc. website (html link '***our communities***'), the subsidiary healthcare facilities are listed: https://uhs.com/our-communities/.The UHS, Inc. website continues to use "we" and "our" to describe the subsidiaries and their patients, as illustrated below:

> **Improving the lives of the people we serve in our hospitals and communities**
>
> The care you trust, not far from home. Our facilities are dedicated to supporting our communities and giving back. Discover how UHS serves your community.
>
> **400+** FACILITIES    **96,700** EMPLOYEES    **3.6M** PATIENTS PER YEAR

513. Treating UHS-Hartgrove, UHS Inc., and UHS-D as separate and distinct corporate entities would sanction a fraud or promote injustice. UHS, Inc. has engaged in a nationwide scheme of acquiring health care facilities and directly profiting from patient neglect and abuse. Allowing UHS, Inc. to be treated as a legally distinct entity sanctions their scheme where they profit from their subsidiary facilities' abuse and neglect but may never face liability for that abuse and neglect. Because UHS, Inc. can simply close any subsidiary healthcare facility where significant patient harm occurs—as it did with Rock River Academy in Rockford Illinois—UHS, Inc. would have the power to both enable child sexual abuse and ensure no plaintiff can obtain a judgment to compensate them for that sexual abuse.

514. At all relevant times, UHS, Inc. knew the precise conditions that would result in patient sexual exploitation and abuse occurring at its facilities as it received hundreds of reports to that effect from its facilities across the nation since at least 2005.

515. At all relevant times, UHS, Inc., together with and through its wholly owned subsidiary and agent, UHS-D, mandated an overall business and budgetary strategy at its subsidiary healthcare facilities like Hartgrove Hospital to maximize profits at the cost of patient safety:

114

FILED DATE: 11/12/2025 3:53 PM   2025L014133

a. Subsidiary employees were instructed by Defendant UHS, Inc., together with and through its wholly owned subsidiary and agent, UHS-D, to intake as many patients as possible while keeping payroll as low as possible, resulting in consistent understaffing;

b. Subsidiary employees were further specifically directed to prioritize the preparation and submission of medical records for billing to maximize payments from state and federal programs like Medicare and Medicaid;

c. Employees were specifically authorized to submit medical records that reflected patient treatment that did not actually occur; and

d. UHS, Inc.'s policy of handling patient complaints of sexual abuse was to disbelieve and discredit patients. UHS's subsidiaries like Hartgrove Hospital were specifically authorized to do the same: to not take patients seriously when they complained of abuse, and to do nothing to ensure sexual abuse is not in fact occurring to patients who report abuse.

516. As a direct and proximate result of the sexual exploitation and abuse she experienced at the hands of a Hartgrove Hospital employee and Defendants UHS-Hartgrove, UHS, Inc., and UHS-D's institutional negligence, Jane Doe 4 has suffered and will continue to suffer severe and serious personal injuries, including but not limited to severe psychological distress, emotional anguish, humiliation, embarrassment, loss of self-esteem, and other injuries and damages.

517. At all relevant times, UHS-Hartgrove shared elements of managerial staff with UHS, Inc. and UHS-D.

518. At all relevant times, UHS-Hartgrove and UHS, Inc., together with and through its wholly owned subsidiary and agent, UHS-D, had joint control and management of operations at Hartgrove Hospital.

519. At all relevant times, UHS-Hartgrove and UHS, Inc., together with and through its wholly owned subsidiary and agent, UHS-D, had joint control and management of their operations through common managers, and executives, including Hartgrove Hospital's President who also worked at UHS Corporate Headquarters in King of Prussia, Pennsylvania.

520. At all relevant times, UHS-Hartgrove, UHS, Inc., and UHS-D shared profits relating to its behavioral health facilities and services.

521. Because UHS-D, Hartgrove, UHS, Inc., and UHS-D are in a joint venture, these Defendants are liable to Plaintiff for the debts and liabilities of one another, including any and all judgments rendered against any of these entities as it relates to their joint behavioral healthcare facility Hartgrove Hospital.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against Defendants UHS OF HARTGROVE, INC., UNIVERSAL HEALTH SERVICES, INC., and UHS OF DELAWARE, INC., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of bringing this action, and for such other further relief this Court deems appropriate and just.

### COUNT 11: NEGLIGENCE – DIRECT PARTICIPANT LIABILITY
*Plaintiff v. Defendants UHS, Inc., and UHS-D*

522. Plaintiff incorporates all preceding paragraphs into this Count as if fully set forth herein.

523. At all relevant times, Defendant UHS, Inc. and UHS-D had the right to and did govern the conduct of Hartgrove Hospital, as it does all of its subsidiary health care facilities. This included but was not limited to UHS, Inc. and UHS-D establishing, implementing, monitoring, and enforcing the policies, procedures, and training that subsidiary facility employees and patients were to follow.

524. At all relevant times, Hartgrove Hospital and its agents or employees were following the direction or authorization of those UHS, Inc. and UHS-D policies, procedures, training, and directions when they knew or had reason to know that Jane Doe 4 was being sexually exploited, abused, and battered on the premises by a Hartgrove Hospital agent or employee but did

116

nothing to prevent or protect her from such sexual exploitation abuse or otherwise stop the sexual exploitation and abuse.

525. At all relevant times, Defendants UHS, Inc. and UHS-D, and their agents and employees, breached their duty to Jane Doe 4 when they negligently failed to implement or enforce policies that appropriately acknowledged the documented risk of patient sexual exploitation and abuse and took measures to prevent it from occurring at subsidiary health care facilities like Hartgrove Hospitals. This includes policies that:

a. require the reasonable monitoring of the whereabouts of staff like Jane Doe 4's abusers to ensure, particularly at nighttime, that staff have a valid medical purpose to enter patients' barracks and are not doing so with the intention of sexually abusing patients;

b. train staff to recognize and report sexual abuse when it is occurring and create an environment where patients both feel and are in fact safe to report they are experiencing sexual abuse;

c. educate patients as to what inappropriate behavior constitutes grooming and/or sexual abuse and inform patients of the practical means to report sexual abuse both internally and externally;

d. ensure staff members who are engaging in such inappropriate and abusive behaviors will be terminated from employment promptly;

e. organize patients, staff, and the brick-and-mortar components of a facility in such a way as to prevent or at least minimize known or foreseeable risks of sexual abuse;

f. require safety audits be conducted to ensure that patients are in fact not experiencing sexual abuse at a given facility, particularly where unusual incident reports or other complaints document the issue may be occurring there; and

g. require facilities and their staff members to take seriously patient complaints of sexual abuse and meaningfully investigate those complaints.

526. At all relevant times, Defendant UHS, Inc. and UHS-D negligently failed to review internal and external complaints coming from Hartgrove Hospital and respond accordingly, resulting in the foreseeable sexual abuse of Jane Doe 4. Notwithstanding the dozens of police

117

reports, unusual incident reports, and media coverage, UHS, Inc. defended its policies and procedures and openly disbelieved patients who bravely reported their experiences,

527. Defendants UHS, Inc. and UHS-D control UHS, Inc.'s healthcare facility subsidiaries and uses them to enhance its own profits. When child sexual exploitation and abuse reaches a level of severity at any given subsidiary that the public become aware of it through media coverage, UHS, Inc. may simply shut the facility down, evading accountability for the harm it has created, tolerated, and profited from.

528. At all relevant times, the key decision makers for Hartgrove Hospital are the same decision makers at UHS, Inc. and UHS-D. All major decisions for UHS healthcare facilities are controlled by UHS, Inc. and UHS-D. Hartgrove Hospital's own CEO represents himself to the public as an employee of UHS, Inc.

529. At all relevant times, UHS, Inc. and UHS-D record revenue from individual healthcare facility subsidiaries like Hartgrove Hospital on UHS, Inc. and UHS-D's accounting books, and UHS, Inc. controls the submission of individual healthcare facility subsidiaries' patient medical records for billing to be reimbursed by state and federal Medicaid programs. All major financial and managerial decisions of Hartgrove Hospital and UHS' other healthcare facility subsidiaries were made through a centralized system controlled and operated by UHS, Inc. and UHS-D.

530. At all relevant times, employees of Hartgrove Hospital and other UHS healthcare facility subsidiaries were employees of UHS, Inc. or UHS-D who received paychecks and benefits directly from UHS, Inc. or UHS-D.

531. On UHS' website, for example, it identifies UHS itself as employing over 96,700 individuals across the "UHS map" of hospitals, facilities, and health services. For example, if an

118

individual were interested in applying for a job at a subsidiary healthcare facility of UHS, it would apply for such a job directly on the UHS website: https://jobs.uhs.com/careers/. The underlying subsidiary healthcare facility does not have its own separate website portal for job applications:



532. At all relevant times, UHS has held itself and its subsidiary healthcare facilities out to the public as a single company both through its public statements to the media, its filings with the state and federal government, its system of hiring and employing individuals, and its public website. Under the tab '*our facilities*' on the UHS website (html link '*our communities*'), the subsidiary healthcare facilities are listed: https://uhs.com/our-communities/. The UHS website continues to use "we" and "our" to describe the subsidiaries and their patients.

119

FILED DATE: 11/12/2025 3:53 PM    2025L014133

> *Improving the lives of the people we serve in our hospitals and communities*
>
> The care you trust, not far from home. Our facilities are dedicated to supporting our communities and giving back. Discover how UHS serves your community.
>
> **400+** FACILITIES    **96,700** EMPLOYEES    **3.6M** PATIENTS PER YEAR

533. UHS, Inc. has engaged in a nationwide scheme of acquiring health care facilities and directly profiting from patient neglect and abuse. Allowing UHS, Inc. to be treated as a legally distinct entity sanctions their scheme where they profit from their subsidiary facilities' neglect but may never face liability for that neglect. Because UHS, Inc. can simply close any subsidiary healthcare facility where significant patient harm occurs—as it did with Rock River Academy—UHS, Inc. would have the power to both enable child sexual abuse and ensure no plaintiff can obtain a judgment to compensate them for that sexual abuse.

534. At all relevant times, UHS, Inc. and UHS-D directed and authorized the policies and procedures (or lack thereof) that created an environment where sexual exploitation and abuse was knowingly tolerated at its healthcare facility subsidiaries, including Hartgrove Hospital.

535. Sexual abuse is objectively a foreseeable outcome of being a patient at a UHS subsidiary health care facility. Plaintiff incorporates allegations ¶¶ 245(a)-(s) demonstrating the federal government's findings to that effect. UHS, Inc. knew the precise conditions that would result in patient sexual abuse occurring at its facilities as it received hundreds of reports to that effect from its facilities across the nation since at least 2005.

120

536.    UHS, Inc. and UHS-D mandated an overall business and budgetary strategy at its subsidiary healthcare facilities like Hartgrove Hospital to maximize profits at the cost of patient safety:

a.  Subsidiary employees were instructed by UHS, Inc. and UHS-D to intake as many patients as possible while keeping payroll as low as possible, resulting in consistent understaffing;

b.  Subsidiary employees were further specifically directed to prioritize the preparation and submission of medical records for billing to maximize payments from state and federal programs like Medicare and Medicaid;

c.  Employees were specifically authorized to submit medical records that reflected patient treatment that did not actually occur; and

d.  UHS, Inc.'s policy of handling patient complaints of sexual abuse was to disbelieve and discredit patients. UHS's subsidiaries like Hartgrove Hospital were specifically authorized to do the same: to not take patients seriously when they complained of abuse, and to do nothing to ensure sexual abuse is not in fact occurring to patients who report abuse.

537.    As a direct and proximate result of the sexual exploitation and abuse she experienced at the hands of a Hartgrove Hospital employee and Defendants UHS, Inc. and UHS-D's institutional negligence, Jane Doe 4 has suffered and will continue to suffer severe and serious personal injuries, including but not limited to severe psychological distress, emotional anguish, humiliation, embarrassment, loss of self-esteem, and other injuries and damages.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against Defendants UNIVERSAL HEALTH SERVICES, INC. and UHS OF DELAWARE, INC. for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of bringing this action, and for such other further relief this Court deems appropriate and just.

### COUNT 12: NEGLIGENT HIRING AND RETENTION
*Plaintiff v. Cooper Defendants*

538.    Plaintiff incorporates Paragraphs 1 through 352 as though fully set forth herein.

121

539. At all relevant times prior to its sale of Hartgrove Hospital, the Cooper Defendants accepted and treated minor patients at Hartgrove, including but not limited to those who suffered from emotional or behavioral disorders and problems, mental illnesses, depression, attention deficit disorder (ADD) / attention-deficit hyperactivity disorder (ADHD); those who had known or suspected preexisting traumas such as physical and sexual abuse; and those suffering from self-destructive behavior/suicidal ideation.

540. At all relevant times prior to its sale of Hartgrove Hospital, the Cooper Defendants owned and operated a residential treatment program at Hartgrove whereby minors such as Plaintiff resided at the facility for a period of time, without their parents or guardians, and for the purpose of undergoing inpatient 24-hour care.

541. At all relevant times prior to its sale of Hartgrove Hospital, the Cooper Defendants agreed to and did undertake to provide for the supervision, care, medical and physical safety of children and adolescents such as Plaintiff at and upon the premises of Hartgrove.

542. At all relevant times prior to its sale of Hartgrove Hospital, the Cooper Defendants knew or should have known that Plaintiff's abuser had a particular unfitness for the position he held at Hartgrove, which gave him unsupervised access to and oversight of vulnerable minor patients such as Plaintiff, based on his history of misconduct and incompetence.

543. At all relevant times prior to its sale of Hartgrove Hospital, the Cooper Defendants knew or should have known that Plaintiff's abuser posed a risk of harm to vulnerable minor patients such as Plaintiff and that he was otherwise unfit for the positions of trust and authority he held at Hartgrove.

544. At all relevant times prior to its sale of Hartgrove Hospital, the Cooper Defendants had a duty to adequately vet its staff members, employees, agents, and/or servants prior to hiring

122

them to work with the minor patient/residents residing or undergoing treatment at Hartgrove for mental or behavioral care and treatment.

545. At all relevant times prior to its sale of Hartgrove Hospital, the Cooper Defendants had a duty to act reasonably in hiring employees.

546. Notwithstanding these duties and policies, the Cooper Defendants failed to conduct a proper background check on Plaintiff's abuser prior to hiring him to ensure he did not have a history of disqualifying offenses, despite knowing that he would be working unsupervised with minor patient/residents at Hartgrove Hospital.

547. Notwithstanding its knowledge and these duties, the Cooper Defendants failed to ensure that its hiring standards, policies, and procedures adequately screened for sexual abusers prior to hiring them and providing them with unsupervised and unfettered access to minor patient/residents.

548. Notwithstanding its knowledge and these duties, the Cooper Defendants hired Plaintiff's abuser despite knowledge of the danger posed by him to minor Hartgrove patient/residents and failed to take any measures to protect and ensure the safety of minor patient/residents such as Plaintiff.

549. The Cooper Defendants also had a duty to act reasonably in retaining employees.

550. At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants were on notice that staff members had sexually assaulted patient/residents while those patients were being treated at Hartgrove.

551. At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants had a duty to investigate improper staff conduct and to keep patient/residents in a safe environment when on notice that their safety and wellbeing was threatened.

552.     At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants knew, or in the exercise of reasonable care should have known, that predatory staff members and patients presented a risk of danger to minor patients/residents such as Plaintiff at Hartgrove.

553.     At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants knew or in the exercise of reasonable care should have known, that Plaintiff's abuser had a particular unfitness for the position he held at the Hartgrove facility, which gave Plaintiff's abuser unsupervised and unfettered access to and oversight of vulnerable minor patient/residents, including Plaintiff, based on his history of misconduct and incompetence.

554.     Despite having notice of the dangers posed by Plaintiff's abuser, the Cooper Defendants retained his employment and failed to take remedial measures to protect and ensure the safety of patient/residents, including Plaintiff.

555.     By hiring and retaining Plaintiff's abuser, the Cooper Defendants created a risk of exposing hospital patients to potentially dangerous individuals and created the opportunity for Plaintiff's abuser to sexually, physically, and emotionally exploit and abuse Plaintiff.

556.     As a result of the Cooper Defendants' negligent hiring and retention of her abuser, Plaintiff's safety was entrusted to an individual who the Cooper Defendants knew or should have known with the exercise of reasonable care, was not fit or prepared to safely perform mental health services and/or to otherwise be responsible for supervising minor, vulnerable patients, such as Plaintiff, in rooms and locations alone (or as the only adult) on the premises.

557.     As a direct and proximate cause and result of the Cooper Defendants' wrongful acts and omissions, which includes the negligent hiring and retention of Plaintiff's abuser, Plaintiff was abused while residing at Hartgrove Hospital.

558.    As a direct and proximate cause of the Cooper Defendants' wrongful acts and omissions, and the resulting child sexual, physical and psychological exploitation and abuse, Plaintiff has suffered and continues to suffer serious injuries and damages, including but not limited to great pain of mind and body; shock; severe and permanent psychological and emotional distress; physical manifestations of aforesaid emotional and psychological distress; feelings of humiliation, disgrace, embarrassment, and loss of self-esteem; and loss of normal life; Further, she has sustained economic damages, including but not limited to past and future expenses for psychological treatment, therapy, and counseling, and loss of income and/or loss of earning capacity.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against Defendants THE COOPER COMPANIES, INC., HOSPITAL GROUP OF AMERICA, INC., HOSPITAL GROUP OF ILLINOIS, INC., HGA MANAGEMENT SERVICES, INC., PSG ACQUISITION INC., and PSG MANAGEMENT INC. for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of bringing this action, and for such other further relief this Court deems appropriate and just.

## COUNT 13: NEGLIGENT SUPERVISION
### *Plaintiff v. Cooper Defendants*

559.    Plaintiff incorporates Paragraphs 1 through 352 and 538 through 558 as if fully set forth herein.

560.    At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants accepted and treated minor patients at Hartgrove, including but not limited to those who suffered from emotional or behavioral disorders and problems, mental illnesses, depression, attention deficit disorder (ADD) / attention-deficit hyperactivity disorder (ADHD); those who had known

125

or suspected preexisting traumas such as physical and sexual abuse; and those suffering from self-destructive behavior/suicidal ideation.

561. At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants owned and operated a residential treatment program at Hartgrove whereby minors such as Plaintiff resided at the facility for a period of time, without their parents or guardians, and for the purpose of undergoing inpatient 24-hour care.

562. At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants agreed to and did undertake to provide for the supervision, care, and physical safety of children and adolescents at and upon the premises of Hartgrove.

563. At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants had a duty to ensure its patients / residents at Hartgrove were safe while residing and/or undergoing treatment at the facility.

564. At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants had a duty to adequately vet, control and supervise their employees and agents for the protection of patients/residents at Hartgrove, including a duty to vet, control and supervise Plaintiff's abuser.

565. At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants knew, or in the exercise of reasonable care should have known, that predatory staff members and certain residents/patients presented a risk of danger to minor residents/patients such as Plaintiff.

566. At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants had a duty to investigate improper conduct of staff and to keep their residents in a safe environment, when on notice that their safety was threatened.

567. At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants had a policy to require any employee who suspects or receives has knowledge that a resident was

126

or may have been sexually harassed or abused to immediately report such knowledge information to the appropriate supervisory officials and authorities.

568.    At all relevant times prior to the sale of Hartgrove Hospital, pursuant to the Illinois Abused and Neglected Child Reporting Act, the Cooper Defendants and their employees and agents had a legal duty to immediately notify and report to the Illinois Department of Family and Child Services (DCFS) all instances where they suspect or receive knowledge that a patient was or may be have been sexually, physically, or psychologically harassed, abused, and/or groomed.

569.    At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants had a policy to require any employee who suspects or receives knowledge that a resident may be sexually harassed or abused, or was being groomed, to immediately report such knowledge or concerns to the appropriate officials.

570.    At all relevant times prior to the sale of Hartgrove Hospital, pursuant to the Illinois Abused and Neglected Child Reporting Act, the Cooper Defendants and their employees and agents had a legal duty to immediately notify and report to law enforcement and the Illinois Department of Family and Child Services (DCFS) all instances where they suspect or receive knowledge that a patient may be sexually or psychologically harassed, abused, and/or groomed.

571.    At all times relevant herein, the Cooper Defendants hired and employed Plaintiff's abuser.

572.    At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants knew or should have known that Plaintiff's abuser had a particular unfitness for the position he held at Hartgrove, which gave him unsupervised access to and oversight of vulnerable minor patients such as Plaintiff, based on his history of misconduct and incompetence.

127

573. At all relevant times prior to the sale of Hartgrove Hospital, the Cooper Defendants knew or should have known that Plaintiff's abuser posed a risk of harm to vulnerable minor patients such as Plaintiff and were otherwise unfit for the positions of trust and authority he held at Hartgrove.

574. At all relevant times, the Cooper Defendants, by and through their agents, employees, and/or servants, failed to adequately supervise Plaintiff's abuser, as well as predatory patients, by committing one or more of the following acts and/or omissions:

    a. Failed to properly monitor and supervise its employees and agents, including Plaintiff's abuser;

    b. Failed to properly monitor and supervise the time its employees and agents, such as Plaintiff's abuser, spent with residents;

    c. Failed to properly monitor and supervise potentially dangerous residents / patients, who the Cooper Defendants knew or should have known posed a risk of harm to other residents such as Plaintiff;

    d. Failed to promptly and accurately report known or suspected child abuse at its facilities to proper authorities (if reported at all), including but not limited to medical authorities or local law enforcement, and Illinois DCFS, as required by Illinois law;

    e. Failed to follow the facility's policies and procedures on reporting known or suspected abuse of patients / residents;

    f. Failed to enforce the facility's policies and procedures on reporting known or suspected abuse of patients / residents;

    g. Continued to retain Plaintiff's abuser despite their history of misconduct and abuse of residents;

    h. Failed to report Plaintiff's abuser to proper authorities, such as law enforcement and Illinois DCFS, for known or suspected abuse and/or grooming of minor patients including but not limited to Plaintiff;

    i. Failed to properly investigate Plaintiff's abuser;

    j. Failed to treat, investigate or question Staff Perpetrators as suspects, including failure to conduct witness interviews;

    k. Failed to terminate Staff Perpetrators;

128

l. Failed to reprimand, discipline, and terminate staff that failed to report, or failed to promptly and accurately report, known or suspected abuse of minors to the proper officials and authorities;

m. Covered up, minimized, and/or ignored allegations of patient abuse;

n. Permitted staff members to supervise other staff where a conflict of interest existed and it was foreseeable that the supervisor would be unable to adequately and independently supervise said staff members, including but not limited to the subject Staff Perpetrators during the relevant time period; and/or

o. Was otherwise negligent in regards to supervision of predatory staff and residents and in ensuring the safety of vulnerable minor residents such as Plaintiff.

575. As a direct and proximate cause and result of the Cooper Defendants' wrongful acts and omissions, which includes the Cooper Defendants' negligent supervision, Plaintiff was sexually exploited and abused while residing at Hartgrove Hospital.

576. As a direct and proximate cause of the Cooper Defendants' wrongful acts and omissions, and the resulting child sexual, physical and psychological exploitation abuse, Plaintiff has suffered and continues to suffer serious injuries and damages, including but not limited to great pain of mind and body; shock; severe and permanent psychological and emotional distress; physical manifestations of aforesaid emotional and psychological distress; feelings of humiliation, disgrace, embarrassment, and loss of self-esteem; and loss of normal life; Further, she has sustained economic damages, including but not limited to past and future expenses for psychological treatment, therapy, and counseling, and loss of income and/or loss of earning capacity.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against Defendants THE COOPER COMPANIES, INC., HOSPITAL GROUP OF AMERICA, INC., HOSPITAL GROUP OF ILLINOIS, INC., HGA MANAGEMENT SERVICES, INC., PSG ACQUISITION INC., and PSG MANAGEMENT INC. for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of bringing this action, and for such other further relief this Court deems appropriate and just.

129

## COUNT 14: NEGLIGENCE
### *Plaintiff v. Cooper Defendants*

577. Plaintiff incorporates Paragraphs 1 through 352 and 538 through 576 as if fully set forth herein.

578. While Plaintiff's abuser was employed at Hartgrove Hospital, the Cooper Defendants acquired knowledge that Plaintiff's abuser was sexually abusing, harassing, and preying upon vulnerable minor patients.

579. As a matter of practice and custom, the Cooper Defendants were not adequately recording these incidents, complaints, and concerning behavior in Plaintiff's abuser's personnel file or employment record.

580. The Cooper Defendants failed to adequately investigate complaints against Plaintiff's abuser.

581. The Cooper Defendants failed to report Plaintiff's abuser to civil authorities and/or Illinois DCFS.

582. The Cooper Defendants failed to warn Defendants UHS of Hartgrove, UHS, Inc., and UHS-D of Plaintiff's abuser's history of sexual abuse, predatory behavior, and other red flags.

583. The Cooper Defendants misrepresented and misstated Plaintiff's abuser's history to Defendants UHS of Hartgrove, UHS, Inc. and UHS-D.

584. The Cooper Defendants took affirmative steps and actions to conceal Plaintiff's abuser's history of abuse, predatory behavior, and other red flags toward vulnerable minor patients.

585. The Cooper Defendants allowed Plaintiff's abuser to be passed as an employee to UHS of Hartgrove, UHS, Inc. and UHS-D knowing that he would continue to have access to vulnerable minor patients and that there was a strong likelihood that he would continue to sexually abuse and prey upon vulnerable minor patients, such as Plaintiff.

130

586.    At all relevant times, the Cooper Defendants owed a duty of ordinary care to all others, including Plaintiff, to guard against reasonably foreseeable injuries resulting from its conduct.

587.    At all relevant times, the Cooper Defendants owed a duty to provide accurate information about Plaintiff's abuser to other employers seeking information about his past employment and fitness to supervise vulnerable minor patients.

588.    At all relevant times, the Cooper Defendants breached their duty of reasonable care by committing one or more of the following acts and/or omissions:

   a.   failed to adequately investigate complaints against Plaintiff's abuser;

   b.   failed to report Plaintiff's abuser's conduct to civil authorities and Illinois DCFS;

   c.   failed to warn UHS of Hartgrove, UHS, Inc., and UHS-D of Plaintiff's abuser's history of sexual abuse, predatory behavior, and other red flags; and

   d.   misrepresented and misstated Plaintiff's abuser's employment history to UHS of Hartgrove, UHS, Inc., and UHS-D.

589.    As a direct and proximate cause and result of the Cooper Defendants' wrongful acts and omissions, which includes the negligent hiring and retention of Plaintiff's abuser, Plaintiff was sexually exploited and abused while residing at Hartgrove Hospital.

590.    As a direct and proximate cause of the Cooper Defendants' wrongful acts and omissions, and the resulting child sexual, physical and psychological exploitation and abuse, Plaintiff has suffered and continues to suffer serious injuries and damages, including but not limited to great pain of mind and body; shock; severe and permanent psychological and emotional distress; physical manifestations of aforesaid emotional and psychological distress; feelings of humiliation, disgrace, embarrassment, and loss of self-esteem; and loss of normal life; Further, she has sustained economic damages, including but not limited to past and future expenses for

131

psychological treatment, therapy, and counseling, and loss of income and/or loss of earning capacity.

591. At all relevant times, the Cooper Defendants fraudulently concealed their knowledge of Plaintiff's abuser's history of abuse and predatory behavior.

WHEREFORE, the Plaintiff asks Court to enter judgment in her favor and against Defendants THE COOPER COMPANIES, INC., HOSPITAL GROUP OF AMERICA, INC., HOSPITAL GROUP OF ILLINOIS, INC., HGA MANAGEMENT SERVICES, INC., PSG ACQUISITION INC., and PSG MANAGEMENT INC. for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs, with interest, of bringing this action, and for such other further relief this Court deems appropriate and just.

## DAMAGES AND BILL OF PARTICULARS

592. Plaintiff realleges and incorporates by reference each and every previous allegation above as if fully stated in this Count.

593. Plaintiff claims such damages as may be proven at trial, to include, but not necessarily be limited to the following:

a. Past, present, and future disability and loss of a normal life;

b. Past, present, and future, medical expenses, where applicable;

c. Past, present, and future emotional distress;

d. Past, present, and future pain and suffering;

e. Past, present, and future lost wages and lost wage-earning capacity;

f. Pre- and post-judgment interest; and

g. All other damages permitted by law.

594. Plaintiff claims and demands judgment in excess of the jurisdictional minimum of this Court.

132

FILED DATE: 11/12/2025 3:53 PM    2025L014133

WHEREFORE, premises considered, Plaintiff requests judgment against All Defendants in keeping with the foregoing and such other additional relief to which Plaintiff may be entitled under law and which the Court deems just, fair, and appropriate under the circumstances.

Date: November 11, 2025

Respectfully Submitted,

**STINAR GOULD GRIECO & HENSLEY, PLLC**

/s/ *Martin D. Gould*
One of Plaintiff's Attorneys

Martin D. Gould
Bryce T. Hensley
Michael R. Grieco
Steven L. Vanderporten
**Stinar Gould Grieco & Hensley, PLLC**
101 N. Wacker Drive | Floor M | Suite 100
Chicago, Illinois 60606
Firm ID: 101363
P: (312) 728-7444
Martin@SGGHLaw.com
Bryce@SGGHLaw.com
Mike@SGGHLaw.com
Steven@SGGHLaw.com

*Counsel for Plaintiff*

133

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT LAW DIVISION**

| | |
|---|---|
| JANE DOE 4, )<br><br>Plaintiff, )<br><br>v. )<br><br>UHS OF HARTGROVE, INC., doing )<br>business as Hartgrove Behavioral Health )<br>System and Hartgrove Hospital, )<br>an Illinois corporation; )<br>UNIVERSAL HEALTH SERVICES, INC.; )<br>UHS OF DELAWARE, INC.; THE )<br>COOPER COMPANIES, INC.; HOSPITAL )<br>GROUP OF AMERICA, INC., HOSPITAL )<br>GROUP OF ILLINOIS, INC.; )<br>HGA MANAGEMENT SERVICES, INC.; )<br>PSG ACQUISITION, INC.; AND PSG )<br>MANAGEMENT, INC., )<br><br>Defendants. )<br>_____ ) | Case No.: |

## JURY DEMAND

The undersigned demands a jury trial.

Date: November 11, 2025

Respectfully Submitted,

**STINAR GOULD GRIECO & HENSLEY, PLLC**

/s/ *Martin D. Gould*
One of Plaintiff's Attorneys

Martin D. Gould
Bryce T. Hensley
Michael R. Grieco
Steven L. Vanderporten
**Stinar Gould Grieco & Hensley, PLLC**
101 N. Wacker Drive | Floor M | Suite 100

134

FILED DATE: 11/12/2025 3:53 PM 2025L014133

135

Chicago, Illinois 60606
Firm ID: 101363
P: (312) 728-7444
Martin@SGGHLaw.com
Bryce@SGGHLaw.com
Mike@SGGHLaw.com
Steven@SGGHLaw.com

FILED
11/12/2025 3:53 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L014133
Calendar, B
35333131

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT LAW DIVISION

| | |
|---|---|
| JANE DOE 4, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UHS OF HARTGROVE, INC., doing | ) |
| business as Hartgrove Behavioral Health | ) |
| System and Hartgrove Hospital, | ) |
| an Illinois corporation; | ) |
| UNIVERSAL HEALTH SERVICES, | ) |
| INC.; UHS OF DELAWARE, INC.; THE | ) |
| COOPER COMPANIES, INC; PSG | ) |
| ACQUISITION, INC.; PSG | ) |
| MANAGEMENT, INC.; HOSPITAL | ) |
| GROUP OF AMERICA, INC.; HOSPITAL | ) |
| GROUP OF ILLINOIS, INC.; and HGA | ) |
| MANAGEMENT SERVICES, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ORDER

This matter coming to be heard on Plaintiff's Petition to Proceed Under a Fictitious Name, the Court being fully advised finds as follows:

Pursuant to *In re Marriage of Johnson*, 232 Ill. App. 3d 1068 (4th Dist. 1992), the Court has balanced Plaintiff's right to privacy against the public's right of access to open court proceedings. Plaintiff contends there is a compelling interest because she alleges that she was sexually exploited, groomed, and abused by Defendants' employee as a minor patient and the matter is highly personal, private, and sensitive to Plaintiff.

The Court finds there is a compelling interest that favors Plaintiff's right to privacy in keeping her name from the public and such right is superior to the public's right of access to an open proceeding. *See Doe v. Doe*, 282 Ill. App. 3d 1078, 1088 (1st Dist. 1996).

The Court further finds that the privacy issue involved shall be protected in the least restrictive way possible. The Court finds that the least restrictive way to protect the privacy of the Plaintiff is by proceeding under a fictitious name of Jane Doe 4.

This order may be reconsidered if Plaintiff takes any steps to make Plaintiff's name known to the public and shall be reconsidered by the trial judge at the time of jury selection.

Order Prepared by:

Steven L. Vanderporten (ARDC: 6314184)
**Stinar Gould Grieco & Hensley, PLLC**
101 N. Wacker Drive | Floor M | Suite 100
Chicago, Illinois 60606
Firm ID: 101363
P: (312) 728-7444
steven@SGGHLaw.com

_____
**The Honorable Judge**

ENTERED
Judge Toya Harvey-2192

NOV 12 2025

MARIYANA T. SPYROPOULOS
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL